FILED
DEC 19 2005
U.S. COURT OF FEDERAL CLAIMS

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

MARC J. MILLICAN
2540 Curlew Circle
Anchorage AK 99502-1653

Plaintiff,

v.

THE UNITED STATES

Defendant,

Civil Action 05-1330C

No.__________

COMPLAINT

This is a claim to set aside the August 4, 2004, decision of Air Force Board for Correction of Military Records (AFBCMR), No. BC–2003-02505, that denied Millican's pay and records corrections requests to void his April 2002 removal from the FY 2000 Lieutenant Colonel Air Force Reserve Promotion List, his involuntary transfer in April 2003 to the Retired Reserve as a Major (vice LTC), and removal of related derogatory records.

JURISDICTION

Jurisdiction is conferred under 28 U.S.C. § 1491(a), and entitlement to reserve retired pay under 10 U.S.C. § 12731(a).

PARTIES

Plaintiff, Marc J. Millican is a Major in the United States Air Force Retired Reserve.

Defendant, the United States.

FACTS

1. Major Millican in January 1999 was a C-5 pilot with the 312th Airlift Squadron based in Travis AFB, California. Major Millican's full-time civilian profession was an airline pilot.

2. In late 1998 the Department of Defense initiated announced a service-wide Anthrax Vaccination Immunization Program (AVIP). In February 1999 as part of the Air Force's AVIP the

Commander of the 312th, LTC Padilla, sent a memorandum to all squadron members and families. LTC Padilla acknowledged the rising public controversy surrounding the adverse physiological side-affects of the vaccination. LTC Padilla stated that

> our medical people say the Anthrax shot is no more harmful than any other shots you have received in your military career. . . .with virtually no known long-term side effects [emphasis added].

LTC Padilla Memorandum, February 12, 1999, ¶ 9 ["AFBCMR AFBCMR Ex. A"]. However, to assist members in the unit to make an informed decision whether to accept the vaccination, LTC Padilla "encouraged" all unit members to look at information available on the Internet "both positive and negative." LTC Padilla ended his memo stating that members should "think about it a lot." AFBCMR AFBCMR Ex. A ¶ 10.

3. In the unit's May 1999 monthly newsletter, LTC Padilla reaffirmed his previous February 1999 memo by applauding members for trying to become "experts" on the AVIP. He told all members:

> Please think hard, read the briefing [by the 349th Contingency Hospital], talk to people you know and trust and make your choice. If you choose not to get the shot, please come and talk to me . . . .in the end we will respect your decision.

312th Monthly Newsletter, May 1999, at 2 ["AFBCMR AFBCMR Ex. B"][emphasis added].[1]

4. Instead of 'respecting' members' decisions, LTC Padilla concurrently issued a punitive policy to end the careers of members refusing the AVIP. Refusal to comply would result in a "no pay, no points, no participation" Reserve status, with immediate involuntary reassignment to the Standby Reserve.[2] Members were told that the new "stop-loss" authority in 1999, that otherwise barred involuntary separations or retirements for pilots, did not apply to those refusing the AVIP. AFBCMR AFBCMR Ex. B (May and June newsletters).

---

[1] The 312th policy was more generous than one ARNG unit permitting only a list of questions to be submitted by concerned pilots. AFBCMR AFBCMR Ex. A-2 (*Army Times* editorial, 4 NOV 02).

[2] Participation was be denied for the paid monthly drills, called Unit Training Assembly [UTA].

5. Because of the "level of members" concern and number of "unanswered questions," the 312th temporarily suspended anthrax immunization series in May 1999. This "cool-off" period lasted for 60 days. Anthrax News Flash, May 7, 1999, from 349th Hospital, Travis AFB, [AFBCMR Exhibit C]. This was prompted because many unit members within the 312th were considering refusal of the shots.

6. In June 1999, Major Millican's personnel files were submitted for promotion consideration to LTC. The 349th Wing commander, Colonel Black, issued Major Millican a Promotion Recommendation Form (PRF) with the highest rating "DEFINITELY PROMOTE." PRF [AFBCMR AFBCMR Ex. D].

7. Major Millican was selected for promotion to LTC by the FY 2000 Air Force Reserve Line Promotion Selection Board, the board convening in July 1999. Effective date of his promotion was 22 June 2000.

