# United States [illegible] of America

## DEPART[illegible]OF THE AIR FORCE

Andrews AFB, Maryland, February 10, 2006

I HEREBY CERTIFY th[illegible]fficial custodian of all Air Force records and material on file in the office of the [illegible]oard for Correction of Military Records, and that the papers attached hereto are [illegible]ies of Air Force records and material contained in said files relative to the case [illegible]. MILLICAN, 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, AFBCMR Docket Number BC-2003-02505.

MACK M. BURTON
Executive Director
Air Force Board for Correction
of Military Records

I HEREBY [illegible]IF[illegible]t MACK M. BURTON, who signed the foregoing certificate, is the Executive Di[illegible] of [illegible]r Force Board for Correction of Military Records and OFFICIAL CUSTODIA[illegible] tha[illegible]s certification as such, full faith and credit are and ought to be given.

IN TESTIMONY WHEREOF, I, Michael W. Wynne, Secretary of the Air Force, have hereunto caused the seal of the Department of the Air Force to be affixed and my name to be subscribed by the Administrative Assistant to the Secretary of the Department, at the city of Arlington, State of Virginia.

this 13th day of March, 2006.

MICHAEL W. WYNNE
*Secretary of the Air Force.*

By ______________________
*Administrative Assistant.*

# Table of Contents


| Page No. | Content |
|---|---|
| *i* | AF Form 44, dtd 10 Feb 06 |
| *ii* | Table of Contents |
| 1 | AFBCMR Memo, dtd 4 Aug 04 |
| 2 | Record of Proceedings, dtd 4 Aug 04 |
| 10 | Exhibit A, DD Form 149, dtd 21 Jul 03, w/atchs |
| 63 | Exhibit B, Master Personnel Records - withheld |
| 64 | Exhibit C, ARPC/DPB Ltr, dtd 5 Sep 03, w/atchs |
| 92 | Exhibit D, SAF/MRBR Ltr, dtd 26 Sep 03 |
| 93 | Exhibit E, Counsel's Ltr, dtd 17 Nov 03 |
| 95 | Exhibit F, Counsel's Ltr, dtd 22 Dec 03, w/atch |
| 130 | Exhibit G, HQ USAF/JAA Ltr, dtd 14 Jan 04 |
| 136 | Exhibit H, AFBCMR Ltr, dtd 20 Jan 04 |
| 137 | Exhibit I, Counsel's Ltr, dtd 17 Feb 04, w/atchs |
| 176 | Exhibit J, Counsel's Ltr, dtd 23 Mar 04, w/atch |
| 188 | Exhibit K, HQ USAF/JAA Ltr, dtd 15 May 04 |
| 192 | Exhibit L, AFBCMR Ltr, dtd 21 May 04 |
| 193 | Exhibit M, Counsel's Ltr, dtd 11 Jun 04 |

AIR FORCE BOARD FOR CORRECTION OF MILITARY RECORDS
1535 COMMAND DRIVE, EE WING THIRD FLOOR
ANDREWS AFB MD 20762-2002

4 Aug 2004

MILLICAN, MARC
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 USAFR Maj
BC-2003-02505 BCMR CASE#01

Case was:

a. ____________Granted

b. _____X_____Denied

c. __________Admin Closed

________________Congressional interest is indicated in this case; therefore, a copy of the letter to the applicant regarding the decision of the Board is being forwarded to the Director of Legislative Liaison with a request that a copy of their final correspondence, with the interested parties, be furnished to this office:
Congressional Interest: ________________________________.

Enclosure(s):

_____X____ Master Personnel Records

__________ Selection folder

__________ Micro Fiche

__________ VA Records

__________ Medical Records

DeLainna Williams
DELAINNA WILLIAMS
Administrative Assistant, AFBCMR
Air Force Review Boards Agency

1

AUG - 4 2004

RECORD OF PROCEEDINGS
AIR FORCE BOARD FOR CORRECTION OF MILITARY RECORDS

IN THE MATTER OF: DOCKET NUMBER: BC-2003-02505

MARC J. MILLICAN COUNSEL: JOHN A. WICKHAM

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 HEARING DESIRED: YES

---

APPLICANT REQUESTS THAT:

His Officer Performance Report (OPR) rendered for the period 14 Jul 98 through 29 Feb 00 be voided and removed from his records.

The Letter of Reprimand (LOR) dated 19 Dec 99 be voided and removed from his records.

The Propriety of Promotion Action initiated on 13 Mar 00 and related documents be set aside.

The removal of his name from the Fiscal Year 2000 (FY00) Air Force Reserve Line Promotion Selection List on 17 Apr 02 be set aside.

His second deferral of promotion be set aside.

His transfer to the Retired Reserve on 1 Apr 03, which was his mandatory separation date (MSD), be set aside.

His promotion to the Reserve grade of lieutenant colonel retroactive to 30 Jun 00 be reinstated, with constructive service credit in participating status through 30 Jun 03 and back pay and allowances for missed unit training assemblies (UTAs).

He be retired in the Reserve grade of lieutenant colonel effective 1 Jul 03.

His appeal be processed under the provisions of 10 USC 1034, Whistleblower Protection Act.

---

APPLICANT CONTENDS THAT:

He acted in good faith in refusing to take part in the anthrax program because he believed there was sufficient evidence showing the drug was investigational or experimental and, therefore, required his voluntary and informed consent in order to undergo the immunization regimen.

The LOR and OPR were unlawful reprisals after he had exposed falsehoods made concerning the anthrax vaccine (AVIP), in violation of 10 USC 1034.

The removal of his name from the FY00 promotion list was an unlawful promotion delay.

In support of his appeal, the applicant provided a counsel's brief, copies of the LOR, OPR, Propriety of Promotion Action, and other documents associated with the matter under review.

