but that the 18 months operated

> as an outer limit on delays that preclude removal of a name after that point. Absent Presidential action within 18 months, promotion is automatic. Rolader at 785-86.

See also Nation 107 F.Supp.2d at 44-45 (Assistant Navy Secretary was without delegated authority to extend delays); Lewis v. Rumsfeld, 154 F.Supp.2d. 56, 59 (D.D.C. 2001)(officer's claim of an unlawfully delayed promotion was not ripe when Navy's pending removal action had not exceeded 18-month statutory deadline). Therefore, the Air Force's alleged indefinite promotion delay by BG Black of applicant's LTC promotion beyond the 18-months deadline, is legally untenable.

35. Moreover, the Air Force cannot claim it's interpretation of § 14311(d) must be entitled to any deference as being correct because the other services share responsibility to administer that same statute. Lipsman v. Sec'y of Defense, 257 F.Supp.2d 3 (D.D.C.2003)(court rejected Army's demand to defer to its interpretation of correction board statute; when Army shares responsibility to administer a statute with other agencies, the courts owe no deference as normally accorded under Chevron v. NRDC, 467 U.S. 837 (1984), citing Rapaport v. Dep't of Treasury, 59 F.3d 212, 216-17 (D.C.Cir.1995)).

36. Applicant's unlawful promotion claim is also not moot as in Nation, where the Navy did not exceed the 18-month deadline when removing that officer's name from the promotion list. Applicant's removal from the FY 00 list on April 2002— 22 months after the time he would have been promoted— as an unlawful promotion delay. Applicant was promoted to LTC by operation of law. Cf., Lewis at 59; Rolader at 787-88;

CONCLUSION

For the foregoing reasons, applicant requests that the AFBCMR grant relief as set forth above under Item 8.

Respectfully submitted,

John A. Wickham, Esq.
Counsel for Major Millican

Incl:
Exhibits A-O.

**DEPARTMENT OF THE AIR FORCE**
**Air Force Reserve Command (AFRC)**

February 22, 1999

Lieutenant Colonel Frank J. Padilla
312 AS/CC
511 Waldron Street
Travis AFB CA 94535-2154

Fellow 312th Airlift Squadron Members and Families
Worldwide

Dear Fellow Squadron Members and Families,

As you have undoubtedly heard, the Department of Defense (DoD) and, in turn, the Air Force Reserve have instituted a program to vaccinate our people against the Anthrax virus. I know emotions are running very high on this issue for many of you. It is with this in mind that I write you today.

2 Today's military member faces an ever-increasing number of threats, many of which are from new and unconventional sources. Specifically, chemical and biological weapons pose significant dangers to the safety and well being of our fighting forces. Due to the nature of these weapons, the risk is literally everywhere, not just on the battlefield.

3 While there are other forms of biological and chemical weaponry, Anthrax has and will become the weapon of choice of our enemies for many reasons. It is relatively easy to mass-produce, it stores well with a shelf life that literally spans decades and it deploys effectively as a weapon. Most importantly, the effect of the virus is nearly always fatal.

4 As your commander, I simply must do everything I can to protect the men and women of this great squadron. Sometimes this means imposing a program that is very unpopular. In truth, I dislike shots probably as much as anyone, but after completing a thorough study of this issue, I know getting the shot is the right thing to do. It is my most fervent hope that eventually all of you will feel the same way too.

5 Effective immediately, everyone must start the Anthrax series before going out on any airlift mission and in no case later than 1 July 99. Our business is worldwide, and in these turbulent times, itineraries can change with little or no notice. Our crews must be ready to meet every demand placed before us. I know these directions differ slightly from what I stated at the last UTA, but higher headquarters has further refined the policy. This issue continues to be dynamic so please stay alert for additional guidance.

6 News of this vaccine hit this base like a wild fire in the California hills. There are all kinds of information, both positive and negative, on the Internet and in the news. I encourage you to look at all of it. Capt Tom Bell has helped me compile a read file on all the latest Anthrax news. It is in the pilot briefing room for all of you to read. Also, I obtained copies of the PBS *FRONTLINE* program entitled *"Plague Wars"* which is available for your viewing. If that doesn't raise the hair on the back of your neck, I don't know what will. Finally, ABC's *"20/20"* will broadcast a "balanced coverage" program on Anthrax on 23 Feb 99. This letter may not reach you by then, but we will record the program and have it available at the squadron. Bottom line, I want you to read and watch all the information available so you, with your family, can make an informed decision.

EXHIBIT A 24

7 I know for some of you, this is less of an issue over the shot and more of an issue concerning trust. Certainly, past debacles such as exposing our servicemen to nuclear fallout, Agent Orange and our government's handling of the Gulf War Syndrome, do not speak well of our government's track record in this area. Also, there is a lot of faceless rhetoric, particularly on the Internet, speaking out against this program. I choose to turn toward experts I know and trust.

8 Dr Anna McHargue has been our squadron's flight surgeon for over 20 years. I cannot begin to convey all the ways she has helped so many of us over the years to maintain our health and medical qualifications. I trust her implicitly and she says, "get the shot." I trust Dr. Rob Singler, who came to us from the 708th and has provided us with two excellent briefings on Anthrax. He says, "get the shot." Non-affiliated and disinterested organizations such as the Air Line Pilots Association's (ALPA) and American Airlines' medical departments, to name a few, say "get the shot." I trust them also.

9 Our medical people say the Anthrax shot is no more harmful than any of the other shots you have received during your military career. It is a dead enzyme and has been given to over 150,000 military members with virtually no known long-term side effects. We will need to get six shots, three given two weeks apart followed by three additional injections given at 6, 12 and 18 months. An annual booster is required after that to maintain ongoing immunity. It is a tough regimen, I know. I realize strict adherence may not be possible, but as long as you are close to the required timeline, your protection will be sufficient. I have included a letter to our civilian employers in your v-file outlining the program and asking for support in this matter. Hopefully this will help.

10 In conclusion, I vividly remember being on the ramp at Ben Gurion Airport in Tel Aviv, Israel during Desert Storm when the Iraqi Military launched a scud missile our way. With sirens blaring, we abandoned our C-5 for the safety of an air raid shelter. Up until that time, I remember thinking what a pain it was to carry around all that Chemical Defense Gear. Obviously, at that particular time, I was very happy I had it. Like so many of us, I am not exactly thrilled about getting this shot. I hope and pray we never encounter a situation where we need its protection… but if we do, I am satisfied we will be armed with the best protection available. Please, stay calm, think about it a lot, make a decision and go get the shot… or come and talk to me. Thank you and Godspeed.

Sincerely

FRANK J. PADILLA, Lt. Col, USAFR
Commander

Attachment: What Every Person Needs to Know About the Anthrax Vaccine

26
A-2
EXHIBIT

TOM REMPFER AND RUSS DINGLE

# 'Safe, effective and FDA-approved' tramples troops' right to say no





Rempfer, top, and Dingle are former Air National Guard pilots who have filed a citizen's petition with the FDA and a lawsuit against anthrax vaccine manufacturer BioPort Corp.

