consider plaintiffs' arguments.[5]

In 1996, the manufacturer of the AVA, the Michigan Department of Public Health, filed an Investigational New Drug Application that remains open today. The manufacturer's stated purpose for filing the application was "to conduct clinical investigations designed to investigate changes in the approved labeling for the licensed product. The potential labeling would affect the specific clinical indication, route and vaccination schedule for AVA." Pls.' Compl. Ex. J, Letter from MDPH to Dr. Kathryn C. Zoon of October 20, 1996. The Introductory Statement to the 1996 IND application similarly provided that "[t]he ultimate purpose of this IND is to obtain a specific indication for inhalation anthrax and a reduced vaccination schedule." Pls.' Compl. Ex. K, Introductory Statement to the 1996 IND Application of September 20, 1996.

The source of the dispute concerns whether current use of the AVA for inhalation anthrax is licensed in light of the drug's present status and the IND application. Plaintiffs contend that,

---

[5] At the oral argument, the government argued that the Citizen Petition states that the drug is licensed for inhalation anthrax and that is the agency's official position. Tr. at 86. However, the Court is persuaded by plaintiffs' arguments that the Citizen Petition addressed the licensing issue by merely relying on the 1997 Friedman letter and did not do the in-depth analysis as would be appropriate to make that kind of a determination or to contradict the opinion it expressed concerning the Bachman study in the 1985 Federal Register. *See* Tr. at 125.



120

as there has been insufficient study of the vaccine, its license does not incorporate inhalation anthrax. They rely on a 1985 panel that found that the license for anthrax was not broad enough to include inhalation anthrax. The panel findings were based partially on the Brachman Study, which noted that there were too few cases of inhalation anthrax to determine the efficacy of the vaccine. *See* Brachman and Friedlander, Vaccines 736 (eds. Plotkin and Mortimer)(1999). The Brachman Study observed that there have been "no controlled clinical trials in humans of the efficacy of the currently licensed U.S. vaccine." *Id.*[6] Plaintiffs correctly note that there have been no subsequent human studies on the efficacy of the vaccine against inhalation anthrax since that time. In addition, plaintiffs submit that defendants' own documents support their position that a vaccine is investigational if it is used in a manner, or for a purpose, identical to that set forth in the IND application. In this regard, plaintiffs cite a number of documents, including the October 5, 1995, letter by the U.S. Army Medical Research and Material Command, the November 13, 1995, memorandum from the Department of the Army's Joint Program Office for Biological Defense, and information provided by the Army at the July 2, 1996, FDA-sponsored meeting, chronicling the government's

[6] *See* Pls.' Reply at 13 n. 12 for relevant congressional testimony.

statements that the AVA lacked licensure for protection against inhalation anthrax.

Plaintiffs conclude that, because there is insufficient scientific evidence demonstrating that the anthrax vaccine protects against anthrax inhalation exposure, the government's claims violate fundamental precepts of drug law. Specifically, plaintiffs submit that the government claim violates 21 C.F.R. § 201.56(c), detailing general requirements on content and format of labeling for prescription drugs, which provides:

> The labeling shall be based whenever possible on data derived from human experience. No implied claims or suggestions of drug use may be made if there is inadequate evidence of safety or a lack of substantial evidence of effectiveness. Conclusions based on animal data but necessary for safe and effective use of the drug in humans shall be identified as such and included with human data in the appropriate section of the labeling, headings for which are listed in paragraph (d) of this section.

Moreover, plaintiffs contend that 21 C.F.R. § 201.57 (c)(2) is violated. That section provides that "All indications shall be supported by substantial evidence of effectiveness based on adequate and well-controlled studies." *Id.* Plaintiffs assert that the government cannot identify "substantial evidence of effectiveness based on adequate and well-controlled studies" for the anthrax vaccine with respect to protection against inhalation anthrax.

While the issues presented to the Court are complex, and the

evidence somewhat contradictory, the Court is ultimately persuaded that plaintiffs enjoy a substantial likelihood of success on the merits for the following reasons. The FDA, the only agency that this Court could properly defer to in determining AVA's status as an investigational drug, has failed to provide a formal opinion as to AVA's investigational status. Having made that determination, the Court is required to make its own inquiry and determination regarding AVA's investigational status. The Court looked at the labeling requirement, 21 C.F.R. § 201.56, which mandates that "[n]o implied claims or suggestions of drug use may be made if there is inadequate evidence of safety or a lack of substantial evidence of effectiveness." In the case of AVA, the 1985 panel found insufficient data to license the drug for use against inhalation anthrax. To date, no additional studies have been performed and AVA's label does not specify use of the vaccine for this purpose. Moreover, the Court is persuaded that the 1996 IND application remains pending today. The introduction to the application expressly states that one objective of the application is to obtain a specific indication for use of AVA against inhalation anthrax. While the government states that the inhalation anthrax aspect of the IND is no longer active, the documents submitted to this Court under seal suggest otherwise.[7] Finally, statements made by DoD officials suggest

---

[7] SEALED.

that the agency itself has, at some point at least, considered AVA experimental with respect to inhalation anthrax. Given all these factors, the Court would be remiss to conclude that the original license included inhalation anthrax. Having reached that conclusion, the DoD's administration of the inoculation without consent of those vaccinated amounts to arbitrary action.

**III. The Public Interest**

Plaintiffs maintain that Executive Order 13139, Department of Defense Directive 6200.2, and especially 10 U.S.C. § 1107, were enacted to protect soldiers from involuntarily serving as "guinea pigs" in a mass use of investigational medicine. Pls.' Mot. at 23. In their view, defendants' disregard of the violations has already caused half a million members of the armed forces to be experimental subjects without their consent.

Defendants base their public policy argument on the idea that requiring compliance with informed consent would render it infeasible to continue the AVIP for current military operations in Iraq or in conjunction with the war on terrorism. Essentially, defendants argue that the harm to the public interest would include disrupting the smooth functioning of the military, hampering military readiness, and reducing the military's ability to protect its service members. Should those individuals who have refused anthrax vaccinations be injured by

anthrax, their injuries or deaths would have a detrimental effect on the military and its operation at large. Defs.' Opp'n at 37. Plaintiffs counter by observing that if the risks of anthrax injuries were so manifestly present, the State Department, as well as the coalition forces of Britain and Australia, would have taken similar steps to protect their employees. Plaintiffs refute the government's argument concerning the cumbersome administrative results that could ensue from the granting of a preliminary injunction by stating that the DoD was able to comply with similar administrative proceedings in only three weeks between adoption of the predecessor of 10 U.S.C. § 1107 and the start of the Gulf War in 1991. Plaintiffs conclude by remarking that "if the danger articulated by the government is so clear...there should be little difficulty in convincing the President...to sign off on the required paperwork to make the AVIP mandatory...which is all plaintiffs can ask." Pls.' Reply at 24.

