IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JOHN DOE #1, et al.,<br>Plaintiffs, | ) | |
| v. | ) | 1:03-cv-00707-EGS |
| DONALD H. RUMSFELD,<br>SECRETARY OF DEFENSE, et al.,<br>Defendants. | ) | |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' EMERGENCY MOTION TO VACATE PRELIMINARY INJUNCTION AND FOR STAY**

On December 22, 2003, this Court preliminarily enjoined Defendants from inoculating service members with Anthrax Vaccine Adsorbed ("AVA") without either their consent or a Presidential waiver of the consent requirement.[1] The preliminary injunction was premised on the Court's conclusion that the Food and Drug Administration ("FDA") had not approved the anthrax vaccine as safe and effective protection against inhalation anthrax.

The Defendants respectfully ask this Court to vacate its injunction in light of an FDA Order issued December 30, 2003 that confirms and conclusively determines that AVA is safe and effective to protect humans against inhalation anthrax. See Biological Products; Bacterial Vaccines and Toxoids; Implementation of Efficacy Review, Food and Drug Administration, Health and Human Services, Final Rule and Final Order, December 30, 2003 ("FDA Order,"

[1] Although in Defendants' view the Court's injunction properly may apply only insofar as the six Plaintiffs are concerned, out of an abundance of caution the Department of Defense ("DoD") stopped giving anthrax vaccinations to service members as if the Court's preliminary injunction order were intended to apply to all service members. On December 24, 2003, Defendants filed a Motion For Clarification Or In The Alternative For Reconsideration ("Motion For Clarification") as to the scope of the Court's preliminary injunction.

/55

Exhibit 1). The FDA Order, which marks the culmination of extensive agency consideration and completion of the notice and comment process referred to by the Court in its Memorandum Opinion (p. 4), was finalized in the week prior to the Court's preliminary injunction and was signed by the responsible FDA official without substantive changes two days after the Court issued its preliminary injunction order. The Order was issued on, and placed on public display as of, December 30, 2003.[2] The FDA Order addresses data discussed in this Court's preliminary injunction decision as well as more recent findings, concluding that both the earlier and more recent data support a formal categorization of the vaccine as safe and effective regardless of the route of exposure, including inhalation anthrax. Accordingly, in formally categorizing AVA as safe and effective, the FDA did not mandate any change in the labeling requirements for the anthrax vaccine. Instead, it reaffirmed the label, concluding that "the indication section of the labeling for AVA does not specify the route of exposure, and the vaccine is indicated for active immunization against *Bacillus anthrasis*, independent of the route of exposure." FDA Order at 13 (footnote omitted).

There can be no doubt that the FDA Order removes the legal basis upon which relief was sought and granted in this case. The statute that forms the basis of this lawsuit, 10 U.S.C. § 1107, applies only to those drugs and uses that have not been approved as safe and effective. The FDA has approved the anthrax vaccine as safe and effective to protect humans against inhalation anthrax, and the Court therefore should vacate its preliminary injunction.

[2] Given the significance of this FDA Order, Defendants regret that it was not issued and placed on public display in advance of the Court's decision and preliminary injunction order.



156

In light of the serious threat to service members and military readiness presented by the preliminary injunction, Defendants ask not only that the Court dissolve its injunction on an expedited basis but also that it immediately stay the injunction pending disposition of this motion with respect to all but the six Doe Plaintiffs. As discussed in Defendants' Motion For Clarification, even if the views of the merits underlying the preliminary injunction were correct, the injunction could not properly control the United States' conduct with respect to persons who are not parties in this litigation.[3]

The urgency of the matter is clear. In response to the Court's injunction, DOD has temporarily stopped anthrax vaccinations to service members on a program-wide basis. The longer such an injunction remains in place, the greater is the danger to the men and women of our armed forces and to our military preparedness. Prolonged cessation of the inoculation program would gravely threaten the safety of more and more service members and would significantly undermine military readiness. Indeed, until the injunction, approximately 30,000 new troops per month were beginning the anthrax vaccination series. See Declaration of William Winkenwerder, Jr., M.D. ("Winkenwerder Decl."), ¶ 9 (Exhibit 2). There is no basis for putting the health of service members at risk when the only issue in this case has been resolved -- particularly inasmuch as the Court could not properly preclude vaccinations with respect to service members who are not even plaintiffs in this suit.

---

[3] For the same reasons that justify expedited consideration of this motion, Defendants respectfully request that the Court give expedited consideration to the Motion For Clarification. Defendants, therefore, will separately file a motion asking that the Motion For Clarification be disposed of on an expedited basis.



157

If the Court believes that it can neither vacate the injunction on an expedited basis nor stay the injunction with respect to all persons but the six Doe Plaintiffs pending disposition of this motion, we respectfully ask that it issue a stay pending appeal with respect to all persons but those Plaintiffs.[4] The stay will avoid significant delays in the vaccination of service members deploying to hazardous duty overseas while the Defendants pursue an expedited appeal.

## I. THE COURT SHOULD VACATE ITS PRELIMINARY INJUNCTION IN LIGHT OF THE FOOD AND DRUG ADMINISTRATION'S APPROVAL OF THE ANTHRAX VACCINE AS SAFE AND EFFECTIVE

As Defendants explained in opposing Plaintiffs' motion for a preliminary injunction, the AVA label does not limit its use to any particular route of anthrax exposure. The label does not distinguish among individuals who may be infected by anthrax spores entering the body through skin contact, ingestion, or inhalation. Accordingly, DoD and FDA have interpreted the label to encompass inhalation exposure.

In issuing a preliminary injunction, this Court nonetheless concluded that the Food and Drug Administration had not approved AVA as safe and effective for use in preventing inhalation anthrax. The Court emphasized that "[t]he FDA, the only agency that this Court could properly defer to in determining AVA's status as an investigational drug, has failed to provide a formal opinion as to AVA's investigational status." Memorandum Opinion at 28.