8. During the 312th "cool-off" period suspending the anthrax immunizations, Major Millican contacted the U.S. House Subcommittee on National Security to provide both testimony and solicit information concerning upcoming congressional hearings on the anthrax program. In July, 1999, Major Millican attended a variety of Congressional hearings in Washington D.C., on the anthrax program. For Major Millican's participation in the hearing, he later received a letter of thanks in August 1999 from Rep. Shays, Subcommittee Chairman. Representative Shays stated that congressional investigation determined "no studies have been conducted on the long-term health effects of the vaccine." AFBCMR Ex. E. This was plainly at odds with LTC Padilla's February 1999 memo where he induced members to accept the vaccine stating "our medical people say the Anthrax shot [has] virtually no known long-term side effects." AFBCMR Exhibit A ¶ 9.

9. As a result of the Congressional hearings in the Summer of 1999, President Clinton on 30 September 1999 issued Executive Order 13139, providing military members with the right to "informed consent" before administering an investigational drug. The President, after findings by

the Secretary of Defense, may waive this right if "absolutely necessary." AFBCMR Ex. E (executive order).

10. The congressional subcommittee in the Summer of 1999 issued a lengthy report with findings and recommendations. One finding was that the AVIP, as administrated by DoD for inhalation anthrax without FDA license amendment, was an "investigational or experimental drug" under FDA regulations. In a subsequent letter to the Secretary of Defense, the congressional subcommittee asked DoD to "take immediate action to suspend the AVIP." AFBCMR Ex. E at 10 (May 16, 2000).

11. The 312th "cool-off" period of suspended anthrax immunizations resumed at the end of July 1999. Major Millican returned to his duties at the 312th from the Congressional hearings in Washington D.C.. Major Millican then acted consistent with LTC Padilla's memo to use a website to update his fellow pilots at the 312th with an informational posting of "both positive and negative" information about the AVIP.

12. Major Millican posted to an Anthrax website frequented by service members, the current information he had obtained from his Washington D.C. visits, including summaries of subcommittee letters and reports, testimony, and the executive order. The internet site was the privately maintained 312th Pilot website that offered an open-forum postings, a chat room, and related links.

13. On the 312th Pilot "website" the Major Millican, for example, summarized the July 1999 congressional testimony of Dover AFB pilots who had become sick, such as pilot Captain Michelle Piel who testified she had acquired auto-immune disease and grounded. This contradicted LTC Padilla's rumor-report to the 312th earlier in June that Capt. Piel from Dover AFB "was fine and back on flying status." Major Millican also posted reports that some officers and airmen had alleged retaliation for their 1999 testimony on the AVIP. AFBCMR Ex. F (Air Force Times article 17 Jan 2000, "Lawmaker seeks probe of possible retaliation."). Pilots from other units found misrepresentations by DoD. AFBCMR Ex. A-2 (DoD retracted claim that veterinarians routinely

used AVIP; manufacturer lost FDA validation; AVIP investigated as particular cause for Gulf War Illness; adverse reaction rate of 35% or 175 times the DoD published rate).

14. At no time did Major Millican provide any in-person nor e-mail attempts with false information to intimidate, coach, no order any unit members into refusing the vaccination. Nor did Major Millican threaten LTC Padilla in any way with respect to the AVIP. There is also no corroborating record that LTC Padilla ever reported to the OSI, or any other authority, that Major Millican made threats.

15. Major Millican elected not to accept the AVIP, believing in good faith that he had just cause to believe the AVIP was an investigational or experimental drug within the meaning of Executive Order 13139, and therefore required his "voluntary" informed consent. Major Millican's honest belief was supported by the Congressional hearings he had just attended, the subsequent Congressional AVIP Report in 1999 that recommended DoD immediately cease vaccinations as "investigational," and the lack of DoD waiver finding under Executive Order 13129 to otherwise compel his vaccination.

16. LTC Padilla sent a letter to Major Millican that if he did not start the AVIP, he was "no longer eligible to perform UTAs" and accordingly would transferred to the inactive Standby Reserve. AFBCMR Ex. G (26 JUL 99 letter from LTC Padilla to Major Millican).

17. Major Millican however, was placed in a predicament: he had over 19 good reserve years, but less than 20 for retirement purposes, and therefore risked forfeiting his substantial investment towards military retirement. Major Millican also had invested nearly 18 years towards retirement as a civilian airline pilot. Maintaining Major Millican's flight status as a civilian airline pilot required absolutely no medical problems or he faced medical grounding and even termination. Major Millican feared more the threat of permanent or even temporary adverse reaction to the AVIP that would jeopardize his livelihood, than a temporary transfer to the USAF Standby Reserve.