Applicant's complete submission, with attachments, is at Exhibit A.

---

STATEMENT OF FACTS:

Applicant's OPR profile since 1993 follows:

| PERIOD ENDING | EVALUATION |
|---|---|
| 13 Jul 93 | Meets Standards (Non-EAD) |
| 13 Jul 94 | Meets Standards (Non-EAD) |
| 13 Jul 95 | Meets Standards (Non-EAD) |
| 13 Jul 96 | Meets Standards (Non-EAD) |
| 13 Jul 97 | Meets Standards (Non-EAD) |
| 13 Jul 98 | Meets Standards (Non-EAD) |
| * 29 Feb 00 | Does Not Meet Standards (Non-EAD) |

* Contested Report.

Applicant was selected for promotion to the grade of lieutenant colonel by the Fiscal Year 2000 (FY00) Reserve of the Air Force Lieutenant Colonel Board, effective and with a date of rank (DOR) of 22 Jun 00.

On 19 Dec 99, the applicant received an LOR for engaging in acts of nature to cause discontent and undermine military discipline within his squadron. Specifically, after the members of the squadron were notified of the requirements to undergo the anthrax immunization series, he sought out and spoke to members of his squadron advocating they refuse to undergo the anthrax protocol. Further, he actively encouraged other pilots to persuade additional members of his peer group to defy official Air Force policy and refuse to undergo the anthrax immunization series.

On 13 Mar 00, the 349th AMW commander recommended the applicant's name be removed from the FY00 Lieutenant Colonel Promotion List. The basis for the recommendation was the applicant's efforts to purposefully undermine the credibility of the squadron leadership and his attempt to disrupt the orderly operation of the unit and wing by encouraging others to disregard the commander's directives.

On 7 Jan 02, the Deputy Secretary of Defense recommended the applicant's name be removed from the FY00 Lieutenant Colonel Promotion List, indicating the applicant had refused to undergo an anthrax immunization and had advised members of the squadron to refuse their anthrax inoculations. He further indicated the Secretary of Air Force stated he had serious reservations about the applicant's future potential to serve in the higher grade, and that the Secretary recommended the applicant's name be removed from the promotion list. The President of the United States approved the removal recommendation on 17 Apr 02.

On 2 Oct 02, the applicant was notified that he was not recommended for promotion to the grade of lieutenant colonel by a Reserve of the Air Force Selection Board, which was his second deferral.

Applicant was relieved of his Reserve assignment and assigned to the Retired Reserve awaiting pay at age 60, effective 1 Apr 03.

---

<u>AIR FORCE EVALUATION</u>:

ARPC/DPB recommended denial indicating the basic premise of evaluation reports is that they are accurate and objective and the applicant has not provided evidence the contested report was inaccurate; he has not presented any evidence to establish the LOR was incorrect or unjust; he has not provided information to contradict the underlying premise for the propriety of promotion action; the Presidential removal of the applicant was statutorily and administratively proper; there was no credible reason to set aside the second deferral for the applicant's promotion to the grade of lieutenant colonel; the applicant's automatic transfer to the Retired Reserve on his MSD was appropriate; and, his nonparticipation in UTAs was not the foundation for the propriety of promotion action and subsequent removal of his name from the promotion list by the President. The nonparticipation resulted from his refusal to accept the anthrax immunizations.

A complete copy of the ARPC/DPB evaluation is at Exhibit C.

---

APPLICANT'S REVIEW OF AIR FORCE EVALUATION:

Counsel provided a response indicating the advisory opinion simply parroted various language within Air Force Instructions offering little to address the applicant's specific allegations against the LOR, referral OPR, or to explain why his evidence should be dismissed as not credible. With respect to the promotion delay statute, the advisory opinion is not a legal opinion, nor offers analysis of the Rolader case, nor why its regulatory spin on the law makes no sense.

Counsel's complete response is at Exhibit E.

By letter, dated 22 Dec 03, counsel provided a response and additional documentary evidence for the Board's consideration which included documentation pertaining to a preliminary injunction that ordered the Department of Defense to stop inoculating service-members with the anthrax vaccine.

Counsel's complete response, with attachments, is at Exhibit F.

---

ADDITIONAL AIR FORCE EVALUATION:

HQ USAF/JAA recommended denial noting the applicant's contention he acted in good faith in refusing to take part in the anthrax program because he believed there was sufficient evidence showing the drug was investigational or experimental and, therefore, required his voluntary and informed consent in order to undergo the immunization regimen. They also noted his complaints concerning this matter and indicated they were unfounded. All of the administrative consequences that occurred were as a direct result of the applicant's actions and decisions. Throughout the process, the commander acted in accordance with established Department of Defense (DoD) guidelines and within the bounds of his discretion as a commander. The commander was responsible for ensuring that all military personnel under his command received the immunizations. He did not have the authority to allow members to voluntarily refuse to get the shots because they disagreed with the program.

HQ USAF/JAA indicated the commander notified the applicant on several occasions that his refusal to begin taking the vaccine would render him ineligible to perform UTAs and would result in his being administratively sent to the Standby Reserves.

HQ USAF/JAA stated in this case, the commander reproached the applicant not for refusing the anthrax shot, but for inciting disloyalty and mistrust within the squadron. While the applicant was entitled to his own viewpoint concerning the efficacy of AVIP, he was not at liberty to actively persuade other squadron members to refuse to participate. Likewise, the resulting

referral OPR was a direct reflection of the applicant's failure to meet required standards in leadership, professional qualities, judgment, and decisions. In HQ USAF/JAA's view, the applicant has provided no evidence showing the referral OPR was inaccurate. The OPR accurately reflected the applicant's negative impact on mission readiness, good order, and discipline.