Over the past four years, service members and lawmakers have dutifully analyzed the Defense Department's Anthrax Vaccine Immunization Program. Our conclusions require reflection on how to properly — and legally — protect our troops from biological weapons, especially as our nation debates going to war with Iraq.

Our anthrax vaccine education and duty began in 1998, when our commander officially formed a "Tiger Team" and ordered us to develop a list of questions for higher headquarters of service members' concerns about the vaccine. Trained as aviators, we reviewed the facts related to the anthrax vaccine no differently than the preflight of an aircraft prior to a training or combat sortie. The bottom line was no different: You don't take a broken plane airborne.

We found government reports documenting that the vaccine manufacturer lost its Food and Drug Administration validation within one month of the start of the military's mandatory inoculations and remained closed for the next four years.

We found that the vaccine was known to be of questionable effectiveness, a possible cause of Persian Gulf War illness and not approved for use against inhalation anthrax, which is more likely to be found on the battlefield.

Our findings ran directly counter to the rhetoric promoting the Pentagon's program.

One of the first misrepresentations we discovered was the claim that civilian veterinarians routinely used the vaccine. By April 5, 1999, Army Times found AVIP officials correcting themselves to say "at-risk veterinarians." The Defense Department subtly admitted only military researchers and lab workers used the vaccine routinely.

Subsequent congressional inquiries found the vaccine to be experimental and, therefore, by law, could be made mandatory only by presidential order.

But the complexity of the debate was continually glossed over as the Defense Department maintained that the vaccine was "safe, effective and FDA-approved."

In fact, the newest vaccine label reveals an adverse reaction rate of up to 35 percent — 175 times greater than the rate originally published on the old product's label. Its effectiveness was known to be experimental for inhalation anthrax, as shown by the Pentagon, FDA and congressional documents. The Pentagon helped the manufacturer apply for approval for this use, without success.

Most amazingly, the FDA never finalized the vaccine's license rule, but instead relied on a 1970 Public Health Service approval that lacked the proper and lawful effectiveness data.

Knowing our leaders had been misled, we continued our research despite being grounded as pilots and forced out of the Air National Guard. Recently, FDA officials responded to a petition we filed requesting a regulatory review. They acknowledged the following:

■ The FDA has not issued a final rule for the anthrax vaccine.

■ They would not release for use any old vaccine lots [illegible]ed in our petition.

■ They dismissed their responsibility to follow their own rules requiring disapproval of government contracts with deviant manufacturers. Their excuse was that their guidelines were not legally binding.

However, a service member's right of informed consent to an experimental drug or vaccine is statutory and legally binding.

It is time to correct. We believe President Bush will agree that Defense Department officials would be derelict in their duty if they do not:

■ Direct the correction of records for service members previously punished over the old anthrax vaccine.

■ Properly care for the service members made ill by the vaccine.

■ Continue using the vaccine only in accordance with the law — voluntary with informed consent, or mandatory by presidential order.

At a time when thousands of troops face the possibility of deploying to Southwest Asia, strict compliance with the law is more important than ever for a vaccine that lacks a legally finalized licensing rule by the FDA and has never been approved for inhalation anthrax. □

The 312th Airlift Squadron Monthly Newsletter

MAY 1999

# UTA Today

## FROM THE COMMANDER

*"The meaning of things lies not in the things themselves, but in our attitude towards them."*
*Antoine de Saint Exupery*

ONE "KILLER A" DOWN...THREE TO GO Hi Folks! As I write you this, we are winding down from another excellent adventure...ASEV is DEAD! The outbrief is Friday, 21 May. This is where we find out how we *really* did. Early indications are *very* positive... But, come what may, our ASEV blowout party is at *The Cabin* in Elmira on Friday night. I hope you were able to make it. Thanks to everyone who put his or her qualifications on the line to participate in this big dance. You watered my eyes! I can't imagine working with a better bunch of people...Even *you*, Sean.

THAT WASN'T SO HARD...WAS IT?! Wow! What a UTA! April was AWESOME! It started with the golf tourney on Friday and ran, non-stop, through the 3-mile walk on Sunday.... Camaraderie and Esprit de Corps were had by all... (I hope). As most of you know, these momentous events don't happen by accident. A special thanks to our training gurus, Dave Smallidge, John Ovitt, Mike Spannaus, and Larry Cantrell for putting all that ground training together. Thanks also to Alan Chung for arranging the squadron photo and 3-mile walk. Mike Delgiacco made the mistake of making himself invaluable as our Sports guy...He put together that unbelievable golf tourney. (Although, I'm kind of mad at him for sticking me with Ang, Dave Raymond and Spanky! I had to carry them through 18 holes....*and don't believe anything they say about how I did...They're just jealous!*). Please keep in mind, this is *your* UTA...so if you can think of a better way to do something, please let us know. Each year we learn from the past one ... and continue to tweak our program to make it better and better for *you*. Our *next hard UTA is 8 - 9 April 2000! Please plan ahead... and be there!*

ANOTHER HEARTY PARTY Our Annual Recognition Dinner started noisy... and got noisier! Judging by the dull roar, which permeated throughout the evening, I think a good time was had by all. A special thanks to Lt Sam for putting it all together. Overcome with emotion, he was unable to continue as MC... 'Must have been that stirring honor guard performance accompanied by *Kool and the Gang*. "Mr Entertainment" himself, Dale Andrews carried the torch for us for the rest of the evening... 'Definitely watered my eyes! Doug "Don't call me Bob Saggett" Beyer dazzled us with a tremendous array of raffle prizes. (Thanks *Oddball*, I take back all the bad things I said about you!) It is so hard to pick the award winners. So many of you do so much for us... The list is long and distinguished... And in case you couldn't hear, here's our honorees for 1999:

| | |
|---|---|
| Airman of the Year | Tim O'Neil |
| NCO of the Year | Boyde Crawford |
| SNCO of the Year | Dave Raymond |
| Junior Officer of the Year | Rebecca Gross |
| Field Grade Officer of the Year | Lee Davis |
| Pirate of the Year | Rich Beale |
| Engineer of the Year | John Ludke |
| Loadsmasher of the Yer | John Mooch |
| Ops/Admin of the Year | Elaine Kennedy |
| Flight Surgeon of the Year | Anna McHargue |
| Booster Club Volunteer | Fred Longoria |
| Trougher of the Year | Jason Malone |
| Aircrew of the Year | Blackburn's |
| CrewART of the Year | Dave Smallidge |
| Unsung Hero | "Sin" |
| Citizen Airman of the Year | Warren Leslie |
| Commander's Cup | Pete Briggs |

PAGE 1 COMMANDERS COMMENTS
PAGE 2 1ST SERGEANT
PAGE 3 OPS/ADMIN
PAGE 4 SAFETY
PAGE 4 PILOTS
PAGE 5 ENGINEERS
PAGE 5 LOADMASTERS
PAGE 6 TRAINING