The Court is persuaded that the right to bodily integrity and the importance of complying with legal requirements, even in the face of requirements that may potentially be inconvenient or burdensome, are among the highest public policy concerns one could articulate. Moreover, the Court is not convinced that requiring the DoD to obtain informed consent will interfere with the smooth functioning of the military. However, if obtaining

informed consent were to significantly interfere with military function, defendants are free to seek a presidential waiver. If the Executive branch determines that this is truly an exigent situation, then obtaining a presidential waiver would be an expeditious end to this controversy.

## IV. Irreparable Harm

Plaintiffs argue that their injuries from non-consensual inoculations would be irreparable. They note that the informed consent documents provided to civilians as a result of the anthrax laden letters in the Fall of 2001 identify side effects such as Guillain-Barre Syndrome, multiple sclerosis, angiodema, aseptic meningitis, severe injection site inflammation, diabetes, and systemic lupus erythmatosis. In addition, the pregnancy risk assessment has, as noted above, been recently upgraded. Pls.' Mot. at 15. It is impossible to tell with any certainty what the long-term effects of the vaccination will be. Regardless, plaintiffs submit that no monetary award can adequately compensate individuals whose right to informed consent has been violated.

Defendants' position is that harm in the form of potential side effects is "hypothetical or, at best, unlikely to occur." Defs.' Opp'n at 40. Defendants refer to a *de minimis* risk of serious adverse reactions and report 105 serious adverse

reactions from AVA in over 830,000 recipients. *Id.* They stress that AVA has been used effectively in civilian industry for over 30 years.

Having found that AVA is an investigational drug under 10 U.S.C. § 1107, the Court is persuaded that requiring a person to submit to an inoculation without informed consent or the presidential waiver is an irreparable harm for which there is no monetary relief.

**Conclusion**

The Court has considered Plaintiff's Motion for a Preliminary Injunction, the Response and Reply thereto, counsel's representations at oral argument, and the relevant statutory and case law. In sum, because the record is devoid of an FDA decision on the investigational status of AVA, this Court must determine AVA's status for itself. This Court is persuaded that AVA is an investigational drug and a drug being used for an unapproved purpose. As a result of this status, the DoD is in violation of 10 U.S.C. § 1107, Executive Order 13139, and DoD Directive 6200.2. Thus, because the plaintiffs are likely to prevail on the merits, defendants will not face substantial harm by the imposition of an injunction, the public interest is served, and plaintiffs face irreparable harm, the Court finds that the plaintiffs meet the requirements for a Preliminary Injunction.

The women and men of our armed forces put their lives on the line every day to preserve and safeguard the freedoms that all Americans cherish and enjoy. Absent an informed consent or presidential waiver, the United States cannot demand that members of the armed forces also serve as guinea pigs for experimental drugs.

An appropriate Order accompanies this Opinion.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOHN DOE #1, *et al*, Plaintiffs, v. DONALD H. RUMSFELD, *et al* Defendants. | Civil Action No. 03-707 (EGS) |

**ORDER**

Pursuant to Fed. R. Civ. P. 65 and for the reasons stated by the Court in its Memorandum Opinion docketed this same day, it is this 22nd day of December, 2003, hereby

**ORDERED** that the Motion for a Preliminary Injunction is **GRANTED.** In the absence of a presidential waiver, defendants are enjoined from inoculating service members without their consent; and it is

**FURTHER ORDERED** that defendants are directed to file responsive pleadings by January 30, 2004; and it is

**FURTHER ORDERED** that an Initial Scheduling Conference is scheduled for **March 9, 2004 at 10:00 a.m.** Pursuant to LCvR 16.3 of the Local Rules and Fed. R. Civ. P. 26(f) counsel shall meet and confer by no later than February 24, 2004 and submit their Report addressing all topics listed in LCvR 16.3(c) by no later than March 2, 2004.

**Signed: Emmet G. Sullivan**
**United States District Judge**
**December 22, 2003**

**DEPARTMENT OF THE AIR FORCE**
OFFICE OF THE CHIEF OF STAFF
WASHINGTON, DC

14 January 2004

MEMORANDUM FOR AFBCMR

FROM: HQ USAF/JAA
1420 Air Force Pentagon
Washington D.C. 20330-1420

SUBJECT: Application for Correction of Military Records - Marc J. Millican (AFBCMR 03-02505)

This is in response to your request for our review and comment on subject application. The applicant requests that his retired grade be changed from major to lieutenant colonel and that the adverse Officer Performance Report, Letter of Reprimand and promotion propriety action he received while as a member of the United States Air Force Reserves be set aside. He also requests that the administrative consequences deriving from the above actions be rescinded and that he be given constructive service credit and retroactively placed in an active participation status through 30 June 2003, along with back pay and allowances for the UTAs he missed since 1999. A brief recital of the factual background of this case may aid the Board in its review.

The applicant was a C-5 pilot assigned to the 312th Airlift Squadron, Travis AFB, California. The 312 AS/CC informed him in February 1999 that all squadron personnel were required to begin receiving anthrax shots before flying on any airlift missions and in no case later than 1 July 1999, in accordance with the DoD Anthrax Immunization Vaccine Program (AVIP). The applicant refused to participate in the program, citing his belief that the shots were experimental and could cause severe medical problems. In May and June 1999, the commander reaffirmed his previous statement that the shots were mandatory and that failure to participate in the anthrax program would prevent those members from participating in UTAs. In June 1999, the 349th Wing Commander rated the applicant as a "definitely promote" on his Promotion Recommendation Form. The FY 2000 Air Force Reserve Line Selection Board subsequently selected the applicant for promotion to lieutenant colonel in July 1999. His effective date of promotion was to be 22 June 2000.

In July 1999, the applicant participated in various Congressional hearings involving the anthrax program. The case file does not clearly indicate what he discussed, but it appears he provided information to the panels concerning pilots who suffered medical problems, ostensibly due to the anthrax shot. On 26 July 1999, the commander sent the applicant a letter informing him that because he had not started the anthrax regimen, he was no longer eligible to perform UTAs. The applicant again refused to comply with the AVIP requirements and on 15 November 1999, the commander notified the applicant of his intention to have the applicant involuntarily transferred to the Standby Reserve. The basis for the transfer was the applicant's unsatisfactory participation in UTAs for calendar year 1999. The applicant did not respond to the notice and the commander forwarded his recommendation to the 349 AMW/CC on 19 December 1999, recommending the applicant be reassigned to ARPC.

EX G 130

On 19 December 1999, the applicant received a letter of reprimand from the squadron commander stating that he (the applicant) had "engaged in acts of a nature to cause discontent and undermine military discipline within this squadron." The specific bases for the reprimand was the applicant's efforts to actively seek out squadron members and encourage them to defy Air Force policy by refusing to undergo the anthrax immunization series. The commander also noted that the applicant attempted to disrupt the wing's effectiveness by trying to persuade members of the 312 AS to refuse to fly missions for another squadron even though the commander had specifically requested such assistance due to impacted wing manning levels. The LOR was placed in a UIF. The applicant declined to reply to the LOR. On 10 March 2000, the applicant received a referral OPR based upon the applicant's efforts to "foment discord and attempting to instill a culture of distrust for squadron leadership." The applicant was informed of his right to respond to the OPR, but chose not to provide comments.