The FDA's December 30 Order makes clear that the AVA label encompasses all types of anthrax exposure, whether through inhalation or other means. Therein the FDA declared that

[4] We respectfully ask that the Court rule on this motion and the related Motion for Clarification by Tuesday, January 6, 2004, so that the Defendants will have a timely opportunity to seek a stay from the D.C. Circuit if necessary.



158

"the indication section of the labeling for AVA does not specify the route of exposure, and the vaccine is indicated for active immunization against *Bacillus anthracis*, independent of the route of exposure." FDA Order at 13 (emphasis added). Accordingly, in formally categorizing AVA as safe and effective for use in preventing all forms of anthrax exposure, the agency mandated no change to the existing labeling.

The FDA Order considered the recommendation of the FDA's Panel on Review of Bacterial Vaccines and Toxoids with Standards of Potency that AVA be categorized as safe and effective. The Panel based its evaluation on two studies. The first was "[a] well controlled field study conducted in the 1950s, 'the Brachman study.'" The second was "an open-label safety study conducted by the National Center for Disease Control." FDA Order at 11.

In granting the preliminary injunction, the Court suggested that these studies do not support the view that AVA is effective in preventing inhalation anthrax, see Memorandum Opinion at 28, based in part on its view that the FDA had not formally addressed the data reflected in these studies. The FDA Order specifically concludes that the data on which the Panel relied "support the safety and efficacy of the vaccine." Ibid. The FDA Order, which is entitled to "'a high level of deference,'" Serono Laboratories, Inc. v. Shalala, 158 F.3d 1313, 1320 (D.C. Cir. 1998) (citation omitted), establishes, consistent with the Defendants' previous submissions, that the data do not support the distinctions in efficacy urged by Plaintiffs and accepted by the Court in issuing its preliminary injunction.[5]

[5] In the face of some evidence supporting the FDA's determination, this Court is not to undertake de novo review and substitute its judgment for that of the FDA. Bristol-Myers Squibb Company v. Shalala, 923 F. Supp. 212, 216 (D.D.C. 1996). Instead, the FDA is to be accorded deference when it is evaluating scientific data within its technical expertise. FPC v. Florida

(continued...)

The FDA also relied on the recent findings of the Institute of Medicine, a component of the National Academy of Sciences, which performed a congressionally mandated study of AVA and published a report in March 2002. As the FDA explained, the Institute of Medicine "reviewed all available data, both published and unpublished, [and] heard from Federal agencies, the manufacturer [of AVA], and researchers." FDA Order at 14. The Institute's report concluded that "AVA, as licensed, is an effective vaccine to protect humans against anthrax including inhalation anthrax." Ibid. The FDA declared its "agree[ment] with the report's finding that studies in humans and animal models support the conclusion that AVA is effective against *B. anthracis* strains that are dependent upon the anthrax toxin as a mechanism of virulence, regardless of the route of exposure." Ibid.[6]

The FDA Order removes any basis for the Court's preliminary injunction. Plaintiffs' claims in this suit are premised on a statute (10 U.S.C. § 1107) that applies only to drugs and uses that have not been approved as safe and effective. This Court's injunction was based on its conclusion that the FDA had not, in fact, approved AVA as safe and effective for use in preventing inhalation anthrax. The FDA Order reaffirms that AVA's label has always authorized

[5](...continued)
Power & Light Co., 404 U.S. 453 (1972); International Fabricare Inst. v. EPA, 972 F.2d 384, 389 (D.C. Cir. 1992); Tri-Bio Laboratories, Inc. v. United States, 836 F.2d 135, 142 (3d Cir. 1987), cert. denied, 488 U.S. 818 (1988).

[6] This finding also thus contradicts another argument put forth by Plaintiffs and accepted by the Court -- namely, that since 1985 no additional studies of the efficacy and safety of AVA have been performed. Memorandum Opinion at 26. To the contrary, the IOM report details various studies that support its conclusions and those contained in the FDA Order. Exhibit 3, Institute of Medicine, "The Anthrax Vaccine: Is it Safe? Does it Work?" National Academy Press, 2002, Ch. 3.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOHN DOE #1, *et al*, Plaintiffs, v. DONALD H. RUMSFELD, *et al* Defendants. | Civil Action No. 03-707 (EGS) |

**ORDER**

On December 22, 2003 the Court issued a Preliminary Injunction enjoining the defendants from inoculating service members without their consent. The Court was persuaded that the record evidence before the Court was devoid of an FDA final decision on the investigational status of Anthrax Vaccine Adsorbed ("AVA"). Within days of the Court's injunction, the Food and Drug Administration ("FDA") published a final rule categorizing AVA as safe and effective for use against inhalation anthrax. Although the timing of the issuance of the rule is arguably highly suspicious, nevertheless, the rule has been issued and the principle reason for the issuance of the injunction has been addressed by the government. Accordingly, upon consideration of the government's Motion to Stay the Injunction as Applied to Persons Other than the Named Parties, the Response and Reply, hereto, and pursuant to the proceedings



EXHIBIT D
161

held in open court on January 7, 2004, it is hereby

**ORDERED** that the government is entitled to a stay of the Court's injunction pending further order of the Court and further challenges to the government's final rule; and it is

**FURTHER ORDERED** that the Motions Hearing previously scheduled for January 14, 2004 at 10:00 a.m. in Courtroom One has been converted to a Status Hearing.

**Signed:** **Emmet G. Sullivan**
**United States District Judge**
**January 7, 2004**



/62

security and sustain our responsibilities overseas with lower force levels and less cost.

### RAF Biggin Hill

**Sir John Hunt :** To ask the Secretary of State for Defence what are the current estimates for the building of the additional accommodation required at RAF Cranwell following the closure of the officer and aircrew selection centre at RAF Biggin Hill.

**Mr. Archie Hamilton :** The estimated cost of the new facilities required at RAF Cranwell amounts to some £7.5 million at current prices. This figure now allows for VAT and current levels of inflation in the construction industry.

**Sir John Hunt :** To ask the Secretary of State for Defence what are the current estimates for the likely level of capital receipts from the disposal of the site at present occupied by RAF Biggin Hill.