18. Major Millican's commander on 15 November 1999 gave Major Millican the expected notice of his involuntary transfer to the Standby Reserve. AFBCMR Ex H. The actual request was then forwarded on 19 December 1999. The purported regulatory basis for the transfer

was "unsatisfactory Reserve participation" in UTAs. However, LTC Padilla had already determined that members refusing AVIP were ineligible to satisfactorily participate in any UTA. The request to transfer dated 19 DEC 1999 added that "derogatory data," was NONE, "record of disciplinary actions" NONE. AFBCMR Ex. G (request at ¶2f, h).

19. Despite LTC Padilla's request informing ARPC on 19 December 1999 that there no evidence of derogatory data or disciplinary actions against Major Millican, Padilla dubiously issued on the same day a UIF filed Letter or Reprimand to Major Millican for causing "discontent and disloyalty" with the AVIP. AFBCMR Ex. I. LTC Padilla's policy over the past months was to invite members to openly discuss the AVIP program and research the issue with senior officials "you trust." Major Millican on 16 December had also just answered several questions about the AVIP posed by a news reporter from a local newspaper, where Major Millican stated "he was not taking the AVIP." [3]

20. Padilla's "open-debate" policy obviously backfired and members began refusing AVIP. Padilla then began a punitive campaign to chill any further education on the AVIP and those having a role in the Congressional hearings and disseminating official findings. Major Millican's internet postings openly exposed Padilla's prior statements to the unit on the purported safety of the AVIP as false. LTC Padilla exaggerated efforts taken by Major Millican to educate his fellow pilots, with concocted "seditious" allegations in the LOR AFBCMR Ex. I at ¶ 1 ("intent to raise discontent and disloyalty"). Ex. F (*Air Force Times,* "Lawmaker seeks probe of possible retaliation," noting 14 Air Force members testified, with committee staff member stating "there are things that have happened to other witnesses that cause us concern.").

21. Nowhere in the LOR does Padilla accuse Millican of forwarding to fellow pilots untruths about the AVIP, such as to misleading information about recent Congressional findings. The LOR allegations of encouraging defiance of "official Air Force policy" on the AVIP is no different that the recent Congressional letter to DoD to "take immediate action" to halt an illegal

---

[3] Major Millican answered questions after telephone inquiry by the Fairfield Daily Republic Reporter (local Travis AFB), with answers appearing in the paper on 17 December 1999. Padilla did not mention this in the LOR or later OPR.

vaccination program using an "investigational or experimental drug". On the heels of Millican's involvement in the Congressional probe, the Padilla LOR had a chilling effect on a military member's right to unrestricted communications with Congress. 10 U.S.C. § 1034(a).

22. Major Millican, as a public employee, has the right to speak without fear of retaliation on any matters of political, social or other public concern even if it may disrupt military operations. One court has determined this applies to Air Force members in flying duties who express health concerns over the anthrax vaccine as an experimental program and the potential wrongdoing of military officials who administer it. Ssgt Adkins v. Rumsfeld, Sec'y of Defense, 389 F.Supp. 2d 579, 586 (D.Del. 2005)(airman adequately alleged violation of protected free speech when reprimanded as reprisal after expressing legitimate health concerns of the vaccine, thus outweighing military's interest that speaking out decreased unit readiness and disrupted high-priority flying missions).[4]

23. When reassignment to the Standby Reserve was unsuccessful, LTC Padilla in March 2000 issued a command-directed Referred OPR for the period JUL 98- FEB 00. AFBCMR Ex. K. The accusations were essentially the same as contained in the LOR. Conspicuous was the acknowledgment in the OPR that only "undocumented" verbal performance feedback was given. Moreover, the adverse OPR contradicts Padilla's 19 DEC 99 request to transfer Major Millican to the Standby Reserve that had declared "no derogatory data or disciplinary actions" have been taken against Major Millican.

24. Major Millican replied to both the LOR and OPR by inviting LTC Padilla and OPR rater LTC Brunz, to produce any corroboration, e-mails, or witnesses to support their contentions. Major Millican also alleged that Padilla exaggerated and distorted his efforts to educate fellow unit members about the AVIP. Major Millican also pressed Padilla about his LOR allegation that in 2 September 1999 phone call Major Millican allegedly made a threat to Padilla. Major Millican denied this had occurred because Padilla's phone call was to congratulate Major

[4] Adkins at 582 cited in support, Doe v. Rumsfeld, 341 F.Supp.2d 1, 19 (D.D.C.2004)(permanent injunction against the anthrax vaccine, absent informed consent, on the basis it was either an investigational new drug or unapproved for its intended use).