According to HQ USAF/JAA, the wing commander's decision to recommend the applicant's removal from the lieutenant colonel promotion list was justified and neither arbitrary or capricious. As with the LOR and OPR, the promotion propriety action was based on the applicant's attempt to cause dissension within the squadron. His actions were inconsistent with the standard of conduct and professionalism required for a lieutenant colonel. The standard for removing an officer's name from the promotion list is very broad. The governing Air Force Instruction (AFI 36-2504) instructs commanders to initiate a propriety of promotion action when there is cause to believe the officer is not mentally, physically, morally, or professionally qualified to perform the duties of the higher grade. There was certainly sufficient evidence to substantiate the wing commander's recommendation. Every member of the applicant's chain of command, to include the Secretary of the Air Force and Deputy Secretary of Defense concurred in the removal action. Ultimately, the President made an independent determination the applicant's conduct made him unfit for the higher grade. There was no evidence indicating the applicant was singled out due to his personal views on the anthrax program.

HQ USAF/JAA noted the applicant's assertion he is entitled to be retroactively promoted because the President did not sign the removal action within 18 months from the time he was notified of the commander's initiation of the propriety action. They also noted his reliance on Rolader v. United States to support his argument. HQ USAF/JAA indicated because the applicant's promotion was processed as a removal rather than a delay, the 18-month deadline discussed in 10 USC 14311 did not apply and the Rolader decision is not dispositive.

HQ USAF/JAA stated there was no grounds for the Board to set aside the applicant's second nonselection for promotion. His promotion record was considered by a properly convened selection board that determined the applicant was not qualified for promotion.

With respect to the applicant's request to set aside his automatic transfer to the Retired Reserve on 1 Apr 03, HQ USAF/JAA noted such an action was statutorily mandatory upon his second nonselection for promotion and is not a basis for relief.

HQ USAF/JAA indicated the applicant's argument he was the victim of reprisal for testifying before Congress is baseless. The various disciplinary and administrative actions that were taken

were as a direct result of the applicant's conduct and his impact to mission readiness and good order and discipline.

HQ USAF/JAA noted the documentation provided from a recent Federal District Court decision (Doe v. Rumsfeld) wherein the judge issued a preliminary injunction against inoculating service members without their informed consent until such time the Food and Drug Administration (FDA) made a written declaration concerning the effectiveness of the vaccine against inhalation anthrax. The applicant now argues that in granting the injunction, the judge accepted the plaintiff's assertion the anthrax vaccine is an investigational drug and the commander's order for all squadron members to receive the vaccine was illegal. According to HQ USAF/JAA, the argument is invalid, as the same judge has now lifted the injunction after the FDA made a written determination the anthrax vaccine is safe and effective against all forms of anthrax.

In HQ USAF/JAA's view, the applicant has failed to demonstrate the existence of any error or present facts and circumstances supporting an injustice. The applicant bears the responsibility of the consequences of his actions.

A complete copy of the HQ USAF/JAA evaluation is at Exhibit G.

---

APPLICANT'S REVIEW OF ADDITIONAL AIR FORCE EVALUATION:

Counsel reviewed the HQ USAF/JAA evaluation and furnished a detailed response and additional documentary evidence which are attached at Exhibit I.

By letter, dated 23 Mar 04, counsel provided additional documentation for the Board's consideration, which included a recent published Federal Court case issued which counsel believes is relevant to the applicant's argument that the disciplinary actions taken against him were in retaliation for expressing his First Amendment free speech rights against the anthrax vaccine.

Counsel's complete response, with attachment, is at Exhibit J.

---

ADDITIONAL AIR FORCE EVALUATION:

HQ USAF/JAA reviewed the applicant's responses and additional documentary evidence and recommended denial. HQ USAF/JAA indicated, in summary, that what the applicant refuses to acknowledge or accept is that the removal action was not done simply because he refused to take the anthrax shot. The administration actions that were taken, to include the LOR, referral OPR, and promotion removal action resulted directly from

the applicant's attempts to dissuade other members of the squadron from participating in the AVIP, undermining the authority of his commander, and his repeated efforts to cause dissension within the unit. That, in and of itself, was sufficient to warrant each of the administrative actions that were taken. Regardless of his personal views on the anthrax program, the applicant had absolutely no right, constitutional or otherwise, to make statements disloyal to his commander and to commit misconduct that was detrimental to the unit's mission. Such behavior is incompatible with that expected of an Air Force officer and warranted his promotion removal. In USAF/JAA's view, the applicant has failed to carry his burden of proving the existence of an error or injustice.

A complete copy of the HQ USAF/JAA evaluation is at Exhibit K.

---

APPLICANT'S REVIEW OF ADDITIONAL AIR FORCE EVALUATION:

Counsel reviewed the HQ USAF/JAA evaluation and furnished another detailed response which is attached at Exhibit M.

---

THE BOARD CONCLUDES THAT:

1. The applicant has exhausted all remedies provided by existing law or regulations.

2. The application was timely filed.

3. Insufficient relevant evidence has been presented to demonstrate the existence of error or injustice. The applicant's complete submission was thoroughly reviewed and his contentions were duly noted. However, we do not find the applicant's assertions and the documentation presented in support of his appeal sufficiently persuasive to override the rationale provided by the Air Force offices of primary responsibility (OPRs). In our view, the issues raised by the applicant were more than adequately addressed by the OPRs. Therefore, in the absence of sufficient evidence to the contrary, we agree with the recommendation of OPRs and adopt their rationale as the basis for our decision that the applicant has failed to sustain his burden of establishing that he has suffered either an error or an injustice. Accordingly, we find no compelling basis to recommend granting the relief sought in this application.