MAKE IT VOLUNTARY INFORMATION WAS TAKEN

22

EXHIBIT B

The 312th Airlift Squadron Monthly Newsletter

PAGE 2 MAY 1999

MORE GOOD TIMES TO COME I have always believed, if you have fun at what you do, the fun will see you through to tough times. Well, times are tough. There is no doubt about that. Our Killer A's (ASEV, ANTHRAX, ACTIVATION and AIRCRAFT ANOMOLIES) continue to hang over our heads and make being a reservist harder than it's ever been. Please, please join us in some of the fun to come:

| | |
|---|---|
| White Water Rafting | 18 Jun 99 |
| Squadron Bowling Tourney | 25 Jun 99 |
| Oakland A's Game/Fireworks | 3 July 99 |
| Family Appreciation Day/Picnic | 24 July 99 |
| Annual House Boat Trip | 10 -13 Sep 99 |

WAITING TO EXHALE As you all know, the deadline for receiving your first Anthrax shot is 31 May 99. No pay or points are allowed after that date until you comply with this directive. It is my deepest hope that all of you will comply. I don't want to see any of you go...not for this reason. Good people, we know and trust, have made it their business to become experts in this program. Doc Rob Singler and Doc Anna McHargue, among others, endorse this shot. Doc Singler has provided us with some very excellent briefings on Anthrax and its immunization program. For those of you who were unable to attend his briefings, his answers to most of the questions we had about the shot are included in this issue of UTAToday. (Thanks to Brain Paddock for putting the questions together and submitting them to the Doc.) Please, think hard, read Singler's briefing, talk to people you know and trust and make your choice. If you choose not to get the shot, please come and talk to me. Give me the chance to make sure, in my mind and yours, you are making . this choice for the right reasons. In the end, we will respect your decision.

A STELLAR FELLER I am more than certain many of you are tired of my stories... particularly ones about my Grandpa... But, I'm stubborn and this is *my* newsletter input. So here I go again... My Grandpa would always make me tag along with him whenever I wasn't in school. Every week, he dragged me to the local barbershop in town, more to sit around and B.S. rather than any real need for a haircut. One of his old friends had a reputation for being a Class A, heavy-duty whiner. I think his name was Tom, but it's been a long time. I remember Grandpa asking Tom how he was doing. Tom, would reply, "Not so good." There was a distinct whine to his voice. "You see, it's this summer heat. I just hate it. Oh, I hate it so much. It just frazzles me up and frazzles me down. I just hate the heat. It's almost killing me!" My Grandpa would simply mumble, "Uh-huh" and he would cut his eyes at me to make certain I heard the lamentation. Then Tom would again mewl, "I hate plowing. That packed-down dirt ain't got no reasoning, and mules ain't got no sense. It's killing me. I can't never seem to get done. My feet and hands stay sore, and I get dirt in my eyes and up my nose. I just can't stand it." My Grandpa would simply say "Uh-huh, Uh-huh" and then look at me and nod. On the way home, my Grandpa would ask me, "Did you hear what ol' Tom had to say?" I would nod. My Grandpa would continue, "Boy, there are people who went to sleep all over the world last night, poor and rich and white and black, but they will never wake up again. And those dead folks would give anything at all for just five minutes of this weather or 10 minutes of the plowing that ol' Tom was grumbling about. So you watch yourself about complaining, boy. What you're supposed to do when you don't like a thing is change it. If you can't change it, change they way you think about it. Don't complain." Remember folks, *Attitude is Everything! Try to focus on the good we do.* Until next time, stay well, fly straight and may all your landings be happy ones! fj

## 1ST SERGEANT

Hi gang! It's a real pleasure to become part of the 312th family. My job is people, and everyone is my business. If something comes up, please drop by and let me know. If nothing is up, drop by anyway and let me know what going well with the family, the job, and even the reserves. My door is always open for you.

LODGING The good attendance at the hard UTA brought out some requirements for using lodging that some of us were not aware of.
You must sign up for a room before the Wednesday prior to the UTA if you need a room and you will be in UTA status. If you sign up for a room and you end up not being able to attend the UTA, you must cancel the reservation. If you do use a room on base, you must turn the key in yourself, and sign the log at the front desk before 1100 on Sunday. If you have any questions please let me know.
INTERNET USE / ABUSE This is scary. Someone who has been living in the jungle evading capture for the last three years obviously never heard that we can't use Internet access in the squadron to look at porn. It happened to another squadron in our wing

28

The 312th Airlift Squadron Monthly Newsletter
JUNE 1999

# UTA Today

## FROM THE COMMANDER

*"While we are here, we should set goals and achieve them, make the best of things, make others feel good about themselves, and be happy with what we are and what we are doing."*
*Janet Evans*

A NEW HOPE
Howdy folks! Thanks so much for making us all look so good during our ASEV. The final report was glowing ...as predicted. We have succeeded in keeping the team away from us for at least another couple of years. *AWESOME!* With ASEV gone and Kosovo winding down (thank goodness!), I can only see one "Killer A" in our windscreen.... And you know what it is. The deadline for you to receive your first Anthrax shot is this UTA (19 Jun). After that, it's no points, pay or participation until you receive the shot. (Our current Stop Loss policy has no real bearing on this.) Please come in and chat with me if you feel you will not get the shot. (I promise I'll be nice). In the end, we will respect your decision. I know many of you have decided to get the shot, but will hold out for the very end before getting it. I can't say I blame you... but please consider the fact that many of our squadron mates depend on their reserve participation to keep their families clothed and fed... Namely our troughers. These are the people who have supported you through thick and thin through it all. Please, if you have decided to get the shot, do it soon. We want to keep the missions rolling and the paychecks flowing. Thanks!

RETURN OF THE JEDI
So much to do....So little time. Please tell your section when you will complete your annual tour. This will allow our wing to free up unobligated funds to use in other areas, such as refurbishing our squadron or getting us more computers. Also, please see the Shirt and weigh in by the end of this month. If you think you might be close, please communicate with us and we will work out a program that will work for you. Finally, and most importantly, please strive to complete your semi-annual currency by the end of this month. When it's all said and done, the most important thing we do is fly the jet. Flying safe takes practice.

THE PHANTOM MENACE
Our airplanes are broke and maintenance is becoming more and more frustrated as pressure is brought to bear on them to improve reliability. When tempers flare, it becomes easy to engage in finger pointing and to become distracted by separate issues. One of our crews was the recipient of these frustrations and I thought it might be nice to pass along the experience to you. The thought of passing along a compliment to Sean Neilon sort of runs against my grain.... But, oh well. Our very own, John "this is not a personal crusade" Davis spied an improper temp fix on bleed ducting on the wing. He notified maintenance, but they held fast that it was a good repair. Standing firm, John notified "Stump" Neilon and he refused the airplane and they went to the spare. (They were on a high priority banner mission.) High ranking maintenance folks emerged and comments were made. Our crew acted professionally and they held firm. The lesson is: (1) Stand by your beliefs. Mx doesn't have to fly that airplane. We do. I will support your decision. (2) If you are getting high level attention from the actives or from maintenance, call me, Spencer or the OG/CC out to your airplane, please! We can talk to these people from a different perspective. Help us to help you! (3) Remember... *Style and Grace*. Sean and his crew refused to get caught up in the emotion and therefore the attention never wavered from the mechanical problem to the crew's behavior.