On 13 March 2000, the 349 AMW/CC recommended the applicant's name be removed from the FY 2000 lieutenant colonel promotion list. The basis for this recommendation was the applicant's efforts to purposefully undermine the credibility of the squadron leadership and his attempt to disrupt the orderly operation of the unit and wing by encouraging others to disregard the commander's directives. The commander concluded that such actions were inconsistent with the standards of conduct and professionalism expected of a senior field grade officer. The applicant was informed that he could not assume the higher grade until a decision was made on the removal action. The applicant did not respond to the removal notification letter and on 7 January 2002, the Deputy Secretary of Defense concurred with the promotion propriety action and forwarded the package to the President who approved the removal recommendation on 17 April 2002. On 1 April 2003, the applicant was transferred to the Retired Reserves as a result of being twice non-selected for promotion to lieutenant colonel.

The applicant contends that he acted in good faith in refusing to take part in the anthrax program because he believed there was sufficient evidence showing the drug was investigational or experimental and therefore required his voluntary and informed consent in order to undergo the immunization regimen. He states that his commander gave no indication that refusal to participate would result in "punitive action." He complains that the commander's order placed him in a predicament. He had 19 years in the Reserves and risked "forfeiting this investment" if he refused to take the shots. On the other hand, he had 18 years toward retirement as a civilian airline pilot which could be forfeited if he had an adverse reaction to the anthrax shots. He believes he was unfairly required to choose between the two alternatives to his detriment. The applicant denies trying to entice other pilots to refuse to participate; rather he claims he was following the commander's guidance and invitation to discuss the pros and cons of the program. He argues that the commander has overstated the applicant's role in discussing the issue with other pilots and the actions taken against him were a "damage-control knee-jerk response" by the commander. He asks that he be allowed to retire as a lieutenant colonel, along with receiving corresponding back pay and benefits. He further requests that all adverse administrative actions be rescinded from his personnel records.

The applicant's complaints are unfounded and his request to have his military records amended should be rejected by the Board. Despite his arguments to the contrary, the applicant was not "punished" for "expressing his First Amendment rights" to the members of the

squadron, nor was he reprised against for making a statement to a Congressional subcommittee. All of the administrative consequences that occurred were as a direct result of the applicant's actions and decisions. Throughout this process, the squadron commander acted in accordance with established DoD guidelines and within the bounds of his discretion as a commander. The commander was responsible for ensuring that all military personnel under his command received the immunizations. He did not have the authority to allow members to voluntarily refuse to get the shots because they disagreed with the program.

The commander notified the applicant on several occasions that his refusal to begin taking the vaccine would render him ineligible to perform UTAs and would result in his being administratively sent to the Standby Reserves. The applicant cannot now argue that the commander's action in reassigning him to the Standby Reserves was unexpected. The applicant was fully aware of the consequences of his actions and he made a knowing and deliberate decision to refuse participation in AVIP. The applicant alone bears the responsibility for the outcome he now complains about.

In this case the commander reproached the applicant not for refusing the anthrax shot, but for inciting disloyalty and mistrust within the squadron. The applicant sought out and spoke with members of the squadron, advocating that they refuse to undergo the anthrax protocol. He sent out e-mails to other pilots stating that the commander did not care about them and encouraged them to disregard the commander's advice and directives. While the applicant is entitled to his own viewpoint concerning the efficacy of AVIP, he was not at liberty to actively persuade other squadron members to refuse to participate. Moreover, he was certainly not permitted to undermine the authority of the squadron commander by encouraging other pilots to refuse to fly scheduled missions for a sister squadron. The applicant used his position of leadership within the squadron to influence others to defy the commander, causing discord within the unit. Such conduct strikes at the heart of good order and discipline and cannot be tolerated. The squadron commander was clearly within his authority to reprimand the applicant for his inappropriate conduct.

Likewise, the resulting referral OPR was a direct reflection of the applicant's failure to meet required standards in leadership, professional qualities and judgment and decisions. The applicant's immediate supervisor determined that the applicant had engaged in conduct designed to "foment discord within the organization." Both the squadron commander and the wing commander independently concurred with the supervisor's evaluation. As noted by ARPC/DPB, the basic premise of evaluation reports is that they are accurate and objective and presume the integrity of the raters. There should be strong evidence to overcome the report's presumed validity. AFI 36-2401 acknowledges that the most effective evidence consists of statements from the evaluators or from other individuals in the rating chain when the report was signed. The applicant has provided no evidence showing that the referral OPR was inaccurate. In fact, he refused to even provide comments when given the opportunity in 2000. While he may disagree with the evaluation, his argument that he is being made a "scapegoat" by the commander is without merit. The OPR accurately reflects the applicant's negative impact on mission readiness, good order and discipline.

We also note that the applicant's request to rescind the referral OPR should be rejected as untimely. By law and regulation (AFI 36-2603, paragraph 3.5.), an application must be filed within three years after an error or injustice is discovered, or with due diligence, should have been discovered. In the applicant's case, his OPR closed out on 19 May 2000. He did not file his petition for redress with the Board until 21 July 2003. Despite being given sufficient opportunity to contest the validity of the OPR, the applicant chose not to respond. There is no evidence suggesting that the applicant could not have filed his AFBCMR petition within the three-year statutory deadline. We recommend the Board reject his appeal as not being timely.

The wing commander's decision to recommend the applicant's removal from the lieutenant colonel promotion list was justified and neither arbitrary or capricious. As with the LOR and OPR, the promotion propriety action was based on the applicant's attempt to cause dissension within the squadron. His actions were inconsistent with the standard of conduct and professionalism required for a lieutenant colonel. The standard for removing an officer's name from the promotion list is very broad. AFI 36-2504 instructs commanders to initiate a propriety of promotion action when there is cause to believe that the officer is not mentally, physically, morally or professionally qualified to perform the duties of the higher grade. There is certainly sufficient evidence to substantiate the wing commander's recommendation. Every member of the applicant's chain of command, to include the Secretary of the Air Force and Deputy Secretary of Defense concurred in the removal action. Ultimately, the President made an independent determination that the applicant's conduct made him unfit for the higher grade. There is no evidence indicating that the applicant was singled out due to his personal views on the anthrax program.

The applicant asserts that he is entitled to be retroactively promoted because the President did not sign the removal action within 18 months from the time the applicant was notified of the commander's initiation of the propriety action. The applicant improperly attempts to combine the statutory provisions involving promotion delays and promotion removals to support his argument. The two actions are distinct and must be interpreted as such. While a promotion may be delayed for a maximum of 18 months pursuant to 10 USC § 14311, the President may remove an officer's name from the promotion list at any time before the date on which the officer is promoted. There is no statutory deadline under 10 USC § 14310 for the President to make the removal decision. AFI 36-2504 also recognizes the difference between a removal and a delay action and requires different procedures depending on which promotion propriety action is initiated.