**Mr. Archie Hamilton :** Estimates of expected receipts are commercially confidential, but we expect income from disposals at Biggin Hill to more than cover the cost of reproviding facilities for the officer and aircrew selection centre at RAF Cranwell.

**Sir John Hunt :** To ask the Secretary of State for Defence what is the anticipated demand for officers'

---

**Column 141**

married quarters in the Greater London area over the next five years ; and whether accommodation is to be provided at RAF Biggin Hill to meet this demand.

**Mr. Archie Hamilton :** Present plans envisage that the requirement for officers' married quarters in the Greater London area will, over the medium to long term, be reduced. It is our intention to dispose of all the officers' married quarters at RAF Biggin Hill when the station closes. Present plans anticipate that the various elements of the Biggin Hill site will become available for disposal towards the end of 1992, excluding the memorial chapel enclave which will be retained.

### Salerno Incident, 1943

**Mr. Menzies Campbell :** To ask the Secretary of State for Defence how many representations he has received in the last 12 months concerning the incident at Salerno on 20 September 1943 which resulted in the court martial of 91 soldiers of the 51 Highland Division and 50 Northumbrian Division ; and if he proposes to take the steps necessary to obtain a free pardon for them.

**Mr. Archie Hamilton :** My noble Friend the Under-Secretary of State for the Armed Forces will write to the hon. and learned Member.

### Radar

**Mr. Nicholas Bennett :** To ask the Secretary of State for Defence if he will make a statement on developments in the detection by radar of missile attacks.

**Mr. Alan Clark :** Steady progress has been made in developing the ability of radar to detect missile

EXHIBIT E/63

The UNITED KINGDOM PARLIAMENT

Search

Advanced Search



**This Table of Contents lists column numbers, headings, time lines and names of Members in the Commons Hansard Debates text for Thursday 22 Mar 2000**

**Clicking on an item will fetch the appropriate file and position it with the item at the top of the screen.**

---

## Westminster Hall Debates for 22 Mar 2000

**Column: 189WH**

East Midlands Economy [22 Mar 2000]

9.30 am

Gillian Merron (Lincoln)

**Column: 190WH**

**Column: 191WH**

**Mr. Andrew Robathan (Blaby)**

**Gillian Merron**

**Column: 192WH**

**Column: 193WH**

**Column: 194WH**

9.53 am

Mr. Andrew Robathan (Blaby)

**Mr. Andrew Reed (Loughborough)**

**Mr. Robathan**

164

2

**Column: 238WH**

12.47 pm

The Parliamentary Under-Secretary of State for Education and Employment (Ms Margaret Hodge

**Column: 239WH**

**Mr. Evans**

**Column: 240WH**

**Ms Hodge**

**Column: 241WH**

**Mr. Evans**

**Ms Hodge**

**Madam Deputy Speaker (Mrs. Gwyneth Dunwoody)**

**Column: 242WH**

Salerno Mutineers [22 Mar 2000]

1 pm

Miss Anne Begg (Aberdeen, South)

**Column: 243WH**

**Column: 244WH**

**Column: 245WH**

**Column: 246WH**

1.17 pm

The Minister for the Armed Forces (Mr. John Spellar

**Column: 247WH**

**Miss Begg**

**Mr. Spellar**

165

3

**22 Mar 2000 : Column 242WH**

## Salerno Mutineers

1 pm

**Miss Anne Begg (Aberdeen, South):** Almost two years ago, a constituent of mine, Bill Bradbrook, contacted me about what he saw as an injustice that occurred in 1943, during the second world war. He thought that now was the time to forgive, and to set the record straight. Mr. Bradbrook contacted me not on his own behalf, but on behalf of his friend, another constituent, Hugh Fraser. Mr. Bradbrook brought his friend to my surgery and I sat and listended to Hugh Fraser's story. It was the story of a young man who had proudly joined the Cameron Highlanders to fight for his country and had risen to the rank of corporal; a young man who had fought bravely with the 8th Army in the desert campaign and was of undoubted high moral integrity. It was the story of a retired man who, despite having achieved much as an inspector of police in Aberdeen, could not shake off a black stain on his character.

As I listened to the story I found myself getting caught up in the events in north Africa and Italy more than 50 years ago. Despite having been a history teacher, this was the first time that I had heard of the mutiny at Salerno, in Italy. Since that day, I have become increasingly fascinated by the events surrounding the largest war-time mutiny in British military history.

What had motivated 191 men all to make the same decision to disobey an order to fall in in a field near Salerno on 20 September 1943? Why had these men, when told that their action constituted mutiny and that mutiny was a capital offence, remained where they were? Why did so many of them do this? Not all of them could have decided that they did not want to fight any more. Surely something must have gone wrong with the line of command for so many men to refuse to obey the same order. The more I have studied the details of what happened to those men, including my constituent, Hugh Fraser, the more convinced I have become that a great injustice was done, which should now be put right. I called for this debate to highlight what happened to those men in 1943, and afterwards, and to ask my right hon. Friend the Secretary of State for Defence to give serious consideration to awarding the men, who were convicted of mutiny, a free pardon.

166 4

What went wrong at Salerno? The Highland and Tyne Tees divisions had fought bravely with Montgomery and the 8th Army in north Africa and he promised them that he needed them for only one more action. One reason Montgomery was so successful as a military commander was the loyalty that he generated among his men. As essential part of the north Africa campaign had been the esprit de corps that Montgomery had fostered. If a man was separated from his unit, he was to do everything in his power to get back to it.

When the 8th Army crossed over to Sicily, many of the men were wounded or ill, often with dysentery. After all, they had taken part in the long desert campaign. This group of men who were to become the Salerno mutineers were sent back to hospital in Tripoli. From there they were taken to transit camp 155, which was also in Libya.