Millican for making LTC, with Major Millican's pleasant acceptance. Major Millican then later played golf with Padilla in a Travis AFB tournament. Moreover, Padilla's own request to transfer Major Millican to the Standby Reserve curiously stated that no derogatory data or disciplinary actions had occurred through 19 December 1999, other than failure to attend UTA. More suspicious is that Major Millican lives in Alaska, spent little time at the 312th home base in California, while never participating in the unit after July 1999. Finally, there is no record of any report by Padilla's of any personal threats nor seditious acts to the Air Force's criminal investigative agency, OSI. Certainly such dangerous, multiple criminal allegations occurring for the past 6 months would have prompted some prior report somewhere other than suddenly in a coincidental December transfer request to the Standby Reserve.

25. When Major Millican sent this reply to the LOR and OPR, LTC Padilla conveniently, but predictably, invoked the rebuttal time limit to refuse consideration of Major Millican's contentions. Padilla's glaring lack of any evidentiary support or corroboration to his criminal allegations in the LOR or OPR offends Article 107 as false official statements. The promotion list removal and kicking to the Retired Reserve offends Article 93, as maltreatment of a subordinate.

26. LTC Padilla trumped up this LOR to coincide with his second attempted transfer request to make it stick— to ensure the Air Reserve Personnel Center (ARPC) would act and get rid of Millican and *override* the pilot-wide "stop loss" policy. AFBCMR Ex. J (1 JUN 99 ARPC notice implementing stop-loss).

27. Padilla cannot encourage his unit members to use the Internet to look at information available, both positive and negative, and talk to people "you know and trust" to make your choice—and then complain later that members in positions of trust responded to this very invitation.

28. Major Millican did nothing more than honestly and in good faith at that time, express his First Amendment right within the very limit condoned by his commander. Padilla had earlier expressed "the government interest" in promoting free and candid discussion of the controversial AVIP. But the public relations disaster from Congressional outrage had suddenly

elevated Major Millican as *the* star witness of dissent within the 312th, making him the inevitable magnet of contagion. This gave the 312th unwanted notoriety within the Air Force as an unruly hotbed for dissent. It spotlighted Padilla has a poor commander by encouraging free inquiry, with one of its senior leaders publicly testifying against the Air Force at the very seat of Washington policy. In an appalling face and career-saving abuse of command influence, Padilla converted Millican into a pariah by fabricating his private mutiny with a public hanging.

29. Major Millican categorical dispute of the criminal allegations was unanswered. However for the sake of argument, even the acts alleged by Padilla do not support any actionable offenses when they had public purpose to protect the safety of fellow service-members. AFBCMR Ex. I (LOR alleged speaking with unnamed members to refuse vaccine, and alleged phone call with Padilla saying that the commander does not care about member's best interests). Moreover, the AVIP was subsequently found illegal as an investigational or experimental drug imposed without informed consent or presidential waiver.[5] United States v. Wysong, 26 C.M.R. 29 (CMA 1958)(no contact order to discuss case with persons was unconstitutional as overly broad); O'Brien v. United States, 391 U.S. 367, 369-72 (1968)(military's regulation of free speech justified only where it is unrelated to suppression of free expression); Brown v. Glines, 100 S.Ct., 594, n. 15 (1980)(service members right to First Amendment freedom of association may not be curtailed when commander action is irrational, invidious, or arbitrary).

30. In response to filing the LOR and Referred OPR, Major Millican's additional rater, BG Black, Commander , 349th Air Mobility Wing, wrote a letter to Major Millican dated 13 March 2000 giving notice that he was recommending removal of Major Millican from the FY 2000 LTC promotion list. The letter stated Major Millican's promotion was automatically delayed until the SECAF made a final decision. AFBCMR Exhibit L. According to BG Black, the subsequent

[5] Doe v. Rumsfeld, 341 F.Supp.2d 1 (D.D.C. 2004)("rendering illegal" and enjoining military's anthrax vaccine program); prior proceeding, 297 F.Supp. 2d 119, 134 (December 22, 2003, preliminary order enjoining AVIP as arbitrary "violating fundamental principle of drug law" without FDA's approval through Final Order adjudicatory process).

orders dated 12 MAY 2000 that promoted Major Millican to LTC, had no effect. AFBCMR Ex. M (12 MAY 00 promotion orders); AFBCMR Ex. M-1 (25 MAY 00 letter of congratulations to Major Millican from HQ USAF/RE, MG Sherrard, Chief, Air Reserve).