4. The applicant's request his appeal be processed under the provisions of 10 USC 1034, Whistleblower Protection Act, was noted. However, no evidence has been presented which would lead us to believe that the applicant filed a complaint alleging reprisal with the Department of Defense (DoD) Inspector General,



8

or that he did so within the specified time limit. Accordingly, his appeal was processed under the provisions of 10 USC 1552.

5. The applicant's case is adequately documented and it has not been shown that a personal appearance with or without counsel will materially add to our understanding of the issues involved. Therefore, the request for a hearing is not favorably considered.

---

THE BOARD DETERMINES THAT:

The applicant be notified that the evidence presented did not demonstrate the existence of material error or injustice; that the application was denied without a personal appearance; and that the application will only be reconsidered upon the submission of newly discovered relevant evidence not considered with this application.

---

The following members of the Board considered AFBCMR Docket Number BC-2003-02505 in Executive Session on 14 Jul 04, under the provisions of AFI 36-2603:

Ms. Olga M. Crerar, Panel Chair
Mr. Michael J. Novel, Member
Mr. Robert S. Boyd, Member

The following documentary evidence was considered:

Exhibit A. DD Form 149, dated 21 Jul 03, w/atchs.
Exhibit B. Applicant's Master Personnel Records.
Exhibit C. Letter, ARPC/DPB, dated 5 Sep 03, w/atchs.
Exhibit D. Letter, SAF/MRBR, dated 26 Sep 03.
Exhibit E. Letter, counsel, dated 17 Nov 03.
Exhibit F. Letter, counsel, dated 22 Dec 03, w/atch.
Exhibit G. Letter, HQ USAF/JAA, dated 14 Jan 04.
Exhibit H. Letter, AFBCMR, dated 20 Jan 04.
Exhibit I. Letter, counsel, dated 17 Feb 04, w/atchs.
Exhibit J. Letter, counsel, dated 23 Mar 04, w/atch.
Exhibit K. Letter, HQ USAF/JAA, dated 15 May 04.
Exhibit L. Letter, AFBCMR, dated 21 May 04.
Exhibit M. Letter, counsel, dated 11 Jun 04.

Olga M. Crerar

OLGA M. CRERAR
Panel Chair



9

AUG-02-2004 12:39 SPECIAL PROGRAMS 703 695 8405 P.01

28 JUL 2003

PB

# APPLICATION FOR CORRECTION OF MILITARY RECORD UNDER THE PROVISIONS OF TITLE 10, U.S. CODE, SECTION 1552

*(Please read instructions on reverse side BEFORE completing application.)*

*Form Approved OMB No. 0704-0003 Expires Sep 30, 2003*

SCANNED

The public reporting burden for this collection of information is estimated to average 30 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing the burden, to Department of Defense, Washington Headquarters Services, Directorate for Information Operations and Reports (0704-0003), 1215 Jefferson Davis Highway, Suite 1204, Arlington, VA 22202-4302. Respondents should be aware that notwithstanding any other provision of law, no person shall be subject to any penalty for failing to comply with a collection of information if it does not display a currently valid OMB control number.
PLEASE DO NOT RETURN YOUR COMPLETED FORM TO THE ABOVE ADDRESS. RETURN COMPLETED FORM TO THE APPROPRIATE ADDRESS ON THE BACK OF THIS PAGE.

## PRIVACY ACT STATEMENT

AUTHORITY: Title 10 US Code 1552, EO 9397.

PRINCIPAL PURPOSE: To initiate an application for correction of military record. The form is used by Board members for review of pertinent information in making a determination of relief through correction of a military record.

ROUTINE USE(S): None.

DISCLOSURE: Voluntary; however, failure to provide identifying information may impede processing of this application. The request for Social Security number is strictly to assure proper identification of the individual and appropriate records.

## 1. APPLICANT DATA

a. BRANCH OF SERVICE *(X one)*: [ ] ARMY [ ] NAVY [X] AIR FORCE [ ] MARINE CORPS [ ] COAST GUARD

b. NAME *(Last, First, Middle Initial) (Please print)*: MILLICAN, MARC J.

c. PRESENT PAY GRADE: 0-4

d. SERVICE NUMBER *(If applicable)*:

e. SSN: 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

2. TYPE OF DISCHARGE *(If by court-martial, state type of court)*: HONORABLE

3. PRESENT STATUS, IF ANY, WITH RESPECT TO THE ARMED SERVICES *(Active duty, Retired, Reserve, etc.)*: RETIRED

4. DATE OF DISCHARGE OR RELEASE FROM ACTIVE DUTY *(YYYYMMDD)*: 1 APRIL 2003

5. ORGANIZATION AT TIME OF ALLEGED ERROR IN RECORD: 312TH AIRLIFT SQUADRON, TRAVIS AFB, CALIFORNIA

6. I DESIRE TO APPEAR BEFORE THE BOARD IN WASHINGTON, D.C. *(No expense to the Government) (X one)*: [X] YES [ ] NO

7. COUNSEL *(If any)*

a. NAME *(Last, First, Middle Initial)*: WICKHAM, JOHN A.

b. ADDRESS *(Street, Apartment Number, City, State and ZIP Code)*:
32975 SAINT MORITZ DRIVE
EVERGREEN COLORADO 80439-6720
(303) 670-3825

8. I REQUEST THE FOLLOWING CORRECTION OF ERROR OR INJUSTICE:

SEE ATTACHED SUPPLEMENTAL STATEMENT

9. I BELIEVE THE RECORD TO BE IN ERROR OR UNJUST IN THE FOLLOWING PARTICULARS:

SEE ATTACHED SUPPLEMENMTAL STATEMENT

10. IN SUPPORT OF THIS APPLICATION I SUBMIT AS EVIDENCE THE FOLLOWING: *(If Veterans Administration records are pertinent to your case, give Regional Office location and Claim Number.)*

SEE ATTACHED SUPPLEMENTAL STATEMENT (LEGAL BRIEF) AND EXHIBITS A-O

11. ALLEGED ERROR OR INJUSTICE

a. DATE OF DISCOVERY *(YYYYMMDD)*: 17 APRIL 2002

b. IF MORE THAN THREE YEARS SINCE THE ALLEGED ERROR OR INJUSTICE WAS DISCOVERED, STATE WHY THE BOARD SHOULD FIND IT IN THE INTEREST OF JUSTICE TO CONSIDER THIS APPLICATION.