PAGE 1 COMMANDERS COMMENTS
PAGE 2 1ST SERGEANT
PAGE 3 OPS/ADMIN
PAGE 3 SAFETY
PAGE 4 PILOTS
PAGE 4 ENGINEERS
PAGE 5 LOADMASTERS
PAGE 6 TRAINING

25

No copyright
Xerox this and
distribute to whomever you like

LTC Robert Singler
Chief, Hospital Services
349th Contingency Hospital
Travis AFB, CA

Edition #3; 7 May, 1999

# Anthrax News Flash

Edition #3 of what will be a briefly continuing newsletter for our Reservists

Disclaimer
This "newsletter" represents the personal opinion of Robert C. Singler, MD. It has neither been reviewed nor sanctioned by the US Air Force, which bears no responsibility for its content.

Strong Request
Make sure that everything you quote to someone else has references attached. Otherwise it's **hearsay**.

The Latest
Here's a perfect example of the power of rumor at work:

**YES! It's true.** The Dover AFB Active Duty Wing CC has placed the **anthrax immunization program temporarily on hold. Sort of.**

However, the program is **not** on hold because of new info on supposed dangers of the anthrax vaccine.
In fact, for those getting on an airplane for deployment to a high-threat area, the program is not on hold at all.

Here are the facts (source: Dover Mil Pub Health OIC via HQ 349CH/CC):

1) Dover is now going through exactly what Travis went through three months ago. Air Staff provided the flying community with a briefing which reportedly, at least in part, came across poorly from a public relations standpoint. Is that not a little reminiscent of one of our own squadrons?

2) Because of the level of members' concerns, and the number of unanswered questions, the AD Wing/CC has decided not to require that all members immediately start their anthrax immunization series. During this cooling off period, additional briefings will be held and members will have a chance to have their concerns addressed.
Just like Travis.

3) Those in the process of deployment to areas where anthrax immunization is required **are** required to start their shots.

Most important, as this issue is addressed at a Command medical level or at a Congressional level, I'll keep you apprised of developments. **There is currently no scientific information I have received that makes me unwilling to get my next shot.**

MORE TO FOLLOW as the facts come in.

Rob Singler

EXHIBIT C 30

# PROMOTION RECOMMENDATION

## I. RATEE IDENTIFICATION DATA *(Read AFI 36-2402 carefully before filling in any item)*

| 1. NAME *(Last, First, Middle Initial)* | 2. SSN | 3. GRADE | 4. DAFSC |
|---|---|---|---|
| MILLICAN, MARC J. | 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 | MAJ non-EAD | 11A2A |

| 5. ORGANIZATION, COMMAND, LOCATION | 6. PAS CODE |
|---|---|
| 312th Airlift Squadron (AMC), Travis AFB CA | T81LFLPG |

## II. UNIT MISSION DESCRIPTION

The mission of the 312th Airlift Squadron is to train and provide qualified C-5 aircrews to fly worldwide airlift missions and augment the active duty forces under various readiness conditions up to and including full mobilization.

## III. JOB DESCRIPTION

1. DUTY TITLE:
AIRCRAFT COMMANDER C-5

2. KEY DUTIES, TASKS, RESPONSIBILITIES: Responsible for the safe and timely movement of the largest aircraft in the Air Force, valued at over 100 million dollars. Supervises flight crews of up to 22 people and is directly responsible for the safety of up to 73 passengers. Has personal responsibility for the management of strategic airlift missions to include: contingency operations, joint Army-Air Force training exercises, NATO operations and special assignment airlift missions. Ensures strict compliance with Air Force, AMC and international flight procedures. SIGNIFICANT ADDITIONAL DUTIES: Flight Commander

## IV. PROMOTION RECOMMENDATION

- Superior officer with remarkable leadership abilities and time-tested skills in aviation--truly unsurpassed performance as C-141 Aerial Refueling Instructor Aircraft Commander--always exceeds every challenge
- Wealth of knowledge; diverse background--rapidly ascended to CT-39 Instructor Aircraft Commander
- Goal-oriented; ability to motivate/inspire others resulted in most successful ORIs, ASEVs, QAFAs ever Combat tested--commanded over 110 sorties inOperations DESERT STORM/SHIELD; ensuring success
- Impeccable military bearing; served with distinction as White House Aide for Ronald Reagan 1981-1983
- Chosen by 312 AS/CC as Flight Commander--due to superb dedication/standards/managerial qualities
- Tireless contributor; Wing Presentations/Ground Safety/Executive/Operations Officer--a top performer
- Promotion a must; consummate team player, well-rounded leader/officer with command potential/abilities

| V. PROMOTION ZONE | VI. GROUP SIZE | VII. BOARD | VIII. SENIOR RATER ID |
|---|---|---|---|
| BPZ [ ] I/APZ [ ] | 1/3/12 | A0500D | 0M4T8 |

## IX. OVERALL RECOMMENDATION

- DEFINITELY PROMOTE [X]
- PROMOTE [ ]
- DO NOT PROMOTE THIS BOARD [ ]

## X. SENIOR RATER

NAME, GRADE, BR OF SVC, ORGN, COMD & LOCATION
GERALD A. BLACK, Colonel, USAFR
349th Air Mobility Wing (AMC)
Travis AFB CA

DUTY TITLE
Commander

| SSN | SIGNATURE |
|---|---|
| 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 | [signature] |

### Instructions

Review previous OERs, OPRs, Education/Training Reports, and Supplemental Evaluation Sheets. Evaluate the officer's performance and assess his or her potential. Write Promotion Reccomendation (Section IV) in concise "bullet" format.

Provide an accurate, unbiased assessment free from consideration of race, sex, ethnic origin, age, religion, or marital status.

31

Provide the officer a copy of this report approximately 30 days prior to the board for which this report is prepared.

EXHIBIT D

DAN BURTON, INDIANA, CHAIRMAN
BENJAMIN A. GILMAN, NEW YORK
CONSTANCE A. MORELLA, MARYLAND
CHRISTOPHER SHAYS, CONNECTICUT
ILEANA ROS-LEHTINEN, FLORIDA
JOHN M. McHUGH, NEW YORK
STEPHEN HORN, CALIFORNIA
JOHN L. MICA, FLORIDA
THOMAS M. DAVIS III, VIRGINIA
DAVID M. McINTOSH, INDIANA
MARK E. SOUDER, INDIANA
JOE SCARBOROUGH, FLORIDA
STEVEN C. LATOURETTE, OHIO
MARSHALL "MARK" SANFORD, SOUTH CAROLINA
BOB BARR, GEORGIA
DAN MILLER, FLORIDA
ASA HUTCHINSON, ARKANSAS
LEE TERRY, NEBRASKA
JUDY BIGGERT, ILLINOIS
GREG WALDEN, OREGON
DOUG OSE, CALIFORNIA
PAUL RYAN, WISCONSIN
JOHN T. DOOLITTLE, CALIFORNIA
HELEN CHENOWETH, IDAHO