The applicant's reliance on *Rolader v. United States*, 41 Fed.Cl 783 (1999), to support his argument that a promotion removal must occur within 18 months is flawed. *Rolader* involved an officer whose promotion was initially delayed pending the outcome of an internal investigation. Ultimately, a decision was made to remove the officer's name from the promotion list, but only after the promotion delay had expired. The *Rolader* court determined that the Air Force failed to follow its own regulatory guidelines in processing the removal action, and because the Air Force did not initiate the removal action until after the officer's effective date of promotion, the officer was promoted by operation of law. The *Rolader* decision does not govern in the applicant's situation. No member of the applicant's chain of command sought to delay the promotion; rather it was always processed as a removal action from the onset and the removal was initiated prior to the applicant's established promotion date. The wing commander's instruction to the applicant

not to pin on lieutenant colonel after his promotion date was not a delay action, but rather a notification that the promotion removal action had been initiated and the applicant was not eligible to be promoted until a final decision was made. Because the applicant's promotion was processed as a removal action rather than a delay, the 18-month deadline discussed in 10 USC § 14311 does not apply and the *Rolader* decision is not dispositive.

There are no grounds for the Board to set aside the applicant's second non-selection for promotion. His promotion record was considered by a properly convened Selection Board that determined the applicant was not qualified for promotion. There is no evidence to the contrary. The same facts that led to the applicant's LOR, OPR and removal from promotion were present when the Board non-selected him for promotion. Their decision was justified based on the applicant's conduct. Therefore, the applicant's request to be promoted to lieutenant colonel effective 30 June 2000, along with back pay and allowances, is not warranted.

If the Board determines an error or injustice occurred requiring correction of the applicant's military record, we urge the Board not to grant his request for direct promotion to the grade of lieutenant colonel. The law mandates promotion nominations be preceded by recommendations from selection boards convened under 10 U.S.C. § 14101 or from special selection boards (SSBs) under 10 U.S.C. § 14502. If the Board deems any remedial action necessary, we recommend the applicant's record be referred to a SSB for its determination whether he should be recommended for promotion.

With respect to the applicant's request to set aside his automatic transfer to the Retired Reserves on 1 April 2003, we note that such an action was statutorily mandatory upon his second non-selection for promotion and is not a basis for relief.

The applicant's argument that he was the victim of reprisal for testifying before Congress is baseless. The various disciplinary and administrative actions that were taken were as a direct result of the applicant's conduct and his impact to mission readiness and good order and discipline. Such measures would have occurred regardless of whether the applicant had spoken to members of Congress. The applicant's argument fails the acid test for reprisal and therefore should be discounted.

Finally, the applicant has provided materials from a recent federal district court decision (*Doe v. Rumsfeld*, (D.D.C., 22 Dec 03)) wherein the judge issued a preliminary injunction against inoculating service members without their informed consent until such time that the FDA made a written declaration concerning the effectiveness of the vaccine against inhalation anthrax. The applicant now argues that in granting the injunction, the judge accepted the plaintiff's assertion that the anthrax vaccine is an investigational drug and the commander's order for all squadron members to receive the vaccine was illegal. This argument is invalid, as the same judge has now lifted the injunction after the FDA made a written determination that the anthrax vaccine is safe and effective against all forms of anthrax.

In conclusion, the applicant has failed to demonstrate the existence of any error or present facts and circumstances supporting an injustice. The applicant bears the responsibility of the consequences of his actions. Accordingly, we recommend applicant's request for relief be denied because it is both untimely and not valid on the merits.

HARLAN G. WILDER
Chief, Administrative Law Division
Office of The Judge Advocate General

Attachment:
Case File

DEPARTMENT OF THE AIR FORCE
WASHINGTON, DC

JAN 20 2004

Office of the Assistant Secretary

AFBCMR
1535 Command Drive
EE Wing 3rd Floor
Andrews AFB, MD 20762-7002

Major Marc J. Millican, USAFR, Retired
c/o Mr. John A. Wickham
32975 St. Moritz Drive
Evergreen, CO 80439-3825

Dear Major Millican

The attached additional advisory opinion is provided for your review and comments. **THIS IS NOT THE DECISION OF THE AFBCMR ON YOUR APPLICATION** (AFBCMR Docket No. BC-2003-02505).

You have 30 days from the date of this letter to respond and/or submit additional matters in support of your request. If no response is received during this period, we will assume you do not wish to provide further comments and your case will be scheduled for consideration by the AFBCMR. If you need more time to comment, it is suggested that you request that your application be temporarily withdrawn until you are prepared to proceed. Your comments and/or submission of additional documentation should be addressed to:

AFBCMR
1535 Command Drive
EE Wing, 3rd Flr
Andrews AFB, MD 20762-7002

Please include your social security account number and/or your service number, and your AFBCMR docket number on all correspondence.

Donna Pittenger

DONNA PITTENGER
Chief Examiner
Air Force Board for Correction
of Military Records

Attachment:
Ltr, HQ USAF/JAA, dtd Jan 14, 2004

cc:
Mr. John A. Wickham

136
EX H

**Reply to:**
**32975 St. Moritz Drive**
**Evergreen, CO 80439**
**(303) 670-3825**
**Fax 670-1586**

**John A. Wickham, Esq.**
**Admitted in Virginia,**
**District of Columbia**
**& Military Courts**

# John A. Wickham & Associates
## Attorneys-at-Law

17 February 2004

Air Force Board for Correction of Military Records (AFBCMR)
Department of the Air Force
Washington D.C. 20330-1430

FAXED 19 FEB04

Re: Dkt. BC-2003-02505,
MARC J. MILLICAN, Major, USAFR (Ret.) 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

SUBJECT: Reply to advisory opinion forwarded 20 JAN 2004, Office of JAG

Board:

Counsel for applicant submits his reply to the third advisory opinion ("3Adv.Op.") dated 14 JAN 2004 and forwarded to applicant by memorandum dated 20 JAN 2004.

1. <u>Violation of promotion delay statute</u>, 10 U.S.C. § 14311

The 3Adv.Op. repeats the allegation in the previous 2Adv.Op. dated 5 Sep 03 at ¶ d. (delay and removal statutes "provide two distinct processes."). The 3 Adv.Op. states,

> The applicant improperly attempts to combine the statutory provisions involving promotion delays and promotion removals. . . .The two actions are distinct and must be interpreted as such. 3Adv.Op. at page 3.