During that time, Major-General Douglas Wimberley, who commanded the 51st Highland Division, of which my constituent, Hugh Fraser, was a

**22 Mar 2000 : Column 243WH**

member, visited camp 155 and said that his men should be returned to their units. There is no doubt that the men believed that they would be. This is confirmed by a number of men who were in camp 155 at the time--especially the camp duty sergeant-major, Sergeant-Major Green who gave evidence for the defence in the subsequent court martial. My constituent remembers Green telling him that he would be going back to his own unit.

In the belief that they were to rejoin their units, the men agreed to join the draft that was called on 14 September 1943. They did not know exactly where their units were; they knew only that they were somewhere in Italy. No one told them that they were going anywhere else: their true destination was kept secret.

Where were the men going? At the time, things were not going well for the American 5th Army in Salerno, so reinforcements were sent for, and three light cruisers dispatched. The American commander had expected the reinforcements to come from what was then Philippeville, in Algeria, which was the official reinforcement camp for Salerno, and also the closest.

There was some confusion over signals and a draft was called at camp 155 instead. The men from the Highland and Tyne Tees divisions readily volunteered, even though many of them were far from fully recovered from their wounds or illnesses. These were the men who had fought so bravely along with Montgomery and they believed that they were rejoining their comrades-in-arms. At no time were they told that they were rejoining the 46th division that was fighting alongside the US 5th Army at Salerno.

Montgomery did not know what was happening to his men either. He wrote on 10 April 1944 to Sir Ronald Adam, the Army's senior administrative officer, saying that, had he been consulted, he would have said no. Montgomery was angry and

/67 5

blamed the whole confusion on Major-General Charles Miller, the man in charge of Army administration in Africa, whom he described as

> the real culprit in this case.

The first that the men knew of their true destination was off the coast of Italy when the message came over the ship's Tannoy system. Many of the men did not believe what they were hearing. They had been told that they were to join their own units. When the men disembarked, the new recruits who had accompanied them were marched away and the veterans of the 8th Army were herded into a nearby field. There they stayed for three days. The men at this time were convinced that if they only stuck together, someone, somewhere, would realise that there had been an administrative error and sort it out. They genuinely believed that right was on their side and that good sense would prevail. Unfortunately, it did not.

After another two days they were told to parade. That was on 20 September 1943. The corps commander, Lieutenant-General Richard McCreery arrived and admitted that there had been, in his words, "a cock-up" which he would sort out when the men joined the new unit. He said that there could be no compromise and that they had to obey orders. If they disobeyed it would be mutiny, which was a capital offence. The order was

**22 Mar 2000 : Column 244WH**

then given. The men were told to pick up their kit and fall in by Captain Albert Lee. The order was repeated three times. Some of the men moved off the field at that time, but 191 did not. They knew that they had disobeyed an order in wartime. They knew that that could be construed as mutiny but they did not feel that they were mutineers. They were not refusing to fight. They just wanted to fight with their own comrades.

All 191 were placed under arrest and marched to a nearby prisoner of war camp. By that time, ironically, the reinforcements were no longer needed at Salerno, as the crisis had passed, but it had not passed for the 191. The mutineers were shipped back to Africa where they were held in a prison near Constantine in Algeria for five weeks before their trial. The whole affair had been an embarrassment for the British Army and so was kept very hush hush.

On 22 October 1943, the defence team for the mutineers met at Constantine for the first time. Captain Hugh Quennell took control. They had six days to prepare a defence, which was an impossible task. They did not even have time to interview the men. Moreover, as this was at least a month after the men had been arrested, they did not know how ill many of the men had been at the time of their arrest.

The court martial opened on 29 October in the gymnasium of the local French school, the only place big enough to hold all the defendants. The men were each given a number to hang round their necks to identify them; my constituent, Hugh Fraser, was given the number 111. The transcript of the trial has only recently been released and it shows that it proved impossible for the defence team to call

168 6

the witnesses that it needed, as many of the men were then on active duty. Those witnesses would have spoken up for the men and proved that they were following orders in insisting that they should return to their own units. The only witness called was Sergeant-Major Green from camp 155, who confirmed that the men had been told that they were returning to their own units; that there was an order from GHQ, which confirmed that; and that the men had not had the necessary medical to determine their fitness to return to active duty.

The trial lasted for five days, but not one of the mutineers was called to the witness stand. Even so, they were found guilty. As a corporal, Hugh Fraser was kept in solitary confinement and passed his time--when he was not breaking rocks--reading the New Testament and polishing his mess tin, which he says became the shiniest in the British Army. On 15 November he was told his sentence: 10 years' penal servitude, and to be reduced to the ranks. He could not believe what he had heard.

The next day, 16 November, the three sergeants involved in the mutiny found out their fate: they were sentenced to death. Luckily, two weeks later, that was commuted to 12 years' hard labour. However, fortunately for the mutineers, on 15 November, Adjutant-General Sir Ronald Adam, the second most senior man in the British Army, arrived in north Africa. He asked to see the papers relating to the mutiny. He was horrified by what he read and demanded that the men be released. Their sentences were therefore suspended, but the men's misery did not end there. They were released but were sent to join the units they had refused to join in September. Many were treated

**22 Mar 2000 : Column 245WH**

harshly, and 80 of them subsequently absconded. That fact has been used in the past by the Ministry of Defence to refuse the men a free pardon. John McFarlane was one of those men and he was stripped of the medal that he won before the mutiny for his bravery in the desert campaign. Unfortunately, he is now dead, but that he absconded twice has been given as the reason to his family why his medal cannot be reinstated. I pay tribute to the work of my hon. Friend the Member for Motherwell and Wishaw (Mr. Roy) who raised John McFarlane's case with the Minister.

My constituent, Hugh Fraser, was not one of the abscondees. Even so, he still says:

> What I would like more than anything is for John McFarlane's military medal to be returned to his wife. It is a sin to take back a gallantry medal after it has been awarded. It broke his heart and the hearts of his wife and family.

Most of the research into the events leading up to and after the mutiny at Salerno was conducted by the historian Saul David, and I recommend his book "Mutiny at Salerno--an injustice exposed" to anyone who is interested in the subject.