31. President Bush on 17 April 2002 removed Major Millican's name from the FY 00 LTC promotion list. AFBCMR Ex. N. Removal from the list occurred 22 months after Major Millican would have promoted on 22 JUN 2000. This is beyond the six-month initial Secretarial delay period without extension, imposed under the promotion delay statute, 10 U.S.C. § 14311(d). This is also beyond the 18-month absolute outer limit or deadline for delaying promotions. Id.

32. There is no record that the SECAF, nor any other official, extended Major Millican's promotion delay after the six month period. The law does not permit the military to allow any subordinate official, here BG Black, to impose an indefinite delay of a promotion. The Air Force's indefinite promotion delay by BG Black of Major Millican's LTC promotion beyond the 18-months deadline, is legally untenable.

33. Because of the LOR, OPR, and punitive transfer to the non-participating reserve, Major Millican was twice non-selected for promotion on October 2002. The removal from the FY 2000 promotion list counted as his first non-selection.

34. Major Millican was transferred to the Retired Reserve on April 1, 2003.

35. In July 2003, Major Millican appealed to the AFBCMR for relief.

36. In addition to the above allegations of error, Major Millican cited before the AFBCMR the preliminary injunction in Doe, 297 F.Supp. 2d 119. The preliminary injunction order stated that "plaintiffs enjoy a substantial likelihood of success on the merits" that the vaccine is an investigational drug because the FDA has failed to provide the predicate "formal opinion as to [vaccine's] investigational status." Opinion at 28. The court concluded with a stern warning:

> Absent an informed consent or presidential waiver, the United States cannot demand that members of the armed forces also serve as guinea pigs for experimental drugs.

Id 33. On December 27, the after the FDA had issued a Final Order declaring the vaccine safe. On January 7, 2004, the Doe court lifted the injunction except to the names plaintiff's. Further proceedings were ordered.

37. In August 2004 the AFBCMR denied Millican's request relief. The AFBCMR's decision offered absolutely no analysis why it chose to rely exclusively on the military staff advisory opinion. It incredibly invoked language generic applicable to any case:

> Insufficient relevant evidence has been presented to demonstrate the existence of probable error or injustice. . . We do not find the applicant's assertions and the documentation presented. . . sufficiently persuasive to override the rationale provided by the Air Force [advisory opinions]. . . . we adopt their rationale as the basis for our decision.

AFBCMR Decision 7 ¶ 3.

38. The AFBCMR's cursory and boilerplate conclusion exposes an appalling abdication of the agencies' independent adjudicatory mandate to be "an honest broker" between the applicant and military staffs. Here, the AFBCMR became a rubber stamp — "an extension of the military staff" condemned by Congress in 1995, and thus the Board "lost its sole reasons for existence." [6]

39. On October 27, 2004, the Doe court issued a permanent injunction "rendering illegal" and enjoining the DoD anthrax vaccine program for every service-member. The court found the FDA's Final Order violated basic procedures of notice and public comment, and ordered a remand for reconsideration. Id at 1 ("Unless and until the FDA classifies the [vaccine] as a safe and effective drug for it intended use, an injunction shall remain in effect prohibiting defendant's use of

---

[6] S. Rep. No. 104-112, 104th Cong., 1st Sess. 246 (1995), National Defense Authorization Act for FY 1996, § 554, *Review of System for Correction of Military Records* (adopting committee provision for DoD to review procedures and provide a report, "the committee is concerned about the perception that among service members that the boards have become lethargic and unresponsive, and abdicated their independence to the uniformed service staffs"). DoD in its 1996 report to Congress created a "Working Group" to study practices and recomm

end reform. DoD Report 21. Two reforms were enacted on timeliness and *ex parte* communications. 10 U.S.C. §§ 1556-57 (1998). The Working Group was disbanded. See also Citizens to Protect Overton Park v. Volpe, 401 U.S. 402 (1972)(unable to determine if Secretary exercised independent adjudicatory without providing reasons for adopting local highway administrator's judgment opinions over petitioner's); Mudd v. Caldera, 26 F.Supp.2d 113, n. 8 (D.D.C. 1998)(Army Secretary must independently consider record and may not rely exclusively on recommendations of uniformed staffs); Crager v. United States, 25 Cl.Ct. 400, 409 (1992)(where Secretary overruled BCMR's recommendation for relief, there is no evidence the adopted JAG opinion was the "predominant voice in the decision-making process").

the [vaccine].”). The DoD’s appeal on December 23, 2004, remains pending. Rumsfeld v. Doe, No. 04-5440 (D.C.Cir.). The current status as of September 2005, are appellant-Rumsfeld’s reply brief to *amicus curiae* briefs in support of affirmance and appellees Doe by the State of Connecticut Attorney General.