12. APPLICANT MUST SIGN IN ITEM 16. IF THE RECORD IN QUESTION IS THAT OF A DECEASED OR INCOMPETENT PERSON, LEGAL PROOF OF DEATH OR INCOMPETENCY MUST ACCOMPANY APPLICATION. IF APPLICATION IS SIGNED BY OTHER THAN APPLICANT, INDICATE RELATIONSHIP OR STATUS BY MARKING APPROPRIATE BOX.

[ ] SPOUSE [ ] WIDOW [ ] WIDOWER [ ] NEXT OF KIN [ ] LEGAL REPRESENTATIVE [ ] OTHER *(Specify)*

13. I MAKE THE FOREGOING STATEMENTS, AS PART OF MY CLAIM, WITH FULL KNOWLEDGE OF THE PENALTIES INVOLVED FOR WILLFULLY MAKING A FALSE STATEMENT OR CLAIM. *(U.S. Code, Title 18, Sec. 287, 1001, provides that an individual shall be fined under this title or imprisoned not more than 5 years, or both.)*

14.a. COMPLETE CURRENT ADDRESS, INCLUDING ZIP CODE *(Applicant should forward notification of all changes of address.)*: 2540 CURLEW CIRCLE ANCHORAGE AK, 99502-1653

b. TELEPHONE NUMBER *(Include Area Code)*: (907) 248-6875

DOCUMENT NUMBER *(Do not write in this space.)*: 0302505 10

15. DATE SIGNED *(YYYYMMDD)*: 21 JULY 2003

16. SIGNATURE *(Applicant must sign here.)*: Marc J. Millican

DD FORM 149, SEP 2000 PREVIOUS EDITION IS OBSOLETE.

SUPPLEMENTAL STATEMENT

OF

MARC J. MILLICAN
Major, USAFR (Ret.)
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

Item 8: Requested Correction of Error or Injustice

1. Marc Millican, hereinafter "applicant," by and through his undersigned attorney, hereby requests that the AFBCMR,

(A) set aside his Officer Performance Report, period 14 JUL 1998 to 29 FEB 2000;

(B) set aside his Letter of Reprimand darted 19 DEC 1999;

(C) set aside the propriety of promotion action initiated 13 MAR 2000 and related documents;

(D) set aside applicant's removal from the FY 2000 Air Force Reserve Line Promotion Selection List on 17 APR 2002;

(E) set aside applicant's second deferral of promotion 2 OCT 2002;

(F) set aside applicant's automatic transfer to the Retired Reserve on 1 April 2003, his mandatory separation date (MSD);

(G) reinstate applicant's promotion to LTC (USAFR) retroactive to 30 June 2000, by operation of law under 10 U.S.C. § 14311(d), with constructive service credit in active participating status through 30 June 2003; with back pay and allowances for missed UTAs.

(E) retire applicant as a LTC (USAFR), effective 31 JUN 2003.

*Note:* because applicant on 1 APR 2003 was involuntarily transferred to the Retired Reserve, he may appeal directly to the AFBCMR without exhausting his administrative remedies before the ERAB, pursuant to AFI 36-2401, Table 1, Rule 3.



11

Items 9 and 10: Factual Support/Errors and Injustice

1. Applicant in January 1999 was a C-5 pilot with the 312th Airlift Squadron (AMC) based in Travis AFB, California. Applicant's full-time civilian profession was a airline pilot.

2. In February 1999, as part of the Air Force's Anthrax Vaccination Immunization Program (AVIP), the 312th Commander, LTC Padilla sent an official memorandum to all squadron members and families.[1] LTC Padilla acknowledged the public controversy surrounding the adverse affects of the vaccination. LTC Padilla then stated that

> our medical people say the Anthrax shot is no more harmful than any other shots you have received in your military career. . . .*with virtually no known long-term side effects* [emphasis added]. Exhibit A ¶ 9.

However, to assist members in the unit to make an informed decision whether to accept the vaccination, LTC Padilla "encouraged" all to look at information available on the Internet "both positive and negative." Ex. A. ¶ 6. LTC Padilla ended his memo stating that members should "think about it a lot." Ex. A ¶ 10.

3. In the May 1999 monthly newsletter of 312th Airlift Squadron, LTC Padilla reaffirmed his previous February 1999 memo by applauding members for trying to become "experts" on the Anthrax vaccination program. He told all members to

> Please think hard, read the briefing [by the 349th Contingency Hospital], talk to people you know and trust and make your choice. If you choose not to get the shot, please come and talk to me . . . .in the end we will respect your decision. Ex. B, page 2.[2]

This was a purported offer of a "voluntary" excusal from the anthrax series based upon informed consent. However, LTC Padilla issued a concurrent policy that prevented members from participation in UTAs unless they complied with the anthrax series. Refusal to comply would result in a "no pay, no points, no participation" status, with involuntary reassignment to the

---

[1] In May 1998, the Department of Defense initiated the AVIP program.