ONE HUNDRED SIXTH CONGRESS

# Congress of the United States

## House of Representatives

COMMITTEE ON GOVERNMENT REFORM
2157 RAYBURN HOUSE OFFICE BUILDING
WASHINGTON, DC 20515–6143

MAJORITY (202) 225–5074
MINORITY (202) 225–5051
TTY (202) 225–6852

HENRY A. WAXMAN, CALIFORNIA, RANKING MINORITY MEMBER
TOM LANTOS, CALIFORNIA
ROBERT E. WISE, JR., WEST VIRGINIA
MAJOR R. OWENS, NEW YORK
EDOLPHUS TOWNS, NEW YORK
PAUL E. KANJORSKI, PENNSYLVANIA
GARY A. CONDIT, CALIFORNIA
PATSY T. MINK, HAWAII
CAROLYN B. MALONEY, NEW YORK
ELEANOR HOLMES NORTON, DISTRICT OF COLUMBIA
CHAKA FATTAH, PENNSYLVANIA
ELIJAH E. CUMMINGS, MARYLAND
DENNIS J. KUCINICH, OHIO
ROD R. BLAGOJEVICH, ILLINOIS
DANNY K. DAVIS, ILLINOIS
JOHN F. TIERNEY, MASSACHUSETTS
JIM TURNER, TEXAS
THOMAS H. ALLEN, MAINE
HAROLD E. FORD, JR., TENNESSEE

BERNARD SANDERS, VERMONT, INDEPENDENT

SUBCOMMITTEE ON NATIONAL SECURITY, VETERANS AFFAIRS AND INTERNATIONAL RELATIONS
Christopher Shays, Connecticut
Chairman
Room B-372 Rayburn Building
Washington, D.C. 20515
Tel: 202 225-2548
Fax: 202 225-2382
E-mail: nsvair.groc@mail.house.gov

August 24, 1999

Mr. Marc Millican
2540 Curlew
Anchorage, AK 99515

Dear Mr. Millican,

Thank you for contacting the Subcommittee on National Security, Veterans Affairs, and International Relations concerning our investigation of the Department of Defense (DoD) force-wide Anthrax Vaccine Immunization Program (AVIP).

To date, we have held four hearings on various aspects of the program. Our investigation is ongoing, and I anticipate that we will conduct additional hearings before we will be able to arrive at specific findings and recommendations. Our review should be completed later this year.

The program mandates the immunization of 2.4 million military and civilian personnel at a cost of over $130 million. Six injections are required over a period of 18 months, followed by an annual booster. The AVIP represents a daunting logistical challenge and a new concept of medical force protection against biological warfare threats.

While we have not yet arrived at firm conclusions, we have identified a number of significant issues of concern to service members and their families. No studies have been conducted on the long term health effects, if any, of the vaccine. The sole FDA-approved anthrax vaccine manufacturer has experienced serious quality control and financial problems. Moreover, there are important questions about the vaccine's effectiveness against weaponized anthrax. These concerns compel many to ask whether the threat of hostile use of anthrax justifies the use of this vaccine in a force-wide, mandatory immunization program.

32

EXHIBIT E

Some military personnel, at a risk to their careers, are refusing to take the shots. Others are suffering adverse health reactions. The impact of the program on retention and morale, particularly in Guard and Reserve units, is becoming troubling.

Even if we were to agree with the Department of Defense that anthrax inoculations were in fact indispensable as a force protection measure, it is becoming readily apparent to many Members of Congress that something ought to be done to make the current AVIP more efficient and effective.

Our military personnel deserve the very best. Like the weapons systems developed for success in combat, the vaccine chosen to meet the most serious biological threat should be as well-tested and as technologically advanced as possible. But the current vaccine, approved in 1970 for use by woolen mill workers, veterinarians and researchers exposed to low levels of anthrax, is difficult to administer and known to be reactogenic.

I very much appreciate your interest in the activities of the Subcommittee and your taking the time to share your concerns with us. You may be assured that whatever actions we take as a consequence of our investigation, we will act only in the best interests of our national security and out of our deep concern for the health and welfare of the fine men and women of our Armed Forces.

Sincerely,

Christopher Shays
Chairman

33
2

THE WHITE HOUSE

Office of the Press Secretary

For Immediate Release September 30, 1999

EXECUTIVE ORDER 13139

- - - - - - - -

IMPROVING HEALTH PROTECTION OF MILITARY PERSONNEL PARTICIPATING IN PARTICULAR MILITARY OPERATIONS

By the authority vested in me as President by the Constitution and the laws of the United States of America, including section 1107 of title 10, United States Code, and in order to provide the best health protection to military personnel participating in particular military operations, it is hereby ordered as follows:

Section 1. Policy. Military personnel deployed in particular military operations could potentially be exposed to a range of chemical, biological, and radiological weapons as well as diseases endemic to an area of operations. It is the policy of the United States Government to provide our military personnel with safe and effective vaccines, antidotes, and treatments that will negate or minimize the effects of these health threats.

Sec. 2. Administration of Investigational New Drugs to Members of the Armed Forces.

(a) The Secretary of Defense (Secretary) shall collect intelligence on potential health threats that might be encountered in an area of operations. The Secretary shall work together with the Secretary of Health and Human Services to ensure appropriate countermeasures are developed. When the Secretary considers an investigational new drug or a drug unapproved for its intended use (investigational drug) to represent the most appropriate countermeasure, it shall be studied through scientifically based research and development protocols to determine whether it is safe and effective for its intended use.

(b) It is the expectation that the United States Government will administer products approved for their intended use by the Food and Drug Administration (FDA). However, in the event that the Secretary considers a product to represent the most appropriate countermeasure for diseases endemic to the area of operations or to protect against possible chemical, biological, or radiological weapons, but the product has not yet been approved by the FDA for its intended use, the product may, under certain circumstances and strict controls, be administered to provide potential protection for the health and well-being of deployed military personnel in order to ensure the success of the military operation. The provisions of 21 CFR Part 312 contain the FDA requirements for investigational new drugs.

Sec. 3. Informed Consent Requirements and Waiver Provisions.

(a) Before administering an investigational drug to members of the Armed Forces, the Department of Defense (DoD) must obtain informed consent from each individual unless the Secretary can justify to the President a need for a waiver of informed consent in accordance with 10 U.S.C. 1107(f). Waivers of informed consent will be granted only when

K 34



3

absolutely necessary.

(b) In accordance with 10 U.S.C. 1107(f), the President may waive the informed consent requirement for the administration of an investigational drug to a member of the Armed Forces in connection with the member's participation in a particular military operation, upon a written determination by the President that obtaining consent:

(1) is not feasible;

(2) is contrary to the best interests of the member; or

(3) is not in the interests of national security.

(c) In making a determination to waive the informed consent requirement on a ground described in subsection (b)(1) or (b)(2) of this section, the President is required by law to apply the standards and criteria set forth in the relevant FDA regulations, 21 CFR 50.23(d). In determining a waiver based on subsection (b)(3) of this section, the President will also consider the standards and criteria of the relevant FDA regulations.

(d) The Secretary may request that the President waive the informed consent requirement with respect to the administration of an investigational drug. The Secretary may not delegate the authority to make this waiver request. At a minimum, the waiver request shall contain:

(1) A full description of the threat, including the potential for exposure. If the threat is a chemical, biological, or radiological weapon, the waiver request shall contain an analysis of the probability the weapon will be used, the method or methods of delivery, and the likely magnitude of its affect on an exposed individual.