However, the issue is whether the Air Force may validly argue that the two statutes operate independently when AFI 36-2504 Chapter 7, defines a removal action as a "promotion delay" within the meaning of the delay statute § 14311(d)(delay for lack of qualifications). Provisions within 7.8 must also be read together so that ¶ 7.8.4 allows automatic delay but that ¶ 7.8.7 terminates the delay at 18 months. Therefore, 3 Adv.Op. misreads it own regulation because a removal action can only be initiated as part of a promotion delay. Once a delay is invoked, the next issue is whether the Air Force can lawfully enforce its own infinite delay provision that selectively ignores the statutory due process requiring Secretarial extensions beyond 6 months and maximum length of delay to 18 months.



137
EX I

No court has agreed with the Air Force departure from the statutory delay procedure, while the Rolader court noted it was "unenforceable." Although its holding in that case did not require it to strike down the Air Force's dubious interpretation,[1] it took the unusual step of going beyond its holding to warn the Air Force in future cases:

> Although not necessary to its result, the court notes that it has serious misgivings about the enforceability of the automatic delay provision of AFR 36-89. The effect of that regulation is to allow a relatively subordinate officer to initiate delay that continues indefinitely. This seems inappropriate when one considers that a six-month delay extension [in § 14311(d)] requires the approval of the Secretary.

Rolader at 787. The court was pointing to cases like Major Millican's where BG Black on 13 March 2000— not the SAF— unilaterally extended his promotion of 22 June 2000 indefinitely. Neither the SAF or his delegated Assistant Secretary extended the delay when the 6 months expired on 22 December 2000, as required by statute § 14311(d)(no delay beyond six months "unless the Secretary concerned specifies a further period of delay," up to 18 months).

The Rolader court also found it "worth noting that the other services have not construed [the two statutes] to permit a removal recommendation to indefinitely extend the time. . . .They construe [both statutes] as operating in tandem. . ." Id at 785-86 (Navy and Army require removal actions as delays subject to Secretarial extension and 18 months limit). This follows the well established canons of statutory construction where the removal and delay laws to be given full effect must be read together as part of a statutory scheme on the same subject, under Title 10, Chapter 1405 (promotions of reserve officers).[2] An otherwise narrow focus on the removal statute read in isolation and torn from the structure and policy of Chapter 1405 as a whole is a "formula for disaster" that may nullify another statute on the same subject. Smith v. Brown, 35 F.3d 1516, 1522-23 (Fed.Cir.1994). By giving full reference to certain laws that fit most logically and comfortably into in the context of the whole body of

---

[1] Rolader at 786 (plaintiff asking court to strike down automatic delay provision).

[2] Chapter 1405 contains §§ 14301 to 14317.

law, Smith relied on Supreme Court decisions on how to interpret both clauses within one statute, and statutes on the same subject:

> The court will not merely look to a particular clause. . .but will take in connection with it the whole statute (or statutes on the same subject) and the objects and policy of the law, as indicated by its various provisions, and give it such a construction as will carry into execution the will of the legislature.

Smith at 1523. That court rejected the government's statutory interpretation that sliced up phrases while ignoring their context because it left the remainder "mere surplusage, entirely without meaning." Smith at 1524, quoting Marbury v. Madison, 5 U.S. 1 (1803). The 3 Adv.Op. omits the part of Rolader warning and explanation why the other services read the delay and removal statutes as operating in tandem. This omission is to avoid the compelling canons of statutory construction against argument that removal and delays actions are unrelated.

The Rolader *dicta* was taken to the next step recently in the promotion delay and removal case of Barnes v. United States, 57 Fed.Cl. 204 (2003) (promotion removal action after scheduled promotion date was invalid where Navy failed to meet statutory delay procedures and the time expired). Interpreting Rolader, the Barnes court stated that "because that officer was not removed from the promotion list on the date his promotion delay expired, the court found Lt.Col. Rolader was promoted by operation of law." Id at 209-210 [emphasis added]. In Barnes, the court found that the Navy regulations should be interpreted so that the delay and removal statutes be read together. Barnes at 207, 218 ("an officer may be removed from a promotion list only during a period of delay."). 3Adv.Op did not mention Barnes.

The court in Barnes found the Navy's later removal action was invalid because it had not complied with the criteria of the delay statute. Id at 218-19 (statute's clear language is that a promotion "shall" occur unless there is compliance with the delay provisions). The court made clear it was not promoting the officer, but only "recognizing the promotion had occurred. Id at 213-14.

Air Force regulation interprets the removal and delay statutes as operating together and not as distinct processes. AFI 36-2504 at ¶ 7.2, states that a propriety of promotion action, including list removal, is initiated when a commander "has cause to believe an officer is not. . .morally or professionally qualified to perform the duties of the higher grade." This "for cause" language is taken

verbatim from the promotion delay statute, § 14311(b)(delay for lack of qualifications). This language reappears in the SJA legal review of 16 June 2000, at ¶ 3c, of BG Black's removal recommendation.

Secondly, AFI 36-2504 at ¶ 7.5 (Involuntary Delay) states that "a delay also occurs if an action begins to remove an officer from a promotion list." This sentence is followed by

> the MAJCOM/FOA commander is the approval authority for delaying a promotion up to 6 months from the DOR. After 6 months, the SAF must approve a delay up to 12 additional months.

This totals the 18 month outer limit appearing in ¶ 7.5.4 (do not delay more than 6 months unless the SAF specifies a longer time. Do not delay more than 18 months). This is consistent with Barnes where the Navy was allowed to initiate a removal action only during a delay. Id at 218.

Instructive here is that the Barnes court rejected the Navy's argument that the removal statute operated independently of any failure to properly delay the officer's promotion. Id at 218 (government position is that the SECNAV may remove the name of any officer from a promotion list at any time even if it was delayed without compliance with statutory procedure). The Court found that position "conflicts" with its regulatory and statutory constraints that removal action be initiated during a delay. Id at 218-219 (adding that statute's clear language is that a promotion "shall" occur unless there is compliance with the delay provisions). Therefore, the Navy could not suddenly divorce its removal action from the delay action. The court cited McCarthy v. United States, 7 Cl.Ct. 390, 394-95, 397 (1985), where the court rejected the Air Force's argument that a commander's removal action with its indefinite delay always supercedes the outer limits on a pending delay period.

The Air Force regulation conflicts internally, and renders the delay statute meaningless. It calls a removal action "a delay" that is subject to MAJCOM extension up to 6 months and SAF approval thereafter. This clearly invokes the delay statute's procedural due process. Having invoked the delay statute's constraints, the regulation suddenly jettisons them all by allowing any subordinate commander to extend the delay indefinitely without intervention by a MAJCOM or SAF. ¶ 7.8.4 (commander's recommendation to remove delays promotion until SAF makes decision). The regulation cannot define a removal a delay that is subject to § 14311 then cherry-pick what provisions it prefers.

In any event, the ¶ 7.8.4 does not specifically state that a delay from a commander's removal action is exempt from the 18 month outer limit. In fact, ¶ 7.8.7 qualifies ¶ 7.8.4 by repeating the 18 month limit, thus explaining the overall intent of ¶ 7.8 (removing an officer). This is consistent with the canon rules of regulatory interpretation to not "slice up" phrases removed from their context on the same subject. Smith at 1523 (canon rules apply to both agency regulations and statutes). This is exactly what the 3 Adv.Op. tries to do by arguing it can slice up ¶ 7.8 to read ¶ 7.8.4 in isolation from ¶ 7.8.7.