In January this year, Saul David submitted new evidence to my right hon. Friend the Secretary of State for Defence from Eric Griffin, who came across two men,

169

whom he called the Tunis mutineers, in the summer of 1944 when he was serving as a clerk to the command psychiatrist, Major O'Hanlon, based in Naples. There is no doubt that the two men were Salerno mutineers. The men's commanding officer had been told that the mutineers' original sentences had been commuted to continuous duty in the front line and, as his unit was being taken out of the line for a rest, so these men could not go with them, he sent them to the psychiatric unit. There is no such punishment in British military history; but if that unofficial vindictiveness was widespread, it is little wonder that the men absconded, as they had been left with little choice.

I shall sum up the reasons why the men who disobeyed an order on that fateful day of 20 September 1943 now deserve a free pardon. They should never have been in Salerno; they were the wrong men from the wrong transit camp. The men genuinely believed that they were lied to about their destination. It is certainly true that those officers who knew that they were going to join the 46th division did not tell the men before embarkation.

The men should not have been put in the position where they had to decide whether to obey the order to fall in or not. Sir Richard McCreery admitted that there had been an error. He should have sorted it out and not insisted that the men joined the new units, especially as, by that time, they had lost faith in the officers who were dealing with them. The men may have disobeyed one order, but they believed that they were carrying out the orders of the one commander whom they trusted, the one who had led them through the desert campaign--General Montgomery. He had told them that, come what may, they were to try to get back to their own units at all costs. The court martial was not thorough in its investigation and the defence was cursory in the extreme.

New evidence now suggests that the men were victimised subsequently in their new units and forced to stay on active front-line service, even when the new units

**22 Mar 2000 : Column 246WH**

were given leave. Perhaps that helps to explain why so many men absconded. I hope that my hon. Friend the Minister will carefully consider the evidence that I have presented to him and that he will reach the same conclusion as me: that the time has come to make reparation for the injustice that was done to the Salerno mutineers. I am asking for a free pardon, not to say that the men were innocent--they all admit that they disobeyed an order in wartime--but to allow them or their families to collect their campaign medals.

The men were not cowards. They did not refuse to fight. It is time for the Army to put its embarrassment at the sorry incident behind it and admit that the men were victims of a failure of command and should not have been put in such a situation. We all like to think that, when tested, we will stand up for our principles. That is what men such as my constituent, Hugh Fraser, did. I shall leave the last words to him, a man who, after the war, rose to the rank of inspector of police, a man of undoubted high moral integrity. He said:

170

Given the same circumstances, I would do the same again. It was purely and simply a matter of principle.

1.17 pm

**The Minister for the Armed Forces (Mr. John Spellar )**: I congratulate my hon. Friend the Member for Aberdeen, South (Miss Begg) on securing a debate on a matter that has aroused the sympathy of many hon. Members over the years. The events surrounding the Salerno mutiny of 1943 have been carefully examined by the legal authorities and the Ministry of Defence, including Ministers, on several occasions. The examinations included consideration of points raised by hon. Members as well as several researchers, particularly in the past 20 years.

Many misunderstandings and erroneous claims surround the Salerno mutiny. Let it be understood at the outset that there is not, and never has been, any suggestion by the authorities that the men were cowards or traitors. Nor was the value of their previous service or strong regimental and divisional loyalty ever denied or ignored by the authorities. Nevertheless, I must refer to the key point that has been overlooked in many discussions on the subject. It has long been a basic tenet of military life--it was during the second world war, and it is today--that a solider has no defence in military law that allows him to choose which lawful orders he will obey and which he will not. My hon. Friend mentioned the letter of 10 April from General Montgomery, who wrote:

The men refused to go into battle, which is of course quite inexcusable--and cannot be condoned.

In September 1943, after an opposed landing on the Italian mainland at Salerno, the allies had gained a precarious foothold. The main British element of the 5th Army force consisted of the 46th and 56th divisions that were not part of the 8th Army. However, fierce German resistance inflicted heavy casualties, primarily on the infantry and General Alexander, the senior commander, arranged for several drafts of infantry reinforcements to be moved as quickly as possibly to Salerno. Among those was a draft of 1,500 men moved on 15 September by Royal Navy warships from a transit camp at Tripoli, holding primarily 8th Army soldiers awaiting posting. Among that draft were, as my hon. Friend said, some

**22 Mar 2000 : Column 247WH**

300 men formerly with two 8th Army formations, the 50th Northumbrian and 51st Highland divisions. Those two divisions were resting in Sicily and had been earmarked soon to return to the UK to prepare for the D-Day landings in June 1944.

The use of those men from Tripoli was not, as is often claimed, an administrative error by the staff at higher headquarters. Contemporary signals show that the relevant headquarters was made aware that those reinforcements from Tripoli would include men previously with 8th Army formations in Sicily, rather than men already earmarked for the 5th Army, who could not be moved in time.

/21

**Miss Begg** : I do not know whether my hon. Friend agrees, but there is evidence that there were conflicting signals that day. One signal was apparently sent to what was then Philippeville, and another to camp 155. That confusion resulted in the Salerno mutineers volunteering for a draft for which they should not have been asked to volunteer; there were already plenty of men at Philippeville and they, in normal circumstances, would have been called to assist the 46th division.

**Mr. Spellar** : My hon. Friend points to evidence that, contrary to what I described, there was an order from headquarters to transfer those troops. Areas of confusion often arise in such circumstances. The key issue, to which I hope to come if there is time, is that when a matter is resolved by a legitimate order, it is not within the duties of soldiers to resist and refuse it.--[*Interruption.*] My hon. Friend may intervene, but I will not be able to go through the whole case.

**Miss Begg** : Will my hon. Friend confirm that the men of the 8th Army, of the Highland and Northumbrian divisions, need not have volunteered for that draft?

**Mr Spellar** : As I said, headquarters ordered the movement of troops because of an emergency in Salerno and heavy casualties taken by the infantry division; other units that might have been used were not thought to be able to get there in time, and there was therefore a legitimate order for the troops to be transported. Indeed, such cross-posting of men to new units and formations was justifiable, lawful and not at all uncommon in emergencies.