40. Regardless of appellate outcome, the Doe court’s one finding of fact is indisputable: in 1999 there was no Final FDA Order authorizing the military to enforce the AVIP—against Millican or the 312th— that classified the vaccine as “safe and effective drug for its intended use.” With the FDA’s sudden Final Order in December 2003 instead of immediate appeal, DoD admits a lawful drug approval process was improperly bypassed.

41. On April 6, 2005, the district court in Doe modified its injunction to resume the AVIP as an alternative to a FDA Final Order. It permitted resumption under either President Clinton’s 1999 EO, or in the future event the Secretary of Defense issued a declaration under the Emergency Use Act, 21 U.S.C. § 360bbb-3 [EUA]. Although the EUA was not invoked, the modified injunction permitted voluntary vaccination by members after “informed consent”.

42. Along with the FDA Final Order in 2003, this vindicated Major Millican’s refusal to follow the immoral and unlawful vaccination orders. It also raises a defense to any invented allegations against him of fomenting disloyalty within the unit after refusing the vaccine. Major Millican’s admitted constitutionally-protected activity, including any activities later contrived by LTC Padilla as disloyal, were a substantial or motivating factor in the retaliatory actions of the reprimand, the referred OPR, and removal from the promotion.

43. Air Force officials were angered and displeased by the media scrutiny over the vaccine. They sought to do whatever they could to squelch the story, stifling all speech related to its health concerns. These actions including engaging in a cover-up to punish Millican under the disciplinary guise of fomenting discord and potentially affecting unit readiness, then revoking his promotion. In fact, the Doe plaintiffs withheld their names under real fears of reprisal for simply exercising a lawful right to challenge the vaccine in court. If societies generally had more military leaders in the

field with the fortitude and courage of Major Millican to expose immoral and unlawful orders from being carried out— at the risk of summary discipline— there would be no escalation into wanton criminal acts. There would be no Abu Garib prisoner abuse, no Vietnam era "Mi Lai massacre" of civilians, and perhaps no Nuremburg trials of Nazi war criminals.

44. Plaintiff now seeks judicial review of the AFBCMR's decision that denied his claims.

## CAUSE OF ACTION

The decision of the Air Force Board for Correction of Military Corrections denying relief was arbitrary and capricious, an abuse of discretion, and contrary to law.

## PRAYER FOR RELIEF

That this Honorable Court declare the decision of the AFBCMR denying relief was arbitrary and capricious, an abuse of discretion, and contrary to law.

That Defendant be ordered to set aside Major Millican's removal from the FY 2000 Air Force Reserve Line Promotion Selection List on April 17, 2002, and set aside his second deferral of promotion on October 2, 2002, and be promoted by operation of law to Lieutenant Colonel.

That the Defendant be ordered to constructively reinstate plaintiff from July 1999 into participating reserve status in the Air Force Reserve with constructive service credit points towards retirement.

That Defendant be ordered correct Major Millican's transfer to the Retired Reserve on April 1, 2003, in the rank of Major to reflect retirement in the rank of Lieutenant Colonel with an increase of retired pay and other benefits at that rank.

That Defendant be ordered to set aside Major Millican's Officer Performance Report (July 1998 to February 2000), and his Letter of Reprimand dated December 19, 1999.

That Defendant be ordered to expunge from plaintiff's official military personnel files all adverse documents to include, but not limited to, the adverse OPR, unsatisfactory UTA performance, LOR, promotion propriety actions, and involuntary retirement.

That this action be remanded to the AFBCMR for any further proceedings consistent with the Court's decision, and to determine whether to award plaintiff back drill pay for missed UTAs and other annual training after refusing the AVIP vaccine series.

Any and all additional relief as deemed appropriate by this Honorable Court, including attorney fees.

December 8, 2005

Respectfully submitted,

John A. Wickham, Esq.
32975 Saint Moritz Drive
Evergreen CO 80439-6720
(303) 670-3825
Fax x670-1586
wickham1@wispertel.net
Admitted to Court of Federal Claims