[2] Th3 312th policy was more generous than one ARNG unit permitting only a list of questions to be submitted by concerned pilots. Ex. A-2 (*Army Times* editorial, 4 NOV 02).

Standby Reserve. Members were told that the new "stop-loss" authority invoked in June 1999 did not apply. Ex. B (May and June newsletters).

5. Because of the "level of members' concern and number of unanswered questions," the 312th temporarily suspended the anthrax immunization series in May 1999. This "cool-off" period lasted for 60 days. Exhibit C.

6. In June 1999, applicant's personnel files were submitted for promotion consideration to LTC. The 349th Wing commander, Colonel (P) Black, issued applicant a Promotion Recommendation Form (PRF) with the highest rating of "definitely promote." Ex. D.

7. Applicant was selected for promotion to Lieutenant Colonel by the FY 2000 Air Force Reserve Line and Health Professions Promotion Selection Board, the board convening in July 1999. Effective date of promotion was 22 June 2000.

**AVIP Congressional hearings, Presidential Executive order, case law** (1999-2002)

8. During the 312th "cool-off" period of suspended the anthrax immunizations, applicant contacted the U.S. House Subcommittee on National Security to provide both testimony and solicit information concerning upcoming congressional hearings on the anthrax program. In July, 1999, applicant then attended a variety of Congressional hearings in Washington D.C., on the anthrax program. For applicant's participation in the hearing, he later received a letter of thanks in August 1999 from Rep. Shays, Subcommittee chairman. Representative Shays stated that congressional investigation determined that "no studies have been conducted on the long-term health effects of the vaccine." Ex. E. This was at odds with LTC Padilla's February 1999 memo, where he induced members to accept the vaccine stating that "our medical people say the Anthrax shot [has] virtually no known long-term side effects." Exhibit A ¶ 9.

9. As a result of the Congressional hearings in the Summer of 1999, President Clinton on 30 September 1999 issued Executive Order 13139, providing military members with the right to "informed consent" before administering an investigational drug. The President,

after findings by the Secretary of Defense, may waive this right if "absolutely necessary." Ex. E (executive order).

10. The congressional subcommittee in the Summer of 1999, issued a lengthy report with findings and recommendations. One finding was that the AVIP, as administrated by DoD for inhalation anthrax without FDA license amendment, was an "investigational or experimental drug" under FDA regulations. In a subsequent letter to the Secretary of Defense, the congressional subcommittee asked DoD to "take immediate action to suspend the AVIP." Ex. E at 10 (May 16, 2000).

11. On May 5, 2001, a federal lawsuit was filed by unrelated Air Force officers seeking a declaration that the AVIP was unlawful as an investigational drug. Bates, Buck v. Rumsfeld, No. 01-0941 (D.D.C.). The court's decision noted for the record that the basis for plaintiffs' allegation of AVIP as an investigational drug was because the manufacturer *still had pending* an FDA application to amend an existing drug license to include a new use for inhalation anthrax. The court also noted that plaintiff Buck's court-martial in May 2001 had determined AVIP was not an investigational drug. Bates v. Rumsfeld, __F.Supp.2d.__ 2002 WL 32128718, at nn. 4, 7 (May 5, 2002), appeal voluntarily dismissed. No. 02-5202 (December 24, 2002).

12. The Bates court dismissed the lawsuit on procedural grounds without reaching the declaratory issue whether AVIP was an investigational drug. In effect, the court merely determined that the lawsuit was premature—the plaintiffs were seeking only an advisory opinion to let them later go back and challenge their adverse personnel actions before intra-service remedies, whether before a correction board or court-martial appellate tribunal. Id at 5-6.

**312th Airlift Squadron AVIP policy: encourage public debate**

13. The 312th "cool-off" period of suspended anthrax immunizations resumed at the end of July 1999. Applicant returned to his duties at the 312th from the Congressional

hearings in Washington D.C.. Applicant then acted consistent with LTC Padilla's memo to use the Internet to update his fellow pilots at the 312th of "both positive and negative" information about the AVIP.

14. Applicant posted to an Anthrax website frequented by service members, the current information he had obtained from his Washington D.C. visits, including summaries of subcommittee letters and reports, testimony, and the executive order. The internet site was the privately maintained 312th Pilot website that offered an open-forum postings, a chat room, and related links.

15. On the 312th Pilot website the applicant, for example, summarized the July 1999 congressional testimony of Dover AFB pilots who had become sick, such as pilot Captain Michelle Piel who testified she had acquired auto-immune disease and grounded. This contradicted LTC Padilla's rumor-report to the 312th earlier in June that Capt. Piel from Dover AFB "was fine and back on flying status." Applicant also posted reports that some officers and airmen had alleged retaliation for their 1999 testimony on the AVIP. Ex. F (Air Force Times article 17 Jan 2000, "Lawmaker seeks probe of possible retaliation."). Pilots from other units found misrepresentations by DoD. Ex. A-2 (DoD retracted claim that veterinarians routinely used AVIP; manufacturer lost FDA validation; AVIP investigated as particular cause for Gulf War Illness; adverse reaction rate of 35% or 175 times the DoD published rate).

16. At no time did applicant provide any in-person nor e-mail attempts with false information to intimidate any unit members to refuse the vaccination. Nor did applicant threaten LTC Padilla in any way with respect to the AVIP. There is also no corroborating record that LTC Padilla ever reported to the OSI, or any other authority, that applicant made threats.

17. Applicant elected not to accept the AVIP, believing in good faith that he had just cause to believe the AVIP was an investigational or experimental drug within the meaning of Executive Order 13139, and therefore required his "voluntary" informed consent. Applicant's honest belief was supported by the Congressional hearings he had just attended, the subsequent Congressional AVIP Report in 1999 that recommended DoD immediately cease vaccinations as

"investigational," and the lack of DoD waiver finding under Executive Order 13129 to otherwise compel his vaccination.