(2) Documentation that the Secretary has complied with 21 CFR 50.23(d). This documentation shall include:

(A) A statement that certifies and a written justification that documents that each of the criteria and standards set forth in 21 CFR 50.23(d) has been met; or

(B) If the Secretary finds it highly impracticable to certify that the criteria and standards set forth in 21 CFR 50.23(d) have been fully met because doing so would significantly impair the Secretary's ability to carry out the particular military mission, a written justification that documents which criteria and standards have or have not been met, explains the reasons for failing to meet any of the criteria and standards, and provides additional justification why a waiver should be granted solely in the interests of national security.

(3) Any additional information pertinent to the Secretary's determination, including the minutes of the Institutional Review Board's (IRB) deliberations and the IRB members' voting record.

(e) The Secretary shall develop the waiver request in consultation with the FDA.

(f) The Secretary shall submit the waiver request to the President

35 4

and provide a copy to the Commissioner of the FDA (Commissioner).

(g) The Commissioner shall expeditiously review the waiver request and certify to the Assistant to the President for National Security Affairs (APNSA) and the Assistant to the President for Science and Technology (APST) whether the standards and criteria of the relevant FDA regulations have been adequately addressed and whether the investigational new drug protocol may proceed subject to a decision by the President on the informed consent waiver request. FDA shall base its decision on, and the certification shall include an analysis describing, the extent and strength of the evidence on the safety and effectiveness of the investigational new drug in relation to the medical risk that could be encountered during the military operation.

(h) The APNSA and APST will prepare a joint advisory opinion as to whether the waiver of informed consent should be granted and will forward it, along with the waiver request and the FDA certification to the President.

(i) The President will approve or deny the waiver request and will provide written notification of the decision to the Secretary and the Commissioner.

Sec. 4. Required Action After Waiver is Issued.

(a) Following a Presidential waiver under 10 U.S.C. 1107(f), the DoD offices responsible for implementing the waiver, DoD's Office of the Inspector General, and the FDA, consistent with its regulatory role, will conduct an ongoing review and monitoring to assess adherence to the standards and criteria under 21 CFR 50.23(d) and this order. The responsible DoD offices shall also adhere to any periodic reporting requirements specified by the President at the time of the waiver approval.

The Secretary shall submit the findings to the President and provide a copy to the Commissioner.

(b) The Secretary shall, as soon as practicable, make the congressional notifications required by 10 U.S.C. 1107(f)(2)(B).

(c) The Secretary shall, as soon as practicable and consistent with classification requirements, issue a public notice in the Federal Register describing each waiver of informed consent determination and a summary of the most updated scientific information on the products used, as well as other information the President determines is appropriate.

(d) The waiver will expire at the end of 1 year (or an alternative time period not to exceed 1 year, specified by the President at the time of approval), or when the Secretary informs the President that the particular military operation creating the need for the use of the investigational drug has ended, whichever is earlier. The President may revoke the waiver based on changed circumstances or for any other reason. If the Secretary seeks to renew a waiver prior to its expiration, the Secretary must submit to the President an updated request, specifically identifying any new information available relevant to the standards and criteria under 21 CFR 50.23(d). To request to renew a waiver, the Secretary must satisfy the criteria for a waiver as described in section 3 of this order.

(e) The Secretary shall notify the President and the Commissioner if the threat countered by the investigational drug changes significantly or if significant new information on the investigational drug is received.



36

5

Sec. 5. Training for Military Personnel. (a) The DoD shall provide ongoing training and health risk communication on the requirements of using an investigational drug in support of a military operation to all military personnel, including those in leadership positions, during chemical and biological warfare defense training and other training, as appropriate. This ongoing training and health risk communication shall include general information about 10 U.S.C. 1107 and 21 CFR 50.23(d).

(b) If the President grants a waiver under 10 U.S.C. 1107(f), the DoD shall provide training to all military personnel conducting the waiver protocol and health risk communication to all military personnel receiving the specific investigational drug to be administered prior to its use.

(c) The Secretary shall submit the training and health risk communication plans as part of the investigational new drug protocol submission to the FDA and the reviewing IRB. Training and health risk communication shall include at a minimum:

(1) The basis for any determination by the President that informed consent is not or may not be feasible;

(2) The means for tracking use and adverse effects of the investigational drug;

(3) The benefits and risks of using the investigational drug; and

(4) A statement that the investigational drug is not approved (or not approved for the intended use).

(d) The DoD shall keep operational commanders informed of the overall requirements of successful protocol execution and their role, with the support of medical personnel, in ensuring successful execution of the protocol.

Sec. 6. Scope. (a) This order applies to the consideration and Presidential approval of a waiver of informed consent under 10 U.S.C. 1107 and does not apply to other FDA regulations.

(b) This order is intended only to improve the internal management of the Federal Government. Nothing contained in this order shall create any right or benefit, substantive or procedural, enforceable by any party against the United States, its agencies or instrumentalities, its officers or employees, or any other person.

WILLIAM J. CLINTON

THE WHITE HOUSE,
September 30, 1999.

# # #

37 6

2D DISTRICT, WASHINGTON

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE
SUBCOMMITTEES:
AVIATION
GROUND TRANSPORTATION

COMMITTEE ON SCIENCE
SUBCOMMITTEE:
ENERGY AND ENVIRONMENT

# Congress of the United States
## House of Representatives
Washington, DC 20515–4702

SUBCOMMITTEES:
HOUSING
FINANCIAL INSTITUTIONS
DOMESTIC AND INTERNATIONAL MONETARY POLICY

CHAIR, REPUBLICAN HOUSING OPPORTUNITY CAUCUS

REPUBLICAN POLICY COMMITTEE

May 16, 2000

The Honorable William S. Cohen
Secretary of Defense
The Pentagon
Washington, DC 20301-1010

Dear Secretary Cohen:

We are writing to ask for an immediate halt to the Department of Defense (DOD) Anthrax Vaccination Immunization Program (AVIP). The following developments in recent months confirm our concerns regarding this program and its impact on the health and morale of our military service members.

- The Institute of Medicine Committee On Health Effects Associated With Exposures During The Gulf War, in response to a DOD request, provided a letter report entitled "An Assessment of the Safety of the Anthrax Vaccine" on March 30, 2000. In its summary the committee stated:

  > There is a paucity of published peer-reviewed literature on the safety of the anthrax vaccine. The committee located only one randomized peer-reviewed study of the type of anthrax vaccine used in the United States (Brachman et al., 1962). However, the formulation of the vaccine used in that study differs from the vaccine currently in use . . . The committee concludes that in the peer-reviewed literature there is inadequate/insufficient evidence to determine whether an association does or does not exist between anthrax vaccination and long-term adverse health outcomes.