Nevertheless, ¶ 7.8.7, then conveniently injects new terms into the delay statute's plain language to extend the 18 months limit for any delay "attributable to the officer." However, ¶ 7.4.2 only states that a "reasonable opportunity" to reply is offered. The statute draws no exceptions and is very clear on what must occur within the 18 months. It provides "notice" to an officer and an "opportunity" to respond and the Secretary's consideration thereof. § 14311(c). The statute at ¶ (d) entitled "maximum length of delay" plainly states that a "promotion may not be delayed more than 18 months from the date the officer would have been promoted [emphasis added]." This language is not ambiguous to allow agency second-guessing. Skinner v. Brown, 27 F.3d 1571, 1574 (Fed.Cir.1994) ("only the most extraordinary showing in legislative history allows courts to disregard the plain meaning of a statute") quoting Garcia v. United States, 105 S.Ct. 479. (1984).

Lastly, it was Millican's commander, COL Rubeor, who "purely on my own discretion as Wing Commander" went beyond the regulation to give Millican another reply opportunity, and then acknowledged ¶ 7.4 only grants one chance. This is certainly not time attributable to Millican. Applicant's Exhibit F (9 Sep 00 letter from COL Rubeor). Applicant did not refuse the removal correspondence as a dilatory tactic. He is a United Airlines commercial pilot living from Alaska but constantly travels (and temporarily resides) throughout the continental United States,. Thus, U.S. postal parcels are often returned that demand immediate release signatures. It appears the command dragged out the process by not alternatively relying on the provisions of ¶ 7.4 allowing prompt "verbal" notice and reply deadline.

According to ¶ 7.5 and the delay statute, only MG Smith, Vice Commander, Air Reserve Command, was authorized as a MAJCOM to delay Millican's promotion date of June 2000 for up to 6 months to December 2000. But this did not occur before the promotion effective date in June 2000 because MG Smith approved the recommendation to remove, and concurrent delay, in October 2000. Because no extension was in effect as of June 2000, Millican's promotion occurred by operation of law. Alternatively, neither the SAF nor his delegate, the Assistant Secretary for Reserve Affairs, authorized any delay beyond December 2000. 10 U.S.C. § 8016(b0(2)(Assistant Secretary of Manpower and Reserve Affairs is delegated duty of "overall supervision over reserve components"); Barnes at 216-17 (Assistant Secretary of Navy for Manpower and Reserve Affairs was proper authority to extend the delay). Millican's promotion then occurred by operation of law on December 2000 so that the President's removal on 7 January 2002 had no effect. Alternatively, because the President did not remove Millican's name from the list until well after the 18 month delay expired, Millican's promotion occurred by operation of law in June 2000.[3]

**2. Whether Millican's alleged disloyalty was based upon the unlawful order of his commander for unit members to take the Anthrax vaccine.**

The 3 Adv.Op crudely argues that this argument is invalid because the court "lifted the injunction after the FDA made a written determination that the vaccine is safe." This is unhelpful to the Board because it misrepresents Doe v. Rumsfeld, No. 03-707 (D.D.C.), by implying the judge's injunction was later declared invalid. However, a simple understanding of the case shows that Millican's commander back in 1999 had no authority to order unit members to take the Anthrax vaccine, and thus no authority to discipline those who allegedly instigated others to refuse the shots.

Any courts-martial for other service-members that may have found the orders legal, are irrelevant. The U.S. District Court (D.D.C.) has jurisdiction as a collateral federal appeal of military convictions. That is why DoD immediately halted its entire AVA program after the Court's preliminary injunction, and why the FDA was forced to publish a Final Rule on the vaccine.

---

[3] Because the promotion occurs automatically by operation of law under § 14311, 3Adv.Op at page 4, erroneously argues that only a special selection board can make a promotion recommendation.



142

The Doe court issued a preliminary injunction after finding that the AVA was illegal as currently administered because it violated "fundamental precepts of drug law." Doe Memorandum and Opinion at 27. This was based upon the court's factual finding that no final FDA rule had been published *to date* on the pending license application whether the vaccine was even safe and effective for use against inhalation anthrax. The court determined that prior informal advice or personal opinions of FDA officials as expressed in a series of letters was inadequate. In other words, DoD's claim that the vaccine was safe and effective for its troops was premature by shortcutting the FDA approval process. Mem. at 23-24 ("the FDA has failed to provide any formal opinion vis-a-vis AVA's investigational status"). In the absence of any published opinion in the Federal Register, the court proceeded to determine for itself that the AVA was investigational. Mem. At 28 ("having failed to provide a formal opinion as to AVA's investigational status, the court is required to make it own inquiry"). In fact, the lack of any final rule compelled the court's to find the AVA's status was investigational requiring member's informed consent. The court then stated,

> Given all these factors, the Court would be remiss to conclude that the original license included inhalation anthrax. . . .The DoD's administration of the inoculation without informed consents of those vaccinated amounts to arbitrary action. Mem. at 29.

The next day on December 23, 2003, the FDA issued a Final Rule on the anthrax license review, published in the Federal Register, stating that the vaccine was safe and effective for use against inhalation anthrax. At this point, DoD was permitted to claim AVA was not an investigational drug. See attached Applicant's Ex. A (excerpt *of FDA Final Rule and Final Order, 21 CFR Parts 201 and 610)*, as an exhibit to Defendant's Emergency Motion to Vacate Preliminary Junction and for Stay, attached here as Applicant's Exhibit C.[4] Of importance is that the Final Rule's "effective date" is not retroactive but 23 December 2004 (365 days after the date of publication). It is noteworthy that the DoD did not appeal the Court's injunction of December 22, to otherwise argue that a FDA Final Rule on the AVA was unnecessary to follow the law. This is a tacit admission that DoD did bypass the federal law requiring a drug's safety for another purpose to first be formally FDA approved. Moreover, the Court on 22 December 2003 rejected the DoD's argument that the inconvenient FDA process is

[4] To vacate is "to render an act void. . . it is not synonymous with suspend which means to stay the enforcement." Black's law Dictionary at 1388 (5th Ed. 1979).



143

less important than military readiness in the war on terrorism:

> [T]he right to bodily integrity and importance of complying with legal requirements, even in the face of requirements that may be inconvenient or burdensome, are among the highest public policy concerns one could articulate. Mem. at 30.