**Miss Begg:** How common was it, in such cross-transfers, for men to be returned to active duty after an illness without a medical examination to determine their fitness?

**Mr. Spellar** : I could go into the research on those areas, but we are dealing with a military emergency, an invasion of Italy, unexpected but heavy losses at Salerno and the order to send in reinforcements. My hon. Friend reiterated the usual allegation that the men were misled about their destination and did not know where they were going. I am sure that hon. Members will understand that operational security meant--and often mean--that the destination of an emergency draft was not announced so that only a handful of more senior

**22 Mar 2000 : Column 248WH**

people in the camp actually knew. That is standard security procedure. Until the destination was announced during the voyage to Salerno, some men assumed that they were returning to their units.

Much emphasis has been placed on whether the men were needed when they arrived. The mutineers' testimony shows that, even while at sea, when they had no knowledge of the situation at Salerno, there was already a conspiracy to refuse to serve there.

With the benefit of hindsight, it is clear that German attacks peaked on 16

172 10

September. However, commanders had to plan for the continuing, immediate threat. A further important factor often overlooked is that such had been the casualties among the British infantry that non-infantry troops from the Royal Engineers and the beach administration companies at Salerno were already fighting at the front as infantry. Even on 16 September, a further 400 Royal Artillerymen were posted as temporary infantry reinforcements. Clearly, replacements for the non-infantrymen in the front-line were needed, and these non-infantry troops were needed to resume their normal tasks. The inevitable difficulties of operating a beachhead under attack had been exacerbated by their removal, which might explain some of the feelings of chaos among the new arrivals.

After landing at Salerno on 16 September, some 1,200 of the 1,500 reinforcements went, without any protest, to join the troops at the front. The remaining 300, largely from the 50th and 51st divisions, refused to move, saying they would serve only with their own units and divisions.

As the men's refusal became clear, the operational situation was explained to them a number of times, but to no avail. The men were personally addressed by the corps commander, who explained why they were needed. He was aware of their grievance at being cross-posted, so he promised that, provided that they complied with current necessary orders, they would be given the opportunity to re-join their previous units once the emergency was over. There is evidence that that promise was kept.

Finally, a formal parade was held at which an explanation was again given of the seriousness of the 300 men continuing on the same course, including the reading of the relevant parts of the applicable legislation. About 100 of the group obeyed the commands and joined units at Salerno. However, 192 stood fast and refused to obey the orders. They were again told of the serious nature of the crime of mutiny, and were allowed time for further reflection before the order was repeated. As my hon. Friend suggested, those who failed to comply were arrested and subsequently charged with mutiny at a court martial at the allied base in north Africa.

It shall speak about the conduct of the court martial and the actions of the defence team. Eleven extenuating circumstances were properly presented. No evidence was submitted by the defending officers to say that the men had been unfit to fight by the operational standards of the time, nor did the men choose to give evidence themselves and be cross-examined. The court subsequently found all but a few of the men guilty of mutiny.

The court heard all the defence statements of

**22 Mar 2000 : Column 249WH**

extenuating circumstances in mitigation before passing sentence; they reflected the responsibility

11

173

expected according to rank. Three sergeants were initially sentenced to death, but that was subsequently commuted to 12 years' imprisonment; the corporals received sentences of 10 years and the remainder received sentences of seven years. However, all sentences were subsequently formally suspended, thus offering the men a chance to redeem themselves; the sentence would be activated only if there was later misconduct.

The conviction for mutiny led to the loss of campaign medals but no gallantry medals were forfeited automatically on conviction. Of the two military medals held, only one was forfeited later, following the subsequent conviction of the holder for another offence.

Following suspension of sentence, the men were posted to other units in the Mediterranean theatre. Retaining the men there, rather than posting them back to their own units--by then in the United Kingdom--was lawful and probably understandable. It could hardly be expected that men who had broken military law should be allowed to achieve the objective of their unlawful action, and the bonus of a return to the UK.

We fully understand the strong loyalties to former units felt by the men, but, as General Montgomery suggested, those could not override lawful orders based on operational necessities and did not give them the right to mutiny. General Montgomery was in no doubt: he could not condone their action in refusing, when called upon, to provide operationally necessary reinforcements for the battlefield. The inescapable fact remains that the men mutinied on active service in the battlefield. By any account, that is a serious offence. To grant a pardon for that offence would be a disservice to the many men, including other 8th Army veterans, who obeyed orders, whether they liked them or not, and fought on. It would be a particular slight to those who gave their lives as a result.

Many who took part in the mutiny--

**Madam Deputy Speaker (Mrs. Gwyneth Dunwoody)** : Order.

---

Next Section Index Home Page

12

174

**DEPARTMENT OF THE AIR FORCE**
AIR FORCE RESERVE COMMAND

9 Sep 00

MEMORANDUM FOR HQ AFRC/DPM

FROM: 349 AMW/CC
520 Waldron Street
Travis AFB CA 94589-2100

SUBJECT: Intent to Remove From Recommended Promotion List
Marc J. Millican, Maj, 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, 312 AS

Ref: (a) 349 AMW/CC Ltr, dtd 31 Jul 00, Intent to Remove from Recommended Promotion List
(b) Major Millican's Ltr, dtd 4 Jul 00, Letter dated 26 May 00 (Adverse Personnel Action)
(c) 349 MSS/DPM Ltr, dtd 26 May 00, Adverse Personnel Actions

1. This memorandum is to confirm that Major Millican was offered an additional opportunity to respond to the above identified action to remove his name from the recommended promotion list for Lieutenant Colonel. Two separate packages were mailed to Major Millican on 2 Aug 00. The first package was mailed via certified mail with return receipt requested and the other package via regular first class mail. The certified package was returned unclaimed (Attachment 1) on 31 Aug 00 and the other package was not returned and can be presumed to have been delivered to Major Millican. The address to which the packages were mailed was the same address provided by Major Millican in his 4 Jul 00 letter and corresponding to the address in his official Personnel record.