18. According to applicant's local command's policy at the 312th, it clearly appeared that the AVIP was in effect a voluntary program consistent with applicant's belief. Members refusing to accept the voluntary vaccination program would only be transferred to the non-participating Standby Reserve in a non-pay status. No correspondence was circulated by LTC Padilla for members to otherwise believe that AVIP refusal at the 312th would result in punitive action. Moreover, LTC Padilla sent a letter to applicant that if he did not start the AVIP, he simply was "no longer eligible to perform UTAs" —in other words, the commander informed unit members, and applicant in particular, that there no need to perform further UTAs because you will be immediately transferred to the Standby Reserve. Ex. G (26 JUL 99 letter from LTC Padilla to applicant).

19. Applicant however, was placed in a predicament: he had over 19 good reserve years, but less than 20 for retirement purposes, and therefore risked forfeiting his substantial investment towards military retirement. Applicant also had invested nearly 18 years towards retirement as a civilian airline pilot. Maintaining applicant's flight status as a civilian airline pilot required absolutely no medical problems or he faced medical grounding and even termination. Applicant feared more the threat of permanent or even temporary adverse reaction to the AVIP that would jeopardize his livelihood, than a temporary transfer to the USAF Standby Reserve.

20. Applicant's commander on 15 November 1999 gave applicant the expected notice of his involuntary transfer to the Standby Reserve. Ex H. The actual request was then forwarded on 19 December 1999. The purported regulatory basis for the transfer was "unsatisfactory Reserve participation" in UTAs. However, LTC Padilla had already determined that members refusing AVIP were ineligible to participate in any UTA. The request to transfer

dated 19 DEC 1999 added that "derogatory data," was NONE, "record of disciplinary actions" NONE. Ex. G (request at ¶2f, h).

**312th AVIP bungled policy with "bait and switch"**

21. Despite LTC Padilla's request informing ARPC on 19 December 1999 that there no evidence of derogatory data or disciplinary actions against applicant, Padilla dubiously issued on the same day a UIF filed Letter or Reprimand to applicant for causing "discontent and disloyalty" with the AVIP. Ex. I. LTC Padilla's policy over the past months was to invite members to openly discuss the AVIP program and research the issue under the guise of a voluntary consent decision. Congressional inquiries and their demands to DoD to cease the AVIP, no doubt went in tandem with Padilla's education focus. Applicant on 16 December had also just answered several questions about the AVIP posed by a news reporter from a local newspaper, where applicant stated "he was not taking the AVIP." [3]

22. Padilla's "open-debate" policy obviously backfired and members began refusing AVIP. Padilla then began a punitive campaign to chill any further education on the AVIP. LTC Padilla exaggerated efforts taken by applicant to educate his fellow pilots, with concocted "seditious" allegations in the LOR Ex. I at ¶ 1 ("intent to raise discontent and disloyalty"). Finally, applicant's internet postings exposed that Padilla had made several false public statements.

23. When reassignment to the Standby Reserve was unsuccessful, Padilla on 13 MAR 2000 issued a command-directed Referred OPR for the period JUL 98- FEB 00. Ex. K. The accusations were essentially the same as contained in the LOR. Conspicuous was the acknowledgment in the OPR that only "undocumented" verbal performance feedback was given. Moreover, the adverse OPR contradicts Padilla's 19 DEC 99 request to transfer applicant to the

---

[3] Applicant answered questions after telephone inquiry by the Fairfield Daily Republic Reporter (local Travis AFB), with answers appearing in the paper on 17 December 1999. Padilla did not mention this in the LOR or later OPR.

Standby Reserve that had declared "no derogatory data or disciplinary actions" have been taken against applicant.

24. Applicant replied to both the LOR and OPR by inviting LTC Padilla and OPR rater LTC Brunz, to produce any corroboration, e-mails, or witnesses to support their contentions. Applicant also alleged that Padilla had exaggerated and distorted his efforts to educate fellow unit members about the AVIP. Applicant also pressed Padilla about his LOR allegation that in 2 September 1999 phone call applicant allegedly made a life threat to Padilla. Applicant denied this had occurred because Padilla's phone call was to congratulate applicant for making LTC, with applicant's pleasant acceptance. Applicant then later played golf with Padilla in a Travis AFB tournament. Moreover, Padilla's own request to transfer applicant to the Standby Reserve curiously stated that no derogatory data or disciplinary actions had occurred through 19 December 199, other than failure to attend UTA. More suspicious to the allegation of fomenting mass mutiny is that applicant lives in Alaska and spent little time at the 312th home base in Travis AFB, California. Finally, there is no record of any report by Padilla's of any life threats or seditious acts to the OSI. Certainly such dangerous allegations occurring for the past 6 months would have prompted some prior report somewhere other than suddenly in a coincidental 19 DEC 99 transfer request to the Standby Reserve.

25. It appears LTC Padilla simply trumped up this LOR to coincide with his transfer request to make sure ARPC would act and get rid of dissenting members and override the new "stop-loss" policy. Ex. J (1 JUN 99 ARPC notice implementing stop-loss). Alternatively, LTC Padilla retaliated when applicant honestly answered a reporter's question, or applicant publicly exposed false information issued by Padilla: it was not true that Capt. Piel from Dover AFB "was fine and back on flying status," and not true that studies had been undertaken to showed "no long-term adverse effects" from AVIP.

26. When applicant sent his reply to the LOR and OPR, Padilla conveniently, but predictably, invoked the rebuttal time limit to refuse consideration of applicant's contentions.