- An internal legal memorandum written in March by two Air Force Reserve judge advocates addressed the following crucial question: *Are orders currently being given to members of the U.S. Armed Forces to submit to anthrax vaccinations consistent with federal law?* In summary, the response stated:

  > Orders currently being given to members of the United States Armed Forces to submit to anthrax vaccinations are illegal because they contradict the express

WASHINGTON OFFICE:
1510 LONGWORTH HOB
WASHINGTON, DC 20515
(202) 225-2605

EVERETT OFFICE:
2930 WETMORE AVENUE, #9E
EVERETT, WA 98201
(425) 252-3188
(800) 562-1385

BELLINGHAM OFFICE:
322 NO. COMMERCIAL, #203
BELLINGHAM, WA 98225
(360) 733-4500

PRINTED ON RECYCLED PAPER

738

> terms of Presidential Executive Order 13139 and 10 U.S.C. Section 1107 (1999). Because the anthrax vaccine is being used in a manner inconsistent with both its original licensing and for a purpose for which it has never been tested, the vaccine is properly considered an Investigational New Drug under Food and Drug Administration ("FDA") regulations and federal court decisions. Both the Executive Order and the statute mandate that informed consent is a prerequisite to all vaccinations with an Investigational New Drug. It is undisputed that service members are not giving their informed consent to the vaccination process.

- On March 22, 2000 the Inspector General, Department of Defense issued an "Audit Report on Contracting for Anthrax Vaccine (Report No. D-2000-105). It documents troubling financial management practices and multiple deficiencies cited by FDA that continue to compromise the program.
- The House Subcommittee on National Security, Veterans Affairs, and International Relations issued an oversight report on February 17, 2000 entitled, "The Department of Defense Anthrax Vaccine Immunization Program: Unproven Force Protection." The report was approved and adopted by the full Committee on Government Reform. After a thorough review of current relevant scientific data and compelling testimonies, the Subcommittee made the following recommendations in brief:

> (1) The force-wide, mandatory AVIP should be suspended until DOD obtains approval for use of an improved vaccine. To accomplish this: (2) DOD should accelerate research and testing on a second-generation, recombinant anthrax vaccine; and, (3) DOD should pursue testing of the safety and efficacy of a shorter anthrax inoculation regimen; and, (4) DOD should enroll all anthrax vaccine recipients in a comprehensive clinical evaluation and treatment program for long term study.

In addition, the Subcommittee also recommended:

> (5) While an improved vaccine is being developed, use of the current anthrax vaccine for force protection against biological warfare should be considered experimental and undertaken only pursuant to FDA regulations governing investigational testing for a new indication.

(It is important to note that this recommendation concurs with the Senate Report 103-97, prepared for Senator John D. Rockefeller and the Senate Committee on Veterans' Affairs in 1994. After a review of the scientific data it concluded, "The vaccine should

therefore be considered investigational when used as a protection against biological warfare.")

- The American Public Health Association Governing Council adopted a policy statement November 10, 1999 urging the DOD to "delay any further immunization against anthrax using the current vaccine or at least to make immunization voluntary." They also called on the DOD to create a commission of military and non-military public health experts ". . . to review the evidence for effectiveness and safety of the current vaccine and the time at which an improved vaccine may be available, and to make recommendations about the continuation of the current immunization program."
- The General Accounting Office (GAO) presented testimony on October 12, 1999 before the House Committee On Government Reform on Anthrax vaccine safety and efficacy issues. The report summary includes the following statements:

> (a) No studies have been done to determine the optimum number of doses of the anthrax vaccine. (b) The long-term safety of the licensed vaccine has not been studied. (c) Since DOD's mandatory inoculation program began in 1998, DOD has conducted two efforts to actively collect data on the short-term safety of the vaccine ... According to the data gathered in both efforts, a higher proportion of females reported reactions to the anthrax vaccine than did their male counterparts. (d) There has been no specific study of the efficacy of the licensed vaccine in humans. Rather, its efficacy in humans has been inferred from other data... (e) Until 1993, FDA inspectors did not inspect the MDPH facility where the anthrax vaccine was made. According to FDA, access was not granted because its inspectors had not been vaccinated against anthrax. DOD conducted inspections, however, and identified deficiencies during a March 1992 inspection, including the absence of stability studies...FDA's subsequent inspections of the production facility in 1997 and 1998 found a number of deficiencies...The facility received warning letters from FDA, including one in March 1997 stating its intent to revoke the facility's license.

- Anecdotal evidence continues to grow of severe, adverse systemic reactions in recipients of the vaccine as demonstrated by congressional testimonies and other sources.

9
40

It is clear the AVIP program, while well-intended, is a flawed policy that should be immediately stopped and re-examined in light of the growing preponderance of evidence challenging the DOD's position. We ask that you take immediate action to suspend the AVIP until DOD complies with the recommendations of the Subcommittee on National Security, Veterans Affairs, and International Relations, House Committee on Government Reform as contained in its February 17, 2000 report.

Sincerely,

| | |
|---|---|
| Jack Metcalf | Christopher Shays |
| Bob Filner | Ben Gilman |
| Dan Burton | Peter DeFazio |
| Nick Rahall | George Nethercutt |
| Cynthia McKinney | Ron Paul |

Dana Rohrbacher

Maurice Hinchey

James Oberstar

Jim Kolbe

Bob Barr

Tammy Baldwin

Bernard Sanders

John Hostettler

Tom Campbell

Martin Frost

James Traficant

Rick Hill

Donald Manzullo

Nancy Johnson

Richard Baker

Lincoln Diaz-Balart

Mark Souder

John Conyers,

Helen Chenoweth-Hage

Donna Christensen

Charles Taylor

Ron Klink

BUD CRAMER

Robert E. "Bud" Cramer, Jr.

Christopher H. Smith

M.C.

Bud Shuster

43

# Lawmaker seeks probe of possible retaliation

## Letter cites cases of airmen who testified about anthrax shots

By David Castellon
TIMES STAFF WRITER

Congressman Dan Burton is using his political clout to aid an Air Force pilot who could face up to two years in prison for refusing his anthrax vaccination.

In a Dec. 28 letter, Burton, R-Ind., and chairman of the House Government Reform Committee, asks Defense Secretary William Cohen to grant Maj. Sonnie Bates' offer to resign his commission rather than face a possible court-martial for refusing a direct order.

Burton also asks Cohen to investigate the treatment of Bates and other service members who have testified before Congress about their concerns over the vaccine's safety.

"It appears that individuals within these witness' command, particularly at Dover Air Force Base [Del.], may have behaved in a retaliatory fashion," the letter states. "Members of the military were assured that they would be protected from retaliation as a result of their bravery for testifying before a congressional committee."

Bates, a C-5 pilot with Dover's 9th Airlift Squadron, is the only person Burton cites as an alleged victim of retaliation. He says that after Bates' testimony Oct. 12, the pilot was ordered to begin his anthrax vaccinations "sooner than other individuals who arrived at Dover at the same time, even prior to those who had been there longer."

"It's not just Sonnie," said a Reform Committee staff member who asked not to be named. "There are things that have happened to other witnesses that cause us concern. There were witnesses who have had reassignments below the level of [duties] they were handling."

The staffer would not give other examples and Burton was unavailable for comment.

Bates, who had a Jan.7 deadline to accept an Article 15 or face a possible court-martial, declined to comment on Burton's letter, as did a Dover spokesman.

Pentagon and Air Force officials also declined comment.