Although the FDA published its Final Rule, the Court refused to vacate (void) its injunction. It only temporarily stayed (suspended) its application to non-parties, until the court ruled on whether to make the preliminary injunction permanent or lift it entirely:

> Although the timing of the issuance of the rule is arguably highly suspicious, the rule has nevertheless, been issued and the principle reason for the issuance of the injunction has been addressed * * * The government is entitled to a stay of the Court's injunction pending further order of the Court. See attached Applicant's Ex. D at 1-2. (Order).[5]

Of importance, the court's refusal to vacate the injunction was a rejection of the government's argument that the final order had simply "confirmed" or "reaffirmed" prior data. See attached excerpt of DoD brief (Defendant's Memorandum In Support at 1-2). The DoD brief was putting "spin" on the Declaration of Mr. Winkenwerder, Assistant Sec'y of Defense (Health Affairs), see attached excerpt Applicant's Exhibit B at ¶ 13 ("The FDA endorsed the conclusion of the independent Institute of Medicine that AVA is an effective vaccine [to protect against inhalation anthrax]"). The DoD was attempting to bootstrap its motion to vacate by making it appear that the FDA Final rule was somehow retroactive or unnecsasary. But their legal brief admits that

> The FDA order marks the culmination of extensive agency consideration finalized in the week prior to Court preliminary injunction. See DoD Brief at 2.

Moreover, Mr. Winkenwerder conceded that before 2003 the DoD's vaccine program had not properly relied on a well-considered FDA formal opinion, but DoD simply rushed on the informal advice from a private lab. The DoD through its subordinate officers can not substitute's their judgment on the vaccine for the lawful exercise of the FDA process. In sum, the court's stay only means that the DoD, as of the publishing date of the FDA order, now has temporary authority to order service members to take the vaccine, pending a further court ruling. Therefore its wholly inaccurate for

---

[5] Although the court suspended the injunction for non-parties, the FDA action applied DoD wide to remove the legal barrier to inoculating all service members. Mem.Op. at 32-33 (original inunction applies to all persons and members of the Armed Forces).



144

3Adv.Op. to argue that "the squadron commander acted in accordance with established DoD guidelines and within the bounds of his discretion.' Id at 3 (top paragraph).

The next issue is straightforward. Because the FDA Final Rule was issued in December 2003 declaring the AVA is not an investigational drug and is safe and effective for inhalation anthrax, then Millican asserts a genuine defense in 1999 to any alleged mutinous or disloyal acts against the AVA made by his commander, Lt.Col. Padilla. The defense is undisputed when the DoD did not appeal the Court's injunction and the FDA agreed to publish the Final Rule. Therefore, any discipline arising from the unlawful order is converted to an unlawful reprisal under 10 U.S.C. § 1034 (whistleblower statute).

This unlawful order defense is sufficient to set aside the resulting Letter of Reprimand, OPR (98-00), PRF, and promotion removal action. Moreover, Millican upon his return to his unit after Congressional hearings in July 1999, only e-mailed his findings to certain interested peers. He also "answered questions from a few members, but never told or ordered any subordinate or contemporary not to take the vaccine, and was never present in the unit after July 1999." [6] United States v. Gray, 6 C.M.A. 615, 20 C.M.R. 331 (1956)(order is unlawful if official giving the order was without authority to do so); Brown v. Glines, 100 S.Ct., 594, n. 15 (1980)(service members right to First Amendment freedom of association may not be curtailed when commander action is arbitrary). The Doe court determined that in the absence of an FDA published opinion, the AVA was arbitrary action.[7]

It is well established even in international military law that soldiers have no right to mutiny when lawful orders are issued.[8] To underscore this rule in Anglo-American law, a recently famous example is a bill that was defeated in March 2000 before the United Kingdom Parliament seeking to set

---

[6] Applicant Millican specifically told his undersigned counsel to reaffirm this statement in this reply.

[7] 3Adv.Op. offers a nit-picking argument that the request to rescind the OPR was untimely as 60 days over the 3 year limit. However, in the interim, the AVIP was temporarily suspended in 2001, Congress was involved in further hearings, a promotion removal was pending, Bates v. Rumsfeld was filed in 2002, and related Doe was filed January 2003.

[8] The LOR alleged an acts of a nature to cause discontent, disloyalty and undermine military discipline in the squadron).



145

aside the guilty verdicts of nearly 100 British soldiers in WWII who refused to obey orders. See attached Applicant's Exhibit E (proceedings of UK Parliament 12 June 1990, and 22 March 2000). In the so-called "Salerno Mutiny of 1943," nearly 300 soldiers volunteered from convalescent leave to return to their own regiment, but the orders were mixed up and they were ordered instead to become replacements in an unfamiliar front-line unit in Italy. After 100 of the soldiers refused to move from their assembly area, they were convicted by courts-martial for mutiny and sentenced to years of hard labor with three sergeants sentenced to death. When the orders mix-up was discovered the sentences were suspended but not set aside, and they were denied military pensions. In 1990 when their military court records were finally de-classified, a bill was introduced in Parliament to grant pardons for all the soldiers and restore back pay. Ex. E at 1 (Salerno Incident, 1943; asking Minister of Defense to pardon soldiers). A book was published in 1995 of their account urging pardons. Saul David, *Mutiny at Salerno: An Injustice Exposed* (Brassey's UK; 1995). When the bill was finally debated in Parliament in 2000, the British Minister for the Armed Forces, John Spellar, refused to grant any pardons, stating,

> We fully understand the strong loyalties to former units felt by the men, but as General Montgomery suggested, those could not override *lawful orders*. . . and did not give them the right to mutiny [emphasis added]. Ex. E at 12.

### 3. Alleged unsatisfactory attendance or compelled non-participation in UTAs

Finally, 3Adv.Op. argues that Millican did not satisfactorily participate in UTAs. This alleged issue is a red herring. The 3Adv.Op. admits that Padilla told unit members,

> failure to participate in the anthrax program would *prevent* those members from participating in UTAs. . . .The commander sent applicant a letter informing him that because he had not started the anthrax regime, he was no longer eligible *to perform* UTAs [italics added].

Unsatisfactory participation thus becomes a hollow charge when AVA refusal compels such members to not participate without a medical excuse from AVIP. It is a *de facto* order by a local commander to temporarily reassign such members for cause to inactive status pending formal transfer. 10 U.S.C. § 12642 (reserve officers failing to attain requisite number of annual drill points or conform to other standards, shall be transferred to inactive status until retired); See 2Adv.Op. at 6 ¶ g1 ("had applicant accepted the Anthrax or accepted a non-flying position he could have continued to participate").



146

However, applicant was never offered a non-flying job, but told by his commander that AVIP refusal was the end of the road— no more active status.

In any event, Lt.Col. Padilla's formal request to transfer Millican to inactive status for the unsatisfactory attendance was denied by ARPC. Instead, ARPC converted the past alleged unsatisfactory participation from AVIP refusal into a non-participating status in the Standby Reserve. Finally, the participation question was never mentioned in the LOR, PRF, or a basis to remove him from the promotion list by BG Black, dated 13 March 2000. See 2Adv.Op at 6 ¶ g1 ("nonparticipation was not the foundation" for the removal).