2. Per AFI 36-2504, paragraph 7.4., an officer is entitled to one opportunity to respond. Such an opportunity was previously provided to Major Millican on 13 Mar 00 (Attachment 2). This second opportunity was purely on my discretion as the Wing Commander and in response to Major Millican's letter of 4 Jul 00 (Attachment 3). His failure to avail himself of this second opportunity to respond does not change my recommendation to remove his name from the Lieutenant Colonel Recommended Promotion List.

3. If you have any questions pertaining to this issue, please contact my Director of Military Personnel, Lt Col Stevens, at DSN 837-1620.

JAMES T. RUBEOR, Colonel, USAFR
Commander

Attachments:
1. 349 AMW/CC Ltr, dtd 31 Jul 00, Intent to Remove from Recommended Promotion List
2. 349 AMW/CC Ltr, dtd 13 Mar 00, Intent to Remove from Recommended Promotion List
3. Major Millican's Ltr, dtd 4 Jul 00, Letter dated 26 May 00 (Adverse Personnel Action)
4. 349 MSS/DPM Ltr, dtd 26 May 00, Adverse Personnel Actions

EXHIBIT F/125

**Reply to:**
**32975 St. Moritz Drive**
**Evergreen, CO 80439**
**(303) 670-3825**
**Fax 670-1586**

**John A. Wickham, Esq.**
**Admitted in Virginia,**
**District of Columbia**
**& Military Courts**

# John A. Wickham & Associates
## Attorneys-at-Law

23 March 2004

FAXED

Air Force Board for Correction of Military Records (AFBCMR)
Department of the Air Force
Washington D.C. 20330-1430

Re: Dkt. BC-2003-02505,
MARC J. MILLICAN, Major, USAFR (Ret.) 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

SUBJECT: New evidence in support:
Wright v. US Army — F.Supp.2d — 2004 WL 439956 (D.Az. 2004)(attached)

Counsel for applicant submits a recently published federal court case issued March 9, 2004, relevant to applicant-Millican's argument that the disciplinary actions taken against him (reprimand, OPR, and promotion list removal), were in retaliation for expressing his First Amendment free speech rights against the Anthrax vaccine.

In Wright v. US Army the court in 2004 issued a preliminary injunction against the Army preventing any adverse personnel actions against Captain Wright including "discharge, demotion, or security clearance revocation." Id at 9. The court had found in its prior 2002 decision (with the Army agreeing) that the Army could not revoke CPT Wright's security clearance based on events occurring before a statute was enacted in 2000 that permitted clearance revocations. 10 U.S.C. § 986(a)(Smith Amendment permitting revocation after October 2000 for criminal convictions). However, the Army in 2003 after the litigation initiated a discharge board proceeding for Wright's alleged lying about his prior conviction when he was commissioned in 1997. In other words, the court found the discharge action violated his First Amendment right (to bring litigation in 2002) when the Army's agreed then that reliance on § 986 was unlawful.

The relevance to Millican's case is that his discipline was retaliation for expressing First Amendment free speech concerning an unlawful use of an experimental and unsafe vaccine *before* the FDA had formally issued a required Final Rule in December 2003. In the absence of this formal rule, Millican in 1999 had free speech protection to allege the vaccine was not safe and unlawful. Because the final rule was not retroactive (similar to the Smith Amendment), there can be no retaliation for his free speech events occurring before December 2003.

John A. Wickham, Esq.
Attorney for Millican

Incl:

Wright v. US Army WL 439956 (D.Az. 2004)

176
EX 5

Westlaw.



**Wright v. U.S. Army**
**2004 WL 439956**
**D.Ariz.,2004.**
**March 9, 2004.**

--- F.Supp.2d ---

Only the Westlaw citation is currently available.

United States District Court,
D. Arizona.
Andrew Keith WRIGHT, Plaintiff,
v.
U.S. ARMY, et al., Defendants.
No. CIV. **02-967**-PHX-EHC.
March 9, 2004.

**Background:** Captain sued United States Army, alleging Fifth Amendment and due process violations. Following Army's representation that it would not take action to void captain's status, dismissal of case as moot, revocation of captain's security clearance, and grant of captain's motion to re-open case, captain asserted First Amendment retaliation claims and moved for preliminary injunction.

**Holdings:** The District Court, Carroll, J., held that:
(1) Smith Amendment did not authorize Army to revoke captain's security clearance;
(2) preliminary injunction would issue to require reinstatement of security clearance; and
(3) Army would be enjoined from initiating proceedings to discharge captain based upon alleged pattern of lies and misrepresentations that occurred prior to issuance of prior preliminary injunction enjoining Army from dropping him from Army rolls.

Motion granted.

[1]

212 Injunction
212k0 k.

To obtain a preliminary injunction, a movant must show either the likelihood of success on the merits and the possibility of irreparable injury or, alternatively, the existence of serious questions going to the merits and the balance of hardships tipping in the movant's favor.

[2]

212 Injunction
212k0 k.

A preliminary injunction may issue when the movant shows either a likelihood of success on the merits and the possibility of irreparable injury, or that serious questions going to the merits were raised and the balance of hardships tips sharply in its favor.

177

[3]

92 Constitutional Law
92k0 k.

There are three ways for a public employee's claim of retaliation for exercising speech rights to have merit: first, a plaintiff can show such a close proximity between the adverse employment action and the protected speech as to create an inference of retaliation; second, a plaintiff can show his employer was opposed to his protected speech; and, third, a plaintiff can show that his employer's proffered explanations for such retaliation were false and pretextual. U.S.C.A. Const.Amend. 1.

[4]

92 Constitutional Law
92k0 k.

Because soldiers must show a respect for duty and a discipline without counterpart in civilian life, a soldier's free speech rights must yield somewhat to meet certain overriding demands of discipline and duty. U.S.C.A. Const.Amend. 1.

[5]

34 Armed Services
34k0 k.

Because the military's right to command and the duty to obey must be unquestioned, the military, for purposes of a soldier's free speech claim, must possess substantial discretion over its internal discipline. U.S.C.A. Const.Amend. 1.