Therefore, Padilla's LOR is admittedly without support, and is a dubious filing when submitted together with a transfer request noting "no derogatory data." Certainly an alleged life threat to Padilla and applicant's seditious acts would have constituted derogatory data.

27. Padilla cannot encourage his unit members to use the Internet to look at information available, both positive and negative, and talk to people "you know and trust" to make your choice—and then complain later that members in positions of trust responded to this very invitation. It is more probable that after encouragement by Padilla to engage in public debate over the AVIP, that the Congressional Report and Presidential EO inflamed unit members to quickly swing against AVIP—regardless of whatever influence certain individuals had in the unit. In a damage-control knee-jerk response, Padilla was forced to back-peddle by retaliating and finding scapegoats to set an example.

28. Applicant did nothing more than honestly and in good faith at that time, express his First Amendment right *within the very limit previously condoned by his commander*. Here, Padilla had once expressed the government interest in promoting free and candid discussion of the controversial AVIP. But after the public relations disaster from Congressional outrage, Padilla reversed the government interest to punish *ex post facto* that same free inquiry in his unit. To misdirect frustration with a poor command "open-forum" policy after Congressional backlash, cannot serving a legitimate governmental interest. O'Brien v. United States, 391 U.S. 367, 369-72 (1968)(military's regulation of free speech justified only where it is unrelated to suppression of free expression).

29. Moreover, AVIP was curiously suspended indefinitely in 2001 for "alleged" shortages by the manufacturer Bioport. Bates v. Rumsfeld, 2002 WL 32128718, at page 5, n. 9 (DoD ceased AVIP in 2001 for all but special missions with no current plans to resume due to shortage). Although an alleged shortage was the circulated public reason, this certainly appeared timed to appease the constant Congressional inquires. AVIP suddenly resumed after the public outcry had lost steam while the 2001 September 11th terrorist bombings eclipsed public interest

altogether. Whether AVIP shortage was the complete reason for AVIP suspension, it was not unreasonable for concerned service-members to believe that DoD was reconsidering AVIP. Nevertheless, upon later full resumption it was clear that DoD was publicly reaffirming that it would not consider AVIP an investigational drug under EO 13139, and thus the defense of informed consent would not apply.[4] Applicant's efforts to educate his fellow unit members in mid-1999, predate this. They occurred when legitimate concerns were present over AVIP safety, whether it was an experimental drug, whether fellow pilots were medically grounded for serious side affects, and whether DoD would agree to the Congressional demand to cease vaccinations.

30. In any event, Padilla's LOR and OPR were unlawful reprisals after applicant had exposed, through his Congressional inquiries, and an IG complaint in October 1999, falsehoods made earlier at the 312th concerning AVIP. This violates the military Whistleblower statute, 10 U.S.C. § 1034. Special BCMR procedures apply to Whistleblower complaints. § 1034(f).[5]

**Unlawful promotion delay and removal from FY00 LTC promotion list**

31. In response to filing the LOR and Referred OPR, applicant's additional rater, BG Black, Commander , 349th Air Mobility Wing, wrote a letter to applicant dated 13 March 2000 giving notice that he was recommending removal of applicant from the FY 2000 LTC promotion list. The letter stated applicant's promotion was automatically delayed until the SECAF made a final decision. Exhibit L. According to BG Black, the subsequent orders dated 12 MAY 2000 that promoted applicant to LTC, had no effect. Ex. M (12 MAY 00 promotion orders); Ex. M-1 (25 MAY 00 letter of congratulations to applicant from HQ USAF/RE, MG Sherrard, Chief, Air Reserve).

---

4 See Bates at n. 4 (noting plaintiff Buck's court-martial in May 2001 rejected accused's defense that AVIP was an investigational drug).

5 In October 1999, applicant signed, along with other officers, an IG complaint against General Weaver, ARNG, for false testimony at a Congressional hearing alleging that only one officer had left the ARNG in lieu of accepting AVIP.



20

32. President Bush on 17 April 2002 removed applicant's name from the FY 00 LTC promotion list. Ex. N. Removal from the list occurred 22 months after applicant would have promoted on 22 JUN 2000. This is beyond the six-month initial Secretarial delay period without extension, imposed under the promotion delay statute, 10 U.S.C. § 14311(d). This is also beyond the 18-month absolute outer limit or deadline for delaying promotions. Id.

33. There is no record that the SECAF, nor any other official, extended applicant's promotion delay after the six month period. The law does not permit the military to allow any subordinate official, here BG Black, to impose an indefinite delay of a promotion. The controlling case is Rolader v. United States, 42 Fed.Cl. 782 (1999)(removal of Air Force officer's name from Colonels promotion list 24 months after he would have been promoted, was invalid where Air Force did not strictly follow due process). Although not necessary to its result there, the Rolader court warned the Air Force in future "related cases" involving promotion delays, that it has

> serious misgivings about the enforceability of the [purported] automatic delay provision in AFR 36-89. The effect of the regulation is to allow a relatively subordinate officer to initiate a delay that continues indefinitely. This seems inappropriate when one considers that a six-month delay extension requires the approval of the Secretary. Id at 786, 787.

See, Nation v. Dalton, 107 F.Supp.2d 37, 44-45 (D.D.C.2000) (promotion unlawfully delayed when Assistant Secretary of Navy was not delegated authority to extend delay beyond six months).[6]

34. The Rolader court also examined the other services' regulatory interpretation of the delay statute and questioned the Air Force's contention to allow "unlimited postponements" of a promotion beyond the 18-month maximum limit. The court found that the Army and Navy construed § 14311(d) to permit only Secretarial extensions beyond the six-month initial period,

[6] In Nation, the court ultimately found the officer's claim was moot after the Secretary removed her name from the promotion list within the statutory deadline, Id at 45.