Over the past year, 17 military members — 14 of them from the Air Force or its reserve branches — testified before Congress criticizing the shots' safety, the treatment of service members who have suffered ill effects and how the mandatory vaccinations affect morale.

The committee staffer said Bates was invited to testify to discuss his research on the vaccine's safety and his discussions with Dover personnel who had begun the shot regimen.

"I have found that 12 people, in my squadron alone, have unusual or disabling illnesses that did not exist prior to the anthrax vaccine, and the causes are unknown," according to a written statement turned in with his testimony. "Medically diagnosed conditions of thyroid damage, liver damage, external and internal cysts (including cysts around the heart), autoimmune disorders, crippling bone/joint pain, seizures, memory loss, vertigo and inability to concentrate have been documented."

Maj. Frank Smolinsky, a Dover spokesman, said in a November interview that a review by the Mayo Clinic in Minnesota of 80 people at Dover reporting medical problems after beginning the vaccinations concluded that the symptoms "appear to be explained by pre-existing illnesses, current illnesses, other concomitant illnesses and stressors or known side effects to the anthrax vaccine."

Another Dover airman, who spoke on condition of anonymity, said he has experienced no repercussions from testifying.

> **'I've been called a boldfaced liar.'**
>
> TECH. SGT. DAVID J. CHURCHILL

But Tech. Sgt. David J. Churchill, a member of the 110th Air National Guard's 110th Fighter Wing at W.K. Kellogg Airport, Mich., said that since testifying, "I'm being watched very carefully."

Churchill, who also is a full-time technician working as a base supply specialist, said he has been restricted to his work area.

"I can't leave the building or anything. I stay in my work area. I can't talk to other people."

He said his public comments about the vaccinations also affected his relationship with fellow guardsmen.

"I've been called a boldfaced liar about the base," he said, while others complained he "was bringing bad publicity on the base."

Churchill said he has suffered severe allergic reactions to the shot including blood blisters in his mouth and had to be taken to an emergency room shortly after his fifth shot.

"My blood pressure was sky high. I thought I was having a heart attack," he said.

He said civilian physicians told him his symptoms appear to be severe allergic reactions to the anthrax vaccine, but said he has been told he must get his sixth shot.

He said he is fed up and told his commanders Jan. 4 that he is quitting his technician job.

In a written statement, 110th officials denied those claims, saying that Churchill was advised in August that he could not conduct activities "contrary or detrimental to the current DOD anthrax vaccination program" on the base, but no restrictions were placed on him.

Wing officials said they were unaware of Churchill's claims of coworker harassment and will take action to make Churchill's work environment "less uncomfortable."

Churchill said he hopes to get an Individual Mobilization Augmentee position in an active-duty unit that will not require him to continue the shots before he has 20 years of service. □



"Serv
is a resp
don't t

Service. A w
about it from our
know what it m
USAA was foun
by military perso
serve our meml
and services th
to banking to i
unique package
you through a
member servi
highest by a wid
members thems
or officers, on
Guard or Reser
a word. It's a w

Call us

USAA We kno
INSURANCE · I

USAA Federal Savings Bank, a
other banking and credit card p
Investment Management Com
Companies. Property and casu
provided by United Services A
General Indemnity Company. L
LENDER

44

EXHIBIT F

**DEPARTMENT OF THE AIR FORCE**
**Air Force Reserve Command (AFRC)**

26 JUL 99

MEMORANDUM FOR MAJOR MARC MILLICAN

FROM: 312 AS/CC
511 Waldron Street
Travis AFB CA 94535-2154

SUBJECT: AF 1288

Per my E-mail to you this date, please sign the enclosed AF 1288 and return it in the envelope provided. At your option, you alternatively may sign the enclosed AF 131, which will then be processed at the appropriate time. As you may know, those who have not started the Anthrax regimen are no longer eligible to perform UTAs. As such, if I have not received either your signed AF 1288 or AF 131 by 20AUG99 the remaining UTA periods this fiscal year will be considered unexcused. Such absences could jeopardize 1999 from being recorded as a "good" year for retirement purposes.

FRANK J. PADILLA, Lt Col, USAFR
Commander

cc: 349 OG/CC
312 AS/DO
312 AS/DOP

45

EXHIBIT G

TAB G

**DEPARTMENT OF THE AIR FORCE**
Air Force Reserve Command (AFRC)

15 NOV 99

MEMORANDUM FOR MAJOR MARC MILLICAN

FROM: 312 AS/CC
511 Waldron Street
Travis AFB CA 94535-2154

SUBJECT: Notification of Initiation of Involuntary Reassignment to the Standby Reserve

1. I am recommending you for involuntary reassignment to the Standby Reserve (ARPC) in accordance with AFI 36-2115, *Assignments Within the Reserve Components*, paragraph 4.2, and Table 5.1, Rule 39. AFI 36-2115 is available for your review at your servicing Military Personnel Flight. The specific reason for this recommendation is based on your unsatisfactory Reserve duty participation in CY 1999. Specifically, the following Unit Training Assembly (UTA) dates were recorded as unexcused: 21/22 AUG 99, 25/26 SEP 99, 16/17 OCT 99, and 13/14 NOV 99. Since you failed to respond to my 26 JUL 99 memorandum to you, in which I requested that you return either a AF 1288 or AF 131 (both of which had been enclosed), your career intentions were not known and all subsequent UTA periods were deemed unexcused. A copy of the 26 JUL 99 memorandum is enclosed (without attachments) as Atch 1.

2. If approved, this action will result in your involuntary reassignment to the Standby Reserve and may impact your ability to obtain future assignments. In the interim, you are denied from taking part in pay or point gaining activities, i.e. UTAs, annual tour, man days, etc., pending the approval authority's decision.

3. Within 24 hours after you receive this memorandum, you must complete and return the attached acknowledgment of receipt (Atch 2). You are entitled to submit statements or/ documents which you desire to be considered in the disposition of your case. These statements or documents must be submitted to this office within 15 calendar days after you receive this memorandum. A return envelope (Atch 3) is provided for your convenience.

4. You should note that failure to acknowledge receipt of this memorandum or failure to submit statements or documents within 15 calendar days after receipt of this memorandum constitutes a waiver of your right to rebut this proposed involuntary reassignment and will result in your case being processed based on the information available.

FRANK J. PADILLA, Lt Col, USAFR
Commander

Attachments:
1. Memorandum dated 26 JUL 99 from 312 AS/CC to Major M. Millican
2. Acknowledgement of Receipt
3. Return envelope

46

EXHIBIT H

MEMORANDUM FOR 312 AS/CC

FROM: Major M. Millican
2540 Curlew Cir
Anchorage AK 99515

1. I hereby acknowledge receipt of and understanding of your memorandum dated 15NOV99 notifying me that an action has been initiated for my involuntary reassignment. I understand that if I do not respond within 15 calendar days after receipt of notification of initiation of involuntary reassignment action, involuntary reassignment action will continue on the basis of the available information.

2. I do / do not desire to submit rebuttal statements or documents for consideration. Rebuttal statements are / are not attached.

MARC J. MILLICAN, Major, USAFR