John A. Wickham, Esq.
Attorney for Millican

Incl:

Applicant's Reply Exhibits A-F

DEPARTMENT OF HEALTH AND HUMAN SERVICES

Food and Drug Administration

21 CFR Parts 201 and 610

[Docket No. 1980N–0208]

# Biological Products; Bacterial Vaccines and Toxoids; Implementation of Efficacy Review

AGENCY: Food and Drug Administration, HHS.

ACTION: Final rule and Final Order.

---

SUMMARY: The Food and Drug Administration (FDA) is amending the biologics regulations in response to the report and recommendations of the Panel on Review of Bacterial Vaccines and Toxoids with Standards of Potency (the Panel). The Panel reviewed the safety, efficacy, and labeling of bacterial vaccines and toxoids that have standards of potency, bacterial antitoxins, and immune globulins. On the basis of the Panel's findings and recommendations, FDA is classifying these products as Category I (safe, effective, and not misbranded), Category II (unsafe, ineffective, or misbranded), or Category IIIB (off the market pending completion of studies permitting a determination of effectiveness).

DATES: This rule is effective [*insert date 365 days after date of publication in the* **Federal Register**]. The final order on categorization of products is effective [*insert date of publication in the* **Federal Register**].

FOR FURTHER INFORMATION CONTACT: Astrid Szeto, Center for Biologics Evaluation and Research (HFM–17), Food and Drug Administration, 1401 Rockville Pike, suite 200N, Rockville, MD 20852–1448, 301–827–6210.

148

EXHIBIT A

## PART 610—GENERAL BIOLOGICAL PRODUCTS STANDARDS

■ 3. The authority citation for 21 CFR part 610 continues to read as follows:

**Authority:** 21 U.S.C. 321, 331, 351, 352, 353, 355, 360, 360c, 360d, 360h, 360i, 371, 372, 374, 381; 42 U.S.C. 216, 262, 263, 263a, 264.

■ 4. Amend § 610.21 to revise the entry "Tetanus Immune Globulin (Human), 50 units of tetanus antitoxin per milliliter" under the heading "ANTIBODIES" to read as follows:

**§ 610.21 Limits of potency.**

* * * * *

ANTIBODIES

* * * * *

Tetanus Immune Globulin (Human), 250 units of tetanus antitoxin per container.

* * * * *

Dated: December 23, 2003.

**Jeffrey Shuren,**

*Assistant Commissioner for Policy.*

[FR Doc. 03–????? Filed ??–??–03; 8:45 am]

**BILLING CODE 4160–01–S**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JOHN DOE #1, et al.,<br>Plaintiffs,<br><br>v.<br><br>DONALD H. RUMSFELD,<br>SECRETARY OF DEFENSE, et al.,<br>Defendants. | ) | 1:03-cv-00707 (EGS) |

**DECLARATION OF WILLIAM WINKENWERDER, JR., M.D.**

1. I am William Winkenwerder, Jr., M.D. I am the Assistant Secretary of Defense (Health Affairs), having served in this position since October 16, 2001. In this capacity, I am responsible for overall supervision of the health and medical affairs of the Department of Defense (DoD).

2. Before coming to the Pentagon, I served in a variety of executive leadership positions in the healthcare industry. These included Vice Chairman, Office of the Chief Executive, and Executive Vice President of Health Care Services for Blue Cross Blue Shield of Massachusetts; Associate Vice President for Health Affairs and Vice President of Emory Healthcare at Emory University; Vice President and Chief Medical Officer for Southern Operations for Prudential Healthcare based in Atlanta; and Associate Medical Director at the Southeast Permanente Medical Group of Kaiser Permanente in Atlanta. I am a board certified internist, and my training includes two years of study in health services research and clinical epidemiology. Prior to serving in the above positions, I had an active practice in primary care medicine. I have written numerous articles on a broad array of health policy issues and have been published in both the New England Journal of

EXHIBIT B
150

Food and Drug Administration, the Centers for Disease Control and Prevention, the Surgeons General of the Army, Navy, and Air Force, and, to the best of my knowledge, the weight of opinion beyond a reasonable doubt in the non-Federal public health community.

13. On December 30, 2003, the FDA issued a final order on the license review for AVA. The FDA concluded that AVA was safe, effective, and not misbranded. The FDA further concluded that AVA "is indicated for active immunization against Bacillus anthracis, independent of the route of exposure." The FDA rule further endorsed the conclusion of the independent Institute of Medicine that AVA, as licensed, is an effective vaccine to protect humans against anthrax, including inhalation anthrax.

14. If the use of AVA for protection against inhalation exposure required compliance with Investigational New Drug requirements of the Federal Food, Drug, and Cosmetic Act, it would be extraordinarily difficult to continue the program in relation to current military operations against Iraq or the continuing Global War on Terrorism. In DoD's experience with INDs for force health protection, including several in relation to current events, the development of a detailed IND protocol, approval through necessary channels, approval by an Institutional Review Board, submission and discussions with the FDA, FDA's 30-day review period, training of principal and associate investigators, education of recipients of the IND, execution and storage of consent forms, and other steps required by 21 CFR Part 312, is a several- month undertaking, even with a generous allotment of personnel to implement it. The additional labor required to diligently execute an IND protocol would be massive (as shown by CDC's more-limited efforts in December 2001) and divert scarce labor from other defense missions. Were the Secretary

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 30th day of December, 2003.

/s/ William Winkenwerder, Jr.
William Winkenwerder, Jr., M.D.
Assistant Secretary of Defense (Health Affairs)



/ 52

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JOHN DOE #1, et al.,<br>Plaintiffs, | ) | |
| v. | ) | 1:03-cv-00707-EGS |
| DONALD H. RUMSFELD,<br>SECRETARY OF DEFENSE, et al.,<br>Defendants. | ) | |

**DEFENDANTS' EMERGENCY MOTION
TO VACATE PRELIMINARY INJUNCTION AND FOR STAY**

For the reasons stated in the accompanying memorandum, Defendants Donald H. Rumsfeld, Tommy Thompson, and Mark B. McClellan hereby move the Court to vacate its preliminary injunction entered on December 22, 2003, and to stay its injunction as to all service members but the six Doe Plaintiffs in this matter while considering this motion. In the alternative, Defendants request that the Court stay its preliminary injunction pending an appeal.

Pursuant to Local Civil Rule 7.1(m), counsel for Plaintiffs was contacted concerning the motion and has indicated that Plaintiffs do not consent to the requested relief. A proposed Order accompanies this motion.

153

EXHIBIT C

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

ROSCOE C. HOWARD, Jr.
United States Attorney

SHANNEN W. COFFIN
Deputy Assistant Attorney General

/s/ Ronald J. Wiltsie, II
JOSEPH H. HUNT
VINCENT M. GARVEY
RONALD J. WILTSIE, II (D.C. Bar # 431562)
Civil Division
United States Department of Justice
P.O. Box 883
Washington, D.C. 20044
Telephone: (202) 307-1401

Counsel for Defendants

December 30, 2003