[6]

34 Armed Services
34k0 k.

The Smith Amendment provisions prohibiting the Department of Defense, after a certain date, from granting or renewing the security clearance of a person convicted of a crime and sentenced to imprisonment of over one year, do not apply to security clearance revocations. 10 U.S.C.A. § 986(a), (c)(1).

[7]

92 Constitutional Law
92k0 k.

The precise nature of the retaliation is not critical to the inquiry in First Amendment retaliation cases brought by public employees; the goal is to prevent, or redress, actions by a government employer that chill the exercise of protected speech rights. U.S.C.A. Const.Amend. 1.

[8]

92 Constitutional Law
92k0 k.

A time period of three to eight months between a public employee's protected speech and the employer's adverse action is not too lengthy a time to support an inference of retaliation in a First Amendment action. U.S.C.A. Const.Amend. 1.

[9]

92 Constitutional Law
92k0 k.

178

Smith Amendment, which prohibited Department of Defense, after certain date, from granting or renewing security clearance of person convicted of crime and sentenced to imprisonment of over one year, was not unconstitutional ex post facto law, inasmuch as it did not permit revocation of existing security clearance. U.S.C.A. Const. Art. 1, § 9, cl. 3; 10 U.S.C.A. § 986(a), (c)(1).

[10]

92 Constitutional Law
92k0 k.

An "ex post facto law" is a law that applies retroactively, especially in a way that negatively affects a person's rights, as by criminalizing an action that was legal when it was committed. U.S.C.A. Const. Art. 1, § 9, cl. 3.

[11]

34 Armed Services
34k0 k.

Smith Amendment, which prohibited Department of Defense, after certain date, from granting or renewing security clearance of person convicted of crime and sentenced to imprisonment of over one year, did not authorize Army to revoke captain's security clearance due to his commission of felony, inasmuch as Amendment applied to captain only upon expiration of his security clearance. 10 U.S.C.A. § 986(a), (c)(1).

[12]

34 Armed Services
34k0 k.

The Smith Amendment gives the Department of Defense broad discretionary power to grant or renew security clearances. 10 U.S.C.A. § 986(d).

[13]

34 Armed Services
34k0 k.

The Smith Amendment confers upon the Secretary of Defense the ability in a meritorious case to abrogate, entirely at his discretion, the prohibition against granting or renewing the security clearance of a person convicted of a crime and sentenced to imprisonment of over one year. 10 U.S.C.A. § 986(a), (c)(1), (d).

[14]

34 Armed Services
34k0 k.

Exceptions to the Smith Amendment's prohibition against granting or renewing the security clearance of a person convicted of a crime and sentenced to imprisonment of over one year are not to be issued lightly. 10 U.S.C.A. § 986(a), (c)(1), (d).

[15]

34 Armed Services
34k0 k.

In passing the Smith Amendment, Congress' concern stemmed from the idea that too many convicted felons were receiving security clearances, not that some convicted felons may unjustly be denied a security clearance. 10 U.S.C.A. § 986(a), (c)(1), (d).

179

[16]

92 Constitutional Law
92k0 k.

It is a violation of the First Amendment to enable a public official to determine which expressions of view will be permitted and which will not, or to engage in invidious discrimination among persons or groups either by use of a statute providing a system of broad discretionary licensing power or the equivalent of such a system by selective enforcement of an extremely broad prohibitory statute. U.S.C.A. Const.Amend. 1.

[17]

92 Constitutional Law
92k0 k.

A statute which, on its face, is so vague and indefinite as to permit the punishment of protected free speech is anathema to the Fourteenth Amendment concept of liberty. U.S.C.A. Const.Amend. 14.

[18]

212 Injunction
212k0 k.

Army captain showed possibility of success on merits of his claim that Army revoked his security clearance in retaliation for him exercising his free speech rights through litigating claims against Army, and preliminary injunction thus would issue to require reinstatement of clearance, where Army mistakenly applied Smith Amendment, just three weeks after District Court had dismissed captain's claims based upon Army's representation that it would not take action to void captain's status. U.S.C.A. Const.Amend. 1; 10 U.S.C.A. § 986 (a), (c)(1), (d).

[19]

212 Injunction
212k0 k.

Army would be enjoined from initiating proceedings to discharge Army captain based upon alleged pattern of lies and misrepresentations that occurred prior to issuance of prior preliminary injunction enjoining Army from dropping him from Army rolls, where District Court had dismissed captain's claims as moot based upon Army's representation that it would not take action to void captain's status, and, thus, Army had waived its right to rely, in any subsequent effort to discharge captain, on events prior to issuance of prior preliminary injunction.
Andrew Keith Wright, Goodyear, AZ, pro se. for Plaintiff.
Arthur G. Garcia, Esq, James C. Hair, Jr, Esq, US Attorney's Office, Phoenix, AZ, for Defendants.

ORDER

CARROLL, District J.
***1** Pending before the Court is Plaintiff's 1) Motion for Preliminary Injunction [Dkt. 75-3]; 2) Motion for Declaratory Relief [Dkt. 75-4]; and 3) Motion to Find Defendants in Contempt [Dkt. 75-5].
Attached as an Appendix to this Order is a chronology of events involving Plaintiff's military career from May 24, 2002, the date Plaintiff filed his initial Complaint, to date.
*Relevant Procedural History*
On July 12, 2002, the Court entered a Preliminary Injunction enjoining the U.S. Government and any of its agencies having jurisdiction over Plaintiff's military status from 1) dropping Plaintiff from the rolls of the Army; and 2) terminating his active duty status as a Captain prior to December 20, 2002. Defendants did not appeal the Order granting the Preliminary Injunction.
On December 23, 2002, Defendants filed a Motion to Dismiss [Dkt. 54] and submitted an exhibit ("Letter") to their Motion to Dismiss, which stated:
Based on the reasoning of the U.S. District Court in issuing the preliminary injunction, this command does not intend to take action to void Andrew Wright's status as a captain, U.S. Army Reserve, on or after 20 December

180