2002.
Captain Wright is currently serving on a tour of extended active duty. Future actions after 20 December 2002 to extend that active duty tour or to allow that tour to terminate on its end date with Captain Wright's release to the Individual Ready Reserve will be in accordance with all laws and regulatory standards applicable to similarly situated officers of the U.S. Army Reserve who are serving on active duty.
[Dkt. 57, p. 2; Dkt. 54, Exh. 1]. [FN1]
On January 17, 2003, despite the attestations in the Letter one month earlier and without filing with the Court, the Department of the Army Central Personnel Security Clearance Facility Plaintiff issued an "Intent to Revoke" Memorandum, which notified Plaintiff that a preliminary decision had been made to revoke his security clearance pursuant to the Smith Amendment. [Dkt. 67, Exh. 6-5].
In its Order dated February 28, 2003, the Court granted Defendants' Motion to Dismiss [Dkt. 54] because "Plaintiff ha[d] received the relief he requested." [Dkt. 57, p. 4]. [FN2] The Court dismissed the case as moot based on Defendants' representations in its December 2002 Motion to Dismiss. [FN3] [Dkt. 57, p. 4].
On March 23, 2003, Defendants revoked Plaintiff's ten-year security clearance after only seven years, which Plaintiff alleges operated to "negate the ability of the Plaintiff to continue to serve on Active Duty with the Army or obtain an assignment in the Army Reserve." [Dkt. 75, p. 2, filed February 2, 2004]. On February 2, 2004, Plaintiff filed a "Motion to Re-Open case, Motion for Temporary Restraining Order and Preliminary Injunction, Motion for Declaratory Relief, and Motion to Find Defendants in Contempt." [Dkt. 75].
On February 3, 2004, Defendants notified Plaintiff, by Memorandum, of an upcoming hearing to take place at the Armed Forces Reserve Center in North Little Rock, Arkansas, on February 18, 2004. The "subject" of the Memorandum was listed as "Notification of Show Cause Board." The Memorandum, issued by the Department of the Army, stated that "[t]he hearing [is] to consider CPT Andrew K. Wright... for administrative separation [FN4] for intentional misstatement of facts in official statements or records, for the purpose of misrepresentation and conduct unbecoming an officer..."
***2** On February 12, 2004, the Court granted Plaintiff's Motion to Re-Open the case to consider actions the U.S. Army took subsequent to the Court's Order of February 28, 2003, which dismissed Plaintiff's claims because he had received the relief requested. Further, the Court granted Plaintiff's Motion for Temporary Restraining Order and enjoined Defendants, or any division thereof, from taking any action to discharge, demote, or otherwise voiding or suspending Plaintiff's status on inactive duty as a Captain in the U .S. Army Reserve for a period often (10) days from the date of the Order or as extended by the Court.
Plaintiff claims the U.S. Army is now "attempt[ing] to achieve indirectly what the Court has ruled they were estopped from doing" based on an alleged misrepresentation in July 2003, discussed *infra*. [Dkt. 75, p. 2]. At issue is whether the Court acted based on representations that Plaintiff had received the relief requested in granting Defendants' Motion to Dismiss, and if so, whether events subsequent to the Court's Order of February 28, 2003, have occurred which justify Plaintiff's dismissal, or whether Defendants are retaliating against Plaintiff. The pending, although now-postponed, military proceedings to terminate Plaintiff, considering that the U.S. Army "[did] not intend to take action to void Andrew Wright's status as a captain, U .S. Army Reserve, on or after 20 December 2002" [Dkt. 54, Exh. 1], are arguably impacted by prior proceedings in this case.
On February 20, 2004, the Court held an evidentiary hearing to determine whether the U.S. Army had acted in contravention to its representations, *supra,* in its Motion to Dismiss, and whether to issue a preliminary injunction.
*Legal Standard--Preliminary Injunction*
[1] In order to obtain a preliminary injunction, a movant must show either the likelihood of success on the merits and the possibility of irreparable injury *or,* alternatively, the existence of serious questions going to the merits and the balance of hardships tipping in the movant's favor. *Mai Systems Corp. v. Peak Computer, Inc.,* 991 F.2d 511, 516 (9th Cir.1993).
[2] In other words, a preliminary injunction may issue when the movant shows " 'either a likelihood of success on the merits and the possibility of irreparable injury, or that serious questions going to the merits were raised and the balance of hardships tips sharply in its favor." ' *Immigrant Assistance Project of Los Angeles Cty. Federation of Labor (AFL-CIO) v. I.N.S.,* 306 F.3d 842, 873 (9th Cir.2002)(quoting *Sega Enterprises Ltd. v. Accolade, Inc.,* 977 F.2d 1510, 1517 (9th Cir.1992)).
*Discussion*
*Plaintiff's Allegations*
Plaintiff is proceeding pro se. Plaintiff argues that Defendants, in their December 2002 Motion to Dismiss [Dkt. 54], misrepresented their position to the Court. Plaintiff contends that the Order dismissing his claims, based on Defendant's representations, requires the U.S. Army to reinstate his security clearance. Further, Plaintiff alleges that the revocation of his security clearance on March 23, 2003, was in retaliation for his legal actions against the U.S. Army. [FN5] Specifically, Plaintiff "contends that several actions committed by the Defendants are indirect [sic] contempt of this Court and in violation of an agreement submitted in writing in this Court to 'treat the

181

Plaintiff as any other Officer' and to take no action to 'divest him of his status as an Officer in the U.S. Army Reserve." ' [Dkt. 67, p. 2]. Plaintiff's referral to "several actions" stems from the revocation of his security clearance [FN6] and his scheduled hearing in Arkansas before the involuntary separation Board to consider involuntary discharge. Plaintiff argues that any misrepresentation as to the status of his security clearance on an application for voluntary deployment to Honduras by Plaintiff was due to Plaintiff's reliance on the Court's Order, which he believes required reinstatement of his security clearance.

***3** Additionally, Plaintiff alleges he has been a reliable and dutiful soldier. Plaintiff submitted a letter from Lieutenant Colonel Scott A. Westley, dated February 25, 2003, which states "I highly recommend approval of this waiver request and that CPT Wright's security clearance be restored. CPT Wright has served with this unit for over two years and I have personally worked with him for eight months of that period. I do not doubt his loyalty to our country or his willingness to serve our Army." [Dkt. 67, Exh. 4-12] . [FN7]

*Defendants' Allegations*

Defendants argue that the Court, if it accepts Plaintiff's argument, may be erecting "an impenetrable shield against any subsequent adverse personnel actions" against Plaintiff. [Dkt. 78, p. 5].

During the evidentiary hearing on February 20, 2004, Defendant argued that Plaintiff intentionally misrepresented his security clearance status on his application, dated July 10, 2003, which was submitted for voluntary deployment with Joint Task Force Bravo to Honduras. Plaintiff represented his security clearance as "Secret." [Hearing Exh. 29, p. 8].

A Memorandum issued on December 7, 2003, and signed by Major General James A. Sholar, referenced the July 2003 application, and advised Plaintiff that:

Your misrepresentation of your clearance status to deploy to Honduras continues a *pattern of misrepresentation* previously documented by a January 27, 2003, Reprimand issued to you by MG Michael D. Rochelle, Commander, U.S. Army Recruiting Command. This Reprimand states that you committed various acts of fraud and deceit against the U.S. Army, including submitting a false statement in August, 1997, on a [Standard Form 86] security questionnaire [FN8] regarding a previous suspension of your clearance.

[Dkt. 67, Exh. 1-1; *See* Dkt. 9, p. 29](emphasis added).

Defendants allege that his recent representation involving his security clearance continues a pattern of dishonesty perpetrated by Plaintiff over the past fifteen years, and warrants an administrative separation hearing.

Defendants refer to the last paragraph in the Letter (Dkt.54, Exh. 1), which states, in part:

Future actions after 20 December 2002 to extend that active duty tour or to allow that tour to terminate on its end date with Captain Wright's release to the Individual Ready Reserve will be in accordance with all law and regulatory standards applicable to similarly situated officer of the U.S. Army Reserve who are serving on active duty.

As such, Defendants claim that they retained the right, pursuant to the above paragraph, to terminate Plaintiff for conduct prior to and known as of December 20, 2002, even though the Court dismissed the case as moot based on the fact that Plaintiff received the relief he requested.

*Reopening of the Case*

The Court reopened this case for the limited purpose of deciding whether *new* events had occurred subsequent to the Order dismissing Plaintiff's claims to justify terminating Plaintiff's status in the Ready Reserve. Despite Defendants claim that Plaintiff had an alleged "history" of misrepresentations, Defendants agreed in December 2002 to take no action to void Plaintiff's status as a captain. However, Defendants revoked Plaintiff's security clearance just twenty-three (23) days after the Court's Order, and later scheduled an administrative hearing, now postponed, for February 18, 2004, to determine his status as an officer in the U.S. Army Reserve.

*Scope of the Court's February 28, 2003 Order*

***4** In its February 28, 2003 Order, the Court addressed mootness because Plaintiff "ha[d] received the relief he requested" with respect to his claims of Fifth Amendment and due process violations. However, the Court advised Plaintiff that any First Amendment retaliation claims "is properly brought in a separate action." [Dkt. 57, p. 4].

On March 24, 2003, Plaintiff filed a separate action (CIV 03-555) [FN9], which the Court consolidated with this action (CIV 02-0967) pursuant to an Order dated February 12, 2004.

Plaintiff has not received the "relief he requested" with respect to his First Amendment claims because the claims had not been resolved by dismissal of the case. Therefore, Plaintiff's First Amendment retaliation claim is before the Court at this juncture. The Court will determine whether Defendants' contention that it did "not intend to take action to void Andrew Wright's status as a captain, U.S. Army Reserve, on or after 20 December 2002" represented that the U.S. Army did not intend to pursue dismissal, or take any action leading to dismissal, based upon Plaintiff's alleged pattern of dishonesty and misrepresentations occurring prior to December 20, 2002. If Defendants' intent is determined as such by the Court, then any adverse employment action against Plaintiff for his alleged dishonesty and misrepresentations are suspect absent non-pretextual reasons for such action.

Defendants argued at the hearing on February 20, 2004, that Plaintiff's recent misrepresentation on July 10, 2003, concerning the status of his security clearance after the clearance had been revoked on March 23, 2003,

182

precipitated the scheduling of a discharge hearing to be held on February 18, 2004. However, Plaintiff's evidence at the hearing reflected that the revocation process was initiated by the Army Litigation Division via a Memorandum sent to Maria Di Marco ("Di Marco"), Adjudications Chief at the Central Personnel Security Clearance Facility on June 24, 2002, regarding his 1987 criminal conviction. Plaintiff has submitted Army correspondence, including the Memorandum to Di Marco, which states that the reasons for the revocation of Plaintiff's security clearance is his criminal conviction. [Dkt. 67, Exh. 4-6]. Further, Defendants continue to maintain that a *pattern* of dishonesty, occurring long prior to December 22, 2002, will be presented at the discharge hearing rather than merely the most recent events, thus resurrecting the very issues resolved by the Court's February 2003 Order.

*First Amendment Retaliation--Revocation of Security Clearance*

[3] There are three (3) ways for a retaliation claim to have merit. First, a Plaintiff can show such a close proximity between the adverse employment action and the protected speech as to create an inference of retaliation. *Coszalter v. City of Salem*, 320 F.3d 968, 977 (9th Cir.2003). Second, a Plaintiff can show his employer was opposed to his protected speech. *Id.* Third, a Plaintiff can show that his employer's proffered explanations for such "retaliation" were false and pretextual. *Id.*

***5** It is widely accepted that non-frivolous litigation is constitutionally- protected free speech. *See, e.g., Lytle v. Wondrash*, 182 F.3d 1083, 1090 (9th Cir.1999); *Redish v. City of Tacoma*, 123 F.3d 1216, 1222-23 (9th Cir.1997).

In the Order dismissing Plaintiff's claims, and noting that any First Amendment claim be brought in a separate action, the Court stated:

Plaintiff contends the administrative actions taken against him are in retaliation for his previous legal actions against Defendants and are an attempt to harass him and remove him from the Army. As such, Plaintiff's claims are... brought under... the First Amendment as retaliation claims.

Unlike due process claims, First Amendment retaliation claims do not require a final agency action or a liberty or property entitlement. Rather, the action of which a plaintiff is complaining must only be sufficiently adverse to deter the exercise of First Amendment rights. *Power v. Summers*, 226 F.3d 815, 820- 21 (7th Cir.2000); *see also Nunez v. City of Los Angeles*, 147 F.3d 867, 875 n. 11 (9th Cir.1988); *Hyland v. Wonder*, 972 F.2d 1129, 1134-35 (9th Cir.1992). Thus, Plaintiff arguably may assert First Amendment retaliation claims even if the Army has discretion in whether to take these administrative actions against Plaintiff, assuming Plaintiff's First Amendment interests outweigh the Army's need to maintain morale and discipline. *See Parker v. Levy*, 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974).

[Dkt. 57, p. 3].

The Supreme Court has determined that:

While the members of the military are not excluded from the protection granted by the First Amendment, the different character of the military community and of the military mission requires a different application of those protections. The fundamental necessity for obedience, and the consequent necessity for imposition of discipline, may render permissible within the military that which would be constitutionally impermissible outside it.

*Parker v. Levy*, 417 U.S. at 760, 94 S.Ct at 2563.

[4][5] As such, "even if there are marginal applications to which [a statute] would infringe on First Amendment values, facial invalidation is inappropriate if the 'remainder of the statute covers a whole range of easily identifiable and constitutionally proscribable conduct." ' Id. (citing *United States Civil Svc. Comm'n v. Nat'l Assn. of Letter Carriers*, 413 U.S. 548, 580-81, 93 S.Ct. 2880, 2898, 37 L.Ed.2d 796 (1973)). Soldiers must show a respect for duty and a discipline without counterpart in civilian life. *See Brown v. Glines*, 444 U.S. 348, 354, 100 S.Ct. 594, 599, 62 L.Ed.2d 540 (1980). Therefore, a soldier's rights "must yield somewhat to meet certain overriding demands of discipline and duty..." *Id.* (quoting *Parker v. Levy*, 417 U.S. at 758, 94 S.Ct. at 2563) (internal quotations omitted). Because the military's right to command and the duty to obey must be unquestioned, the military must possess substantial discretion over its internal discipline. *Id.* at 357, 601.

***6** [6] Here, the specific First Amendment right that Plaintiff claims was violated is the prohibition of retaliation for free speech. As will be addressed, *infra,* the statute on which Defendants rely, namely the Smith Amendment, does not apply to security clearance revocations. As such, Defendants will not be afforded the liberal application of the statute that the Supreme Court envisioned.

Procedurally, Plaintiff states a claim of retaliation that fits into the first prong of the *Coszalter* test, *supra,* by alleging that the U.S. Army initiated proceedings to revoke his security clearance just a few weeks after the Army's assurance that they had no intention of taking any action to void Plaintiff's status as Captain, and by relying on a statute that has no application to Plaintiff at this time.

[7][8] "The precise nature of the retaliation is not critical to the inquiry in First Amendment retaliation cases. The goal is to prevent, or redress, actions by a government employer that chill the exercise of protected First Amendment rights." *Coszalter*, 320 F.3d at 974-75 (9th Cir.2003) (internal quotations omitted). Further, a time period of three (3) to eight (8) months after the protected speech is not too lengthy a time to support an

183

inference of retaliation. [FN10] *See id.* at 977.
Here, the U.S. Army's issuance on January 17, 2003, of the "Intent to Revoke" Memorandum, notifying Plaintiff that a preliminary decision had been made to revoke his security clearance pursuant to the Smith Amendment, and the ultimate revocation of Plaintiff's security clearance just three (3) weeks after the Court's Order of February 28, 2003, supports an inference of retaliation.
*The Smith Amendment (10 U.S.C. § 986)*
[9][10] The Smith Amendment provides that "[a]fter October 30, 2000, the Department of Defense may not grant or renew a security clearance for a person to whom this section applies who is described in subsection (c)." 10 U.S.C. § 986(a). Section (c) provides, in relevant part, that "[a] person is described in this subsection if any of the following applies to that person: (1) The person has been convicted in any court of the United States of a crime and sentenced to imprisonment for a term exceeding one year." 10 U.S.C. § 986(c)(1). [FN11] The statute does not provide for the revocation of an existing security clearance.
[11] Here, Plaintiff was charged with a felony in 1987 and sentenced to eighteen months for his conviction. [FN12] As such, the Smith Amendment applies to Plaintiff and his security clearance, but only upon the expiration of his security clearance. [FN13]
[12][13][14][15] The Smith Amendment gives the Department of Defense and, therefore, Defendants in this case, broad discretionary power to grant or renew security clearances. *Nickelson v. United States,* 284 F.Supp.2d 387, 392 (E.D.Va.2003). Section (d) allows, in a meritorious case, for "Secretary of Defense or the Secretary of the military department concerned [to] authorize an exception to the prohibition in subsection (a) for a person described in... subsection (c)." 10 U.S.C. § 986(d). As such, Section (d) "confers upon the Secretary the ability in a 'meritorious case' to abrogate this prohibition, entirely at his discretion." *Nickelson,* 284 F. Supp.2d at 392. These exceptions, however, are not to be issued lightly. *Id.* In passing the Smith Amendment, Congress' concern stemmed from the idea that too many convicted felons were receiving security clearances, not that some convicted felons may unjustly be denied a security clearance. *Id.* at 392-93.
*The Smith Amendment Vis-a Vis the First Amendment*
***7** [16][17] "It is clearly unconstitutional to enable a public official to determine which expressions of view will be permitted and which will not or to engage in invidious discrimination among persons or groups either *by use of a statute providing a system of broad discretionary licensing power* or, as in this case, the equivalent of such a system by selective enforcement of an extremely broad prohibitory statute." *Cox v. State of Louisiana,* 379 U.S. 536, 557-58, 85 S.Ct. 453, 466, 13 L.Ed.2d 471 (1965)(emphasis added). Further, a statute which, on its face, is so vague and indefinite as to permit the punishment of protected free speech, is anathema to the Fourteenth Amendment concept of liberty. *Id.* at 552, 463. The Supreme Court has "recognized that the lodging of such broad discretion in a public official allows him to determine which expressions of view will be permitted and which will not." *Id.* at 557, 466. Thus, "[i]t is clearly unconstitutional to enable a public official to determine which expressions of view will be permitted and which will not or to engage in invidious discrimination among persons or groups... by use of a statute providing a system of broad discretionary licensing power..." *Id.*
Here, the military arguably could, in meritorious cases, renew the security clearances of persons with convictions and imprisonments of more than one year, but choose to renew only when those who exercised protected free speech did so with actions advocated by the military. Such an implementation of the statute would clearly be unconstitutional. While the revocation, or non-renewal, of a soldier's security clearance, or fear of same, would not prevent the speech at issue here, namely litigation, the possibility of revocation or non-renewal could severely discourage, and be retaliation for such speech, regardless of whether the revocation or non-renewal was in accordance with the Smith Amendment.
[18] Although the Smith Amendment does not permit Defendants to revoke Plaintiff's security clearance, Plaintiff still has the burden of showing that the U.S. Army revoked his security clearance to retaliate against him. The U.S. Army catalogued a history of alleged lies and misrepresentations by Plaintiff, committed by falsifying applications for active duty. However, Defendants waived objections in December 2002 to Plaintiff's alleged history, pursuant to the Letter, *supra,* and indicated no intention of discharging Plaintiff based on that history. They assert an entirely different posture now. There is sufficient evidence to support the inference that Defendants' mistaken application of the Smith Amendment, just three weeks after the Court's Order dismissing his claims as moot, was in retaliation for Plaintiff's litigation.
The U.S. Army's revocation of Plaintiff's security clearance twenty-three (23) days after the Court's Order supports an inference of retaliation that Defendants have failed to rebut. Further, Plaintiff has offered evidence of his exemplary service, including a letter of recommendation from Lieutenant Colonel Scott A Wesley praising Plaintiff's service in to the Army, and recommending the reinstatement of Plaintiff's security clearance. Accordingly, the Court will order reinstatement of Plaintiff's security clearance effective the date of this Order.
*Discharge Proceedings*
***8** [19] Defendants' argument that an alleged pattern of lies and misrepresentations for over a decade can be forgiven, as it was in December 2002, yet his action on July 10, 2003, which Plaintiff contends was based on a

189

false assumption concerning his security status, is grounds for a show cause hearing to terminate his status, is unpersuasive. First, Defendants fail to offer a credible reason for revoking Plaintiff's security clearance *before* his July 2003 representation occurred. Second, Defendants offer no evidence as to what occurred between February 28, 2003, the date of the Court's Order dismissing Plaintiff's claims as moot, and March 23, 2003, the date Defendants revoked Plaintiff's security clearance, to warrant such a revocation. Third, Defendants offer no basis, aside from the July 2003 alleged misrepresentation, to proceed with a separation hearing.

The Court dismissed Plaintiff's claims on February 28, 2003, in reliance on the U.S. Army's intent not to pursue discharge proceedings against Plaintiff as stated earlier in this Order. The Court found that Plaintiff had received the relief requested. The U.S. Army effectively and knowingly waived its right to rely upon the alleged pattern of lies and misrepresentations by Plaintiff prior to December 2002 in any subsequent effort to discharge him. The Court does not erect an "impenetrable shield" for Plaintiff for significant misdeeds in the future, as Defendants suggest, but it does foreclose the U.S. Army from considering the same alleged pattern of lies and misrepresentations that Defendants agreed not to pursue in the Letter of December 2002, and from relying on the Smith Amendment until after the expiration of Plaintiff's security clearance.

During the evidentiary hearing, Army counsel argued that Plaintiff's misrepresentation of the status of his security clearance on July 10, 2003, in voluntarily seeking deployment, is "all it takes to require an officer to show cause for retention." However, Defendants, in their December 7, 2003 letter, *supra* at page 6, to Plaintiff, contend that, in addition to the Smith Amendment, other reasons existed to revoke Plaintiff's security clearance, such as "submitting false documents, submitting false information and your fraudulent enlistment in the Texas Army National Guard" on June 27, 1996. [Dkt. 67, Exh. 6-1].

Based on the Court's Order of February 28, 2030, Defendants may not initiate discharge proceedings based upon the alleged pattern of lies and misrepresentations that occurred prior to December 2002.

*Legal Standard--Contempt*

" 'The standard for finding a party in civil contempt is well settled: The moving party has the burden of showing by clear and convincing evidence that the contemnors violated a specific and definite order of the court." ' In re Dyer, 322 F.3d 1178, 1190-91 (9th Cir.2003)(quoting In re Bennett, 298 F.3d 1059, 1069 (9th Cir.2002)). "The burden then shifts to the contemnors to demonstrate why they were unable to comply." *F.T.C. v. Affordable Media*, 179 F.3d 1228, 1239 (9th Cir.1999).

*Revocation of Security Clearance as Contempt*

***9** The Court finds that Defendants' revocation of Plaintiff's security clearance was in contravention to the Court's Order of February 28, 2003. However, while Defendants' reliance on the Smith Amendment, shortly after the Order, supports an inference of retaliation, the issue of contempt will not be resolved at this stage of the proceedings.

*Conclusion*

Plaintiff has met his burden for issuance of a preliminary injunction, by showing the possibility of success on the merits of his retaliation claim and the possibility of irreparable injury. Defendants have failed to rebut the inference of retaliation. As such, Plaintiff's security clearance shall be reinstated. Defendants are not found in contempt of the Court's Order dated February 28, 2003, at this time. However, Defendants will be enjoined from taking any action to discharge, demote, or otherwise voiding or suspending Plaintiff's status as Captain, or to revoke Plaintiff's security clearance, based upon Plaintiff's actions prior to December 2002.

Accordingly, and pursuant to the hearing held on February 20, 2004,

IT IS ORDERED that all pending motions as of February 20, 2004, in the case numbered CIV 03-0555-PHX-EHC are DENIED without prejudice. [Dkts. 18-1, 18-2, 18-3, 19-1, 20-1, 20-2, 33-1, 34-1, 35-1, 35-2, 35-3, 40-1, 41-1, 42-1, 42-2, 42-3, 43-1].

IT IS FURTHER ORDERED that all pending motions as of February 20, 2004, in the case numbered CIV 03-1252-PHX-EHC are DENIED without prejudice. [Dkts. 5-1, 6- 1].

IT IS FURTHER ORDERED that cases numbered CIV 03-0555-PHX-JAT, CIV 03-1252- PHX-JAT, CIV 03-1321-PHX-JAT, CIV 03-1693-PHX-JAT shall be consolidated into case number CIV 02-0967-PHX-EHC, and all future filings in any of these cases should reflect the case number CIV 02-0967-PHX-EHC.

IT IS FURTHER ORDERED that Plaintiff's Motion for Preliminary Injunction is GRANTED. [Dkt. 75-3].

IT IS FURTHER ORDERED that Defendants are enjoined from taking any action to discharge, demote, or otherwise voiding or suspending Plaintiff's status as Captain, or to revoke Plaintiff's security clearance, based upon Plaintiff's alleged history of lies and misrepresentations prior to December 2002. [Dkt. 75-3].

IT IS FURTHER ORDERED that Plaintiff's Motion for Declaratory Judgment is STAYED without prejudice to consideration at an appropriate time. [Dkt. 75-4].

IT IS FURTHER ORDERED that Plaintiff's Motion to Find Defendant's in Contempt will be addressed, if necessary, at a future hearing. [Dkt. 75-5].

APPENDIX

Chronology of Events

185

*Wright v. U.S. Army Total Personnel Command, et al.* (02 CIV 967)
May 24, 2002: Complaint filed (numbered CIV 02-0967-PHX-EHC).
December 12, 2002: Letter from Lieutenant Colonel Rafe R. Foster to U.S. Attorney Paul K. Charlton, which was attached as Exhibit 1 to Defendants' Motion to Dismiss [Dkt. 54], and states, in relevant part:
Based on the reasoning of the U.S. District Court in issuing the preliminary injunction, this command does not intend to take action to void Andrew Wright's status as a captain, U.S. Army Reserve, on or after 20 December 2002.
***10** Captain Wright is currently serving on a tour of extended active duty. Future actions after 20 December 2002 to extend that active duty tour or to allow that tour to terminate on its end date with Captain Wright's release to the Individual Ready Reserve will be in accordance with all laws and regulatory standards applicable to similarly situated officers of the U.S. Army Reserve who are serving on active duty.
[Dkt. 54, Exh. 1].
January 17, 2003: "Intent to Revoke" Memorandum issued by the Department of the Army Central Personnel Security Clearance Facility, notifying Plaintiff that a preliminary decision had been made to revoke his security clearance pursuant to the Smith Amendment.
February 25, 2003: Letter from Lieutenant Colonel Scott A. Westley recommending that Plaintiff's security clearance be reinstated and opining that he does not doubt Plaintiff's loyalty to the United States or his willingness to serve in the Army.
February 28, 2003: Court Order dismissing Plaintiff's Fifth Amendment and due process claims because "Plaintiff has received the relief he requested" pursuant to the Letter from Lieutenant Colonel Rafe R. Foster to U.S. Attorney Paul K. Charlton. [Dkt. 57, p. 4].
March 23, 2003: Defendants revoke Plaintiff's security clearance pursuant to the Smith Amendment.
July 10, 2003: Plaintiff submits Application for Active Duty, in which he fills in the box under "Security Clearance" with the word "Secret." [Hearing Exh. 29, p. 7]. Both parties stipulate to the fact that Plaintiff's security clearance had been revoked at the time. Plaintiff alleges he believed that the Court's Order, dated February 28, 2003, required Defendants to reinstate Plaintiff's security clearance.
October 17, 2003: Plaintiff sends email correspondence to Colonel Bruce Berwick requesting his security clearance be reinstated. [Dkt. 67, Exh. 4-6].
October 21, 2003: Colonel Bruce Berwick responds via email correspondence to Plaintiff's request for a waiver to the requirement that his security clearance be revoked. Colonel Berwick writes that "[g]iven your criminal conviction, and the determination of the Personnel Security Advisory Board, [Secretary Brownlee] will not consider a meritorious waiver at this time." [Dkt. 67, Exh. 4-6].
October 23, 2003: Plaintiff sends email correspondence to Colonel Bruce Berwick requesting an exception to his security clearance revocation pursuant to the Court's Order dated February 28, 2003, which Plaintiff contends "estopped [the Army] from using my conviction against me in any personnel action." [Dkt. 67, Exh. 4-6].
December 7, 2003: Memorandum from Major General James R. Scholar, U.S. Army Reserve, notifying Plaintiff that "... I am initiating involuntary separation against you..." [Hearing Exh. 1].
December 19, 2003: Plaintiff files a Motion for Order to Show Cause why Defendants should not be held in contempt of court for violating the Order dated February 28, 2003.
***11** January 7, 2004: Plaintiff files a Motion for Temporary Restraining Order and Preliminary Injunction. [Dkt. 63].
February 3, 2004: Defendants notify Plaintiff of upcoming hearing to take place at the Armed Forces Reserve Center in North Little Rock, Arkansas, on February 18, 2004. The "subject" of the Memorandum is listed as "Notification of Show Cause Board." The Memorandum, issued by the Department of the Army, states that "[t]he hearing [is] to consider CPT Andrew K. Wright... for administrative separation for intentional misstatement of facts in official statements or records, for the purpose of misrepresentation and conduct unbecoming an officer..."
February 12, 2004: Order granting Plaintiff's Motion for Temporary Restraining Order. [Dkt. 81].
February 20, 2004: Evidentiary hearing conducted by the Court regarding Plaintiff's Motion for Preliminary Injunction and the activities leading up to the U.S. Army's decision to hold an administrative separation hearing at the Armed Forces Reserve Center in North Little Rock, Arkansas.

FN1. Letter from Lieutenant Colonel Rafe R. Foster to U.S. Attorney Paul K. Charlton, which was attached as Exhibit 1 to Defendants' Motion to Dismiss [Dkt. 54].

FN2. The Court was unaware on the date of its Order that an "Intent to Revoke" Memorandum had been issued.

FN3. Defendants contend that the Letter, *supra,* represents that the U.S. Army "would not seek to void plaintiff's status as a captain but would otherwise treat him as any similarly situated officer..." [Dkt. 78, p. 3]. The Motion and the Court's Order confirmed that any actions concerning a change in Plaintiff's status as an officer in the U.S.

Army Reserve would not be premised on matters which occurred prior to December 20, 2002.

FN4. The Court notes that the upcoming hearing in Arkansas is for consideration of "administrative separation" as opposed to "release to the Individual Ready Reserve" as stated in Defendants' letter of December 12, 2002.

FN5. Plaintiff also alleges due process claims that will not be addressed, as those claims were dismissed pursuant to the Court's Order dated February 28, 2003. The claim before the Court is that of alleged retaliation, after the same Court Order, in violation of the First Amendment.

FN6. Plaintiff avers in his Motion to Find Defendants in Contempt of Court and Motion for Declaratory Judgment that Defendants revoked Plaintiff's security clearance on March 23, 2003, twenty-three (23) days after the Court's issuance of it's Order. [Dkt. 67, p. 4](Plaintiff mistakenly lists the year as 2002, but it is evident Plaintiff intended the year to be reflected as 2003.). Plaintiff also has contended, at the evidentiary hearing of February 20, 2004, that the same Order required Defendants to reinstate his security clearance, the revocation of which was pending at the time of the Court's Order.

FN7. There exist numerous other positive reviews in Plaintiff's personnel file. One performance evaluation states that "CPT Wright is an outstanding officer" who has always been willing "to go the extra mile to complete the mission" and who "should be promoted and considered for positions of increasing responsibility." [Hearing Exh. 66, p. 73]. Another performance evaluation avers that Plaintiff has "strong convictions and stands behind them" and is "[u]nfazed by rapidly changing situations." [Hearing Exh. 66, p. 80].

FN8. Application to the National Guard, dated August 13, 1997.

FN9. Case No. 03-0555 is consolidated with Case No. 02-0967 due to its similar issues.

FN10. The Ninth Circuit rejected any bright-line rule that would be applied to the timing of retaliation. Instead, the Circuit held that "[i]n some cases, the totality of the facts may form such a clear picture that a district court would be justified in granting summary judgment, either for or against a plaintiff, on the issue of retaliatory motive; but the length of time, considered without regard to its factual setting, is not enough by itself to justify a grant of summary judgment." *Id.* at 978.

FN11. The Smith Amendment cannot be regarded as *ex post facto* because the statute does not permit the revocation of an existing security clearance. Rather, the Amendment prohibits the Department of Defense from granting a new security clearance, or renewing an expiring one, *after October 30, 2000.* An *ex post facto* law is "[a] law that applies retroactively, esp. in a way that negatively affects a person's rights, as by criminalizing an action that was legal when it was committed." Black's Law Dictionary, 7th ed., p. 601 (1999).

FN12. Plaintiff's state convictions for conspiracy and manufacture of controlled substances were expunged in 1996. However, Plaintiff served eighteen (18) months for the federal charge of conspiracy to manufacture a controlled substance, to which Plaintiff pleaded guilty. A third charge for fraud, stemming from a check tendered with insufficient funds, was dismissed.

FN13. Plaintiff's security clearance does not expire until 2007.
D.Ariz.,2004.
Wright v. U.S. Army
2004 WL 439956, 2004 WL 439956 (D.Ariz.)
END OF DOCUMENT

Doc 1 of 3

Cite List

© 2004 West | Accessibility Information

THOMSON WEST

187

DEPARTMENT OF THE AIR FORCE
HEADQUARTERS UNITED STATES AIR FORCE
WASHINGTON, DC

15 May 2004

MEMORANDUM FOR AFBCMR

FROM: HQ USAF/JAA
1420 Air Force Pentagon
Washington D.C. 20330-1420

SUBJECT: Application for Correction of Military Records - Marc J. Millican (AFBCMR 03-02505)

This is in response to your request for our further review and comment on subject application. Having reviewed the applicant's 19 February 2004 comments and arguments, we continue to recommend that the Board deny his application for relief.

The applicant through his counsel argues two primary points: (1) the promotion removal action was invalid and he is entitled to be promoted retroactive to December 2000; and (2) the applicant's commander was without authority to order members of his squadron to take the Anthrax shot, and any subsequent disciplinary actions taken against the applicant were improper. Neither of these arguments is meritorious.

Regarding the removal action, the applicant continues to insist that because the President did not approve the applicant's promotion removal recommendation within 18 months from the applicant's scheduled promotion date, he was promoted to lieutenant colonel effective December 2000 as a matter of law. Counsel obviously recognizes that the plain language of 10 USC § 14310 (promotion removal) does not support this argument, so he asks the Board to merge two separate and distinct statutes together, claiming that this is the only means by which Congressional intent can be divined. In an effort to support his position, counsel asserts that 10 U.S.C. § 14310 cannot operate independently, but must be applied in conjunction with 10 U.S.C. § 14311 (promotion delay). In doing so, counsel contends that the statutory 18 month deadline for promotion delays applies with equal force to promotion removal actions.

Applicant's argument fails because it violates a fundamental tenant of statutory interpretation: courts must give effect to the clear meaning of statutes as written. In a statutory construction case, the beginning point must be the language of the statute, and when a statute speaks with clarity to an issue, judicial inquiry into the statute's meaning, in all but the most extraordinary circumstance, is finished. Demarest v. Manspeaker, 498 U.S. 184 (1991). The statutory provision for promotion removals is clear and unambiguous. The President may remove the name of any officer from a promotion list at any time before the date on which the officer is promoted. As the language of § 14310 makes clear, the President is not bound to make this decision within any specific timeframe.

Obviously, Congress could have required promotion removals to be completed within 18 months, but chose not to. The rationale for their decision is evident. Congress recognized that a

188
EX K

promotion should be delayed while a disciplinary investigation is being conducted, a board of officers has been convened, or a criminal proceeding is pending against the officer. The delay gives the commander sufficient time to resolve uncertainties as to the appropriateness of promoting the officer. However, to prevent the delay from becoming indefinite, Congress imposed an 18-month limit on the delay period.

A promotion removal action however, requires a different decision making process. At this point, the commander has already determined that by a preponderance of the evidence (often through the information obtained during the promotion delay), the officer is unfit to assume the higher grade and is recommending to the President through the chain of command that the promotion be canceled. While a promotion removal action may involve delaying a promotion, the statutory purpose for the removal is distinct from the delay. A delay is meant to determine if the officer should be promoted, pending the outcome of existing inquires. In contrast, in a removal action, a commander has already made the decision that the officer is not fit to assume the higher grade.

Counsel's conclusion that the removal and delay laws must be read together "as part of a statutory scheme on the same subject" is simply not accurate and would, if followed, render § 14310 as subordinate and reliant upon § 14311; an outcome with no statutory basis. In effect, counsel is trying to create a new provision within § 14310 that does not exist.

Counsel further attempts to confuse the issue when he states that AFI 36-2504 requires a removal action to be initiated as a part of a promotion delay. The phrase "promotion propriety action" as used in the AFI is an umbrella term referring to promotion delays, removals, or information presented to the Secretary of the Air Force or a selection board that shows an officer may not be qualified for promotion. It does not, however, mean that the rules associated with a promotion delay are part and parcel the same as a promotion removal. In fact, the instruction differentiates between promotion delays and promotion removals by placing them into different sections within the AFI. Paragraph 7.5 defines the rules associated with promotion delays while paragraph 7.8 is reserved for promotion removals. As with 10 U.S.C. §§ 14310 and 14311, these two regulatory provisions are separate and distinct and must be applied as such. Nowhere in the AFI does it state that a promotion removal is subject to the rules for promotion delays. This is appropriate, given that the purposes of promotion delays and removals are not the same.

Additionally, counsel's argument that paragraph 7.8.7 requires a removal action to be completed within 18 months is erroneous. Paragraph 7.8.7 states, "Removal actions will be processed as expeditiously as possible. The total period of time that an officer's promotion is delayed pending decision on removal, including any prior period of delay under paragraph 7.5., should not exceed 18 months, excluding any period of delay attributable to the officer." The 18 month point is a standard that commander's should strive to meet when processing promotion removal actions; it is not however, an absolute requirement. This is evidenced by the use of the term "should" rather than a compulsory "must." Again, this comports with the fact that the law does not require a promotion removal action to be completed within a specific timeframe. Failure to meet this mark does not, in any way, negate the authority of the President to remove the officer's name from the promotion list or provide the applicant a legal expectation that he will be promoted if the 18 month goal is not met.

Counsel's lengthy discussion of various cases fails to acknowledge that no court has ruled a promotion removal action must take place within 18 months in order to be valid. Counsel's reliance on Rolader v. United States is unhelpful. Rolader dealt solely with a removal action that took place after the promotion delay period had ended. The court held that because the removal action had been initiated after the promotion delay expired, that by operation of law the promotion had already taken place. That analysis does not apply in the applicant's situation. The applicant's promotion was never delayed pursuant to § 14311, rather it was processed from the beginning strictly as a promotion removal under the provisions of § 14310 and AFI 36-2504. As previously discussed, the clear language of § 14310 does not impose an 18-month deadline for the President to act on a promotion removal. Consequently, Rolader does not apply in this case.

Likewise, counsel's enthusiasm for Barnes v. United States does not assist the Board either. Barnes involved an officer whose promotion had been delayed pending completion of administrative and disciplinary actions associated with nonjudicial punishment. The court determined that § 14311 did not authorize a promotion delay in order to complete purely administrative matters, and therefore the delay was improper from the outset. Consequently, the officer's promotion took place on the scheduled date and the removal action was invalid because it occurred after the promotion was already in effect. Because the applicant's promotion was removed in accordance with § 14310, the Barnes decision which dealt with whether a sufficient basis for a delay existed under § 14311, is not applicable.

It is further worth noting that during the discussion of Barnes, counsel references McCarthy v. United States in an attempt to bolster his claim that a federal court has previously "rejected the Air Force's argument that a commander's removal action with its indefinite delay always supercedes the outer limits on a pending delay period." Such a discussion is deceiving, as counsel does not mention that McCarthy was summarily reversed by the United States Court Of Appeals For The Federal Circuit (785 F.2d 326 (1985)) and therefore has no merit whatsoever.

The second prong of the applicant's argument is that Lt Col Padilla did not have the legal authority to order him to take the anthrax shot because it was an experimental or investigational drug and therefore required his informed consent. He maintains that any disciplinary action that was taken as a result of his refusal was improper. He relies on the recent Doe v. Rumsfeld decision issued by the D.C. Circuit in December 2003 to support his position.

The Doe case does not stand for the proposition that the DoD Anthrax Vaccine Immunization Program (AVIP) was administered in violation of the law. The court merely issued a preliminary injunction based on its determination that the FDA had not formally approved the vaccine against inhalation anthrax. It is important to recognize that the safety of the vaccine was the not the focus of the injunction, rather the issue dealt solely with the procedural question of whether the FDA had prepared a formal opinion to support an earlier verbal opinion the DoD had received from FDA officials. The court framed the issue in dispute: "Title 10 U.S.C. § 1107 and the attendant DoD regulation apply only if the *FDA* determines that AVA is an investigational drug or a drug unapproved for its present purpose." [italics in the original]. Thus, the only issue the court resolved was whether the FDA had made a formal determination to support earlier guidance given to the DoD.

In the absence of a formal FDA decision on whether the anthrax vaccine was experimental or investigational, the court took it upon itself to make a preliminary finding that it was. However, the court admitted that it was doing so only because the FDA had not issued a formal opinion. Once the FDA adopted the verbal guidance that had been previously given, the court immediately lifted its injunction. The court's preliminary determination that the AVA was an investigational drug is not binding because the court itself states that the FDA is the only agency that this court could properly defer to in determining the AVA's status. That in fact occurred in December 2003 when the court lifted the injunction. There was no requirement to obtain the applicant's informed consent prior to requiring him to obtain the anthrax shot.

What the applicant refuses to acknowledge or accept is that the removal action was not done simply because he refused to take the anthrax shot. The administrative actions that were taken, to include the LOR, UIF, referral OPR and promotion removal action resulted directly from the applicant's attempts to dissuade other members of the squadron from participating in the AVIP, undermining the authority of his commander, and his repeated efforts to cause dissension within the unit. That, in and of itself, is sufficient to warrant each of the administrative actions that were taken. Regardless of his personal views on the anthrax program, the applicant had absolutely no right, constitutional or otherwise, to make statements disloyal to his commander and to commit misconduct that was detrimental to the unit's mission. Such behavior is incompatible with that expected of an Air Force officer and warrants his promotion removal.

The applicant has failed to carry his burden of proving the existence of an error or injustice. We recommend his request for relief be denied.

HARLAN G. WILDER
Chief, Administrative Law Division
Office of The Judge Advocate General

Attachment:
Case File

DEPARTMENT OF THE AIR FORCE
WASHINGTON, DC

Office of the Assistant Secretary

MAY 21 2004

AFBCMR
1535 Command Drive
EE Wing 3rd Floor
Andrews AFB, MD 20762-7002

Major Marc J. Millican, USAFR, Retired
c/o Mr. John A. Wickham
32975 St. Moritz Drive
Evergreen, CO 80439

Dear Major Millican

The attached additional advisory opinion is provided for your review and comments. **THIS IS NOT THE DECISION OF THE AFBCMR ON YOUR APPLICATION** (AFBCMR Docket No. BC-2003-02505).

You have 30 days from the date of this letter to respond and/or submit additional matters in support of your request. If no response is received during this period, we will assume you do not wish to provide further comments and your case will be scheduled for consideration by the AFBCMR. If you need more time to comment, it is suggested that you request that your application be temporarily withdrawn until you are prepared to proceed. Your comments and/or submission of additional documentation should be addressed to:

AFBCMR
1535 Command Drive
EE Wing, 3rd Flr
Andrews AFB, MD 20762-7002

Please include your social security account number and/or your service number, and your AFBCMR docket number on all correspondence.

RAYMOND H. WELLER
Deputy Executive Director
Air Force Board for Correction
of Military Records

Attachment:
Ltr, HQ USAF/JAA, dtd May 15, 2004

cc:
Mr. John A. Wickham

/92
EX L

**Reply to:**
**32975 St. Moritz Drive**
**Evergreen, CO 80439**
**(303) 670-3825**
**Fax 670-1586**

**John A. Wickham, Esq.**
**Admitted in Virginia,**
**District of Columbia**
**& Military Courts**

# John A. Wickham & Associates
## Attorneys-at-Law

11 June 2004

Air Force Board for Correction of Military Records (AFBCMR)
Department of the Air Force
Washington D.C. 20330-1430

FAXED 11JUN04

Re: Dkt. BC-2003-02505,
MARC J. MILLICAN, Major, USAFR (Ret.) 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

SUBJECT: Reply to 4th advisory opinion forwarded 21 May 2004, Office of JAG

Board:

Applicant through counsel submits his reply to the 4th advisory opinion ("4Adv.Op.") dated 15 May 2004, with AFBCMR cover letter date 21 May 2004.

1. The 4Adv.Op relies on what it believes is the plain reading of the removal statute § 14310(a), in that a service may remove an officer from a promotion list "at any time." The 4Adv.Op then says this reading gives the Air Force *carte blanch* to remove an officer's name from a promotion list without any time constraints under the promotion delay statute, § 14311. However, the full statute allows removal "from a promotion list at any time *before* the date on which the officer is promoted [emphasis added]." This simply means that the statute is not concerned about delays in removal actions if they are completed by the President before the officer's actual scheduled appointment date from the existing promotion list. In other words, because such removal actions occur before the appointment date there is no delaying of a promotion date. If a recommendation for removal is not approved by the President before the scheduled promotion date, the appointment becomes automatically delayed thus triggering § 14311. It is common sense that Congress saw no need to insert an 18-month time limit on removals completed within § 14310, because there is nothing delayed.



193
EX M

A. The 4Adv.Op admits that it is a "promotion delay" when a pending removal action is not completed by the promotion list date. Presented with this dilemma, 4Adv.Op. argues this is not a delay within § 14311 because there are no "ongoing inquiries" or "uncertainties" into whether the officer is unfit to serve in the higher grade. But to answer the question posed, 4Adv.Op. looks to the delay statute that it claims is not relevant. It invokes subsection (a) of § 14311 by alleging that there is no delay in the absence of pending disciplinary actions, a board of officers, or criminal proceedings. See 4 Adv.Op., referring to § 14311(a)(1). This section is entitled "Delay During Investigations and Proceedings" with subparagraphs (A) - (C). The Adv.Op argues that once a removal recommendation is initiated by a commander, he "has already made the decision that the officer is not fit to assume the higher grade," so there is no delay of further proceedings.[1] As set forth below, the only triggering event that §§ 14310 and 14311 are concerned with is a delay of a scheduled promotion.

B. The author of the 4Adv.Op. did not read the entire delay statute, nor understand that Millican's removal action was not an investigatory delay under subsection (a). To preclude such post-hoc rationalizations, the statute contains a catch-all provision covering all situations that delay an appointment beyond the approved promotion list date. Delays under subsection (b) invoke the same due process without further inquires whenever "there is cause to believe that the officer is. . .morally or professionally unqualified." 10 U.S.C. § 14311(b)(Delay for Lack of Qualifications). This subsection does not condition a delay *pending further investigation* into whether the officer might be unqualified, but only when cause exists. Here, the cause to believe Millican was unqualified was the commander's determination to submit a recommendation to remove his name from the LTC promotion list, based upon a reprimand and referral OPR. AFI 36-2504 ¶ 7.5 (delay begins when removal action initiated); Barnes v. United States, 57 Fed.Cl. 204, 207 (2003)(under Navy Regulations, officer may be removed from promotion list only during a delay). Moreover, Millican's promotion was not delayed under the

---

[1] See also 4Adv.Op. at 2 ("A delay is meant to determine if the officer should be promoted, pending the outcome of existing inquiries.")

"pending investigation" subsection (a), but a delay invoking the exact language under subsection (b) for lack of qualifications. See attachment to 1Adv.Op. dated 26 Sep 03 (attached 21 May 2000 legal review of propriety of promotion action citing AFI 36-2504 ¶ 7.2). Regardless of the dubious argument of 4Adv.Op., the Air Force already invoked subsection (b) of the delay statute. Barnes, at 213 (rejecting Navy argument that delay period terminated when Article 15 proceedings ended; "cause" to disqualify is separate and additional statutory grounds for delay).

C. Under subsection (b), when Millican's removal action remained uncompleted at his appointment date in June 2000, his delay was then governed by the six month maximum delay limit without SAF extension under § 14311(d), with up to 18 months with SAF approval. See § 14311(d) (covers delays under either subsection (a) or (b)). In fact, because the commander had initiated the removal recommendation in March 2000 before his appointment date in June, the Air Force gave itself 21 months to complete the removal action before the 18 months expired in December 2001.

D. Another problem exists when the 4Adv.Op. argues that upon the removal recommendation there were no further "ongoing inquiries" into the officer's unfitness. A preliminary recommendation by a subordinate official that is not endorsed by the SAF, the SecDef, nor approved by the President, would transform a delay on-the-merits into a delay *pro forma* without effect. The statute presumes the President and his subordinates play meaningful roles. But 4Adv.Op. renders superfluous the removal statute's reserved Presidential powers by allowing a subordinate commander to conclusively act on the merits of an officer's fitness. Until the President agrees with the recommendation (and various endorsements) over the officer's rebuttal, the ultimate merits of the officer's fitness remain unresolved and subject to the Commander-in-Chief's discretion whether based upon an independent review or political considerations. Therefore, a commander's cause to question an officer's qualifications does not end the inquiry into his fitness, but requires officials senior to the recommending officer to weigh-in before forwarding it up the chain of command. This is why subsections (a) and (b) both fall under the delay statute's due process.

E. The 4Adv.Op claims that applicant cannot make the removal statute "subordinate and reliant" on the delay statute. However as noted above, the removal statute can operate independently if there is no delay for a removal completed *before* the officer's promotion list date. But if one takes the position of the 4Adv.Op to its logical conclusion, a commander could easily defeat the delay statute by simply initiating a removal recommendation pending the results of further investigations or proceedings. For example, a commander could defeat the 18-month limit by initiating a removal action when the OSI finds probable cause that an officer has committed an offense but an Article 15 proceeding is pending. Or a commander could find cause to disqualify and recommend removal but a senior commander disagrees and finds the officer qualified, but the next senior commander, acting beyond the 6-month deadline, reinstates the removal action. Subsection (b) forces a timely final resolution, otherwise the original promotion becomes effective automatically.

F. The 4 Adv.Op. now sees the fallacy in its first advisory opinion that argued a removal action is *always* a separate process. It now changes its story so that a removal action is a delay within § 14311(a) if there are "ongoing inquires" into the officer's fitness. The 4 Adv.Op appears to grudgingly admit §§ 14310 and 14311 do operate in tandem. Having invoked the delay statute in removal cases, the Air Force cannot ignore the full effect of the statute.

2. Because 4Adv.Op. admits removal actions must be read in conjunction with the delay statute, its regulatory argument falls apart. The opinion contends that in AFI 36-2504, delays and removals are "separate and distinct and must be treated as such," referring to ¶ 7.5 (delays) and ¶ 7.8 (removals). But ¶ 7.5 repeatedly states that a delay and removal are *not* separate. Paragraph 7.5 states that "a delay *also occurs* if an action begins to remove an officer from a promotion list [italics added]." Paragraph 7.5.2.1 then adds that promotion delays up to 6 months are automatic without SAF approval "upon initiation of a recommendation. . . .to remove that officer from the list." Paragraph 7.5 corresponds to the delay statute because ¶ 7.5.1 deals with pending investigations, and ¶ 7.5.2 deals with removals for lack of qualifications. Paragraphs 7.5.3 deals with notice and rebuttal, and ¶ 7.5.4 provides the 18

month limit. Lastly, the section covering time limits on removals, ¶ 7.8.7, refers back to ¶ 7.5 (total period should not exceed 18 months "including any period of delay under paragraph 7.5."). The interaction between ¶ 7.5 and ¶ 7.8 is consistent with the way the Barnes court read together the Navy's separate provisions for delays and removals. Barnes, at 207 (court reads Naval regulation as meaning removal from promotion list occurs only during a delay period).

A. The 4Adv.Op. did not comment on the Barnes court's rejection of the Navy's litigation counsel's argument that tried to differentiate its own delay and removal provisions. Barnes at 218 (counsel's argued this is a removal case not a delay case; "that position conflicts with the above regulatory constrains that a removal action be initiated during a period of delay"). Moreover, the AFBCMR has given the Air Force legal office two chances to comment on the Rolader warning that it has "serious misgivings about the enforceability"of an indefinite delay of an Air Force commander. Rolader at 787. Rather, because AFI 36-2504 is consistent with the other services' regulations, the Air Force's argument in Rolader appears now simply as merely its litigation counsel's personal spin commonly referred to "artful pleading." The Barnes case shows that a similar approach is untenable to argue promotion removals and delays are apples and oranges.

B. Lastly, Barnes distinguished the McCarthy promotion delay case that was reversed on appeal. McCarthy v. U.S., 785 F.2d 326 (Fed.Cir. 1985)(Table). Because the unpublished reversal was not reported, the Barnes court could ignore it because the reversal is of "questionable precedence." Id at n. 17. In fact, the Barnes court cited the lower court's decision with approval as consistent with current delay statutes passed in 1996, and case law under Law v. United States, 11 F.3d 1061, 1065 (Fed.Cir. 1993)(court is not ordering a promotion but only recognized under statute that it already occurred). Barnes at n. 17. Moreover, other courts subsequently cited the lower McCarthy case for its rules of law. Long v. United States, 12 Cl.Ct. 174, 176 (1987); Schumacher v. United States, 12 Cl.Ct. 195, 197 (1987).

1. Table decisions without reported opinions also mean the reasons are unique to the facts of that one case and thus have no binding effect on other similar cases. It appears the Barnes



/97

court did obtain the unreported reasons for the reversal by implying that McCarthy court in 1985 did not yet have statutory authority under then 10 U.S.C. § 8380(c), the predecessor to § 14311 (1996), to recognize a promotion. Id n. 17 ("[after guidance from Law,] the court in this case has applied objectively determinable records facts to statutory and regulatory mandates"). This delay statute predecessor before ROPMA in 1996 did not grant equality to reserve officers because promotions could be delayed indefinitely by a service secretary if "in the public interest." See Nation v. Dalton, Sec'y of Navy, 107 F.Supp.2d 37, 43, n. 6 (D.D.C.2000)(Naval officer's promotion delay in 1995 governed not under § 14311 but under prior indefinite delay provision § 5902(d) if in the public interest). The McCarthy court only relied on the Air Force regulation AFR 36-89 (1977) without a statutory mandate, while the court agreed "it lacks jurisdiction to promote plaintiff". Id n. 7. It is safe to assume that McCarthy was reversed on these limited grounds.

3. In response to Doe v. Rumsfeld, the 4Adv.Op finally argues that only the FDA had the right to determine whether the Anthrax vaccine was safe, and if not then offer informed consent. Id ("the FDA is the only agency that the court could defer to in determining the AVA's status."). But this admission boxes the Air Force into a corner because Millican's commander, LTC Padilla, had no official or independent authority prior to the FDA Final Rule in 2003 to compel the vaccine on grounds that is was safe and effective. LTC Padilla was not the agent of the FDA. Moreover, the DoD admitted that the 2003 Final Order "marks the culmination of extensive agency consideration *finalized in the week prior to* the Court's preliminary injunction [italics added]." DoD Brief at 2. This begs the question whether it was arbitrary for LTC Padilla in 1999 to order his unit to take the vaccine when safety and efficacy were in doubt. Moreover, there is a legal presumption that if the FDA has not resolved the safety and effectiveness of AVA, then a lawful order cannot issue to vaccinate— by voluntary consent or otherwise. That is why the court argued DoD was using its troops as "guinea pigs" because in effect, they became an unwitting part of a unapproved field process to determine safety in lieu of the FDA doing its job in a lab and through the adjudication process.



198

A. Even assuming that Millican could not for himself find that the AVA was investigational under 10 U.S.C. § 1107, the order remains unlawful: the court rejected the alternative policy reason to continue the AVA as a matter of "military expediency" in the War on Terrorism because the FDA process was too burdensome. Mem. at 30. It is nonsense to argue that Millican had to accept the vaccine to protect himself from the dangers of Anthrax when DoD refused to determine if the vaccine was not a danger to his health. Moreover, Millican did not foment discord by arguing the AVA was an informed-consent investigational drug, but only repeated Congressional testimony that the vaccine was not yet proven safe and effective. Finally, the 4Adv.Op appears to absurdly imply that Millican should not have instigated disloyalty to not take AVA, but should have joined the Doe lawsuit as a co-plaintiff to force a halt to the entire program. Whether a litigant or whistle-blower makes little difference because administration of the AVA in 1999 could not support a lawful order of forced vaccination under threat of disciplinary action.

B. The remainder of the reply by 4Adv.Op offers only empty rhetoric. It does not dispute the military case law holding that an order is unlawful if the official giving it was without authority to do so. Nor does it dispute case law affirming a service-member's First Amendment rights to association to speak out against arbitrary command action. The cornerstone of arbitrary and capricious agency action is the failure to consider all the relevant factors. Citizens to Protect Overton Park v. Volpe, 401 U.S. 402 (1971). The federal laws designed to first assure the safety and efficacy of drugs forced upon US citizens, is certainly a relevant factor.

C. Finally, in Doe v. Rumsfeld, the court held a hearing on the motion and cross-motion for summary judgment on May 25, 2004. Although the transcript is not available on-line at the court website, a newspaper article reported on the hearing remarks by district court judge Sullivan, entitled "Judge See Little Evidence To Support Anthrax Vaccine," *Washington Post,* page A25, May 26, 2004.[2] The article reports that Sullivan presaged an adverse ruling against DoD, because he

> had significant doubts about whether the federal government has enough scientific evidence to show that the anthrax vaccine required for military personnel is either safe or effective. . . "one of the most jumbled, confusing processes I have ever seen."

---

[2] http://www.washingtonpost.com/wp-dyn/articles/A55581-2004May25.html.



/99

CONCLUSION

For the foregoing reasons, the AFBCMR should grant relief as set forth in applicant's petition.

John A. Wickham, Esq.
Attorney for Millican



200

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

**No. 04-5440**

**September Term, 2005**

FILED ON: FEBRUARY 9, 2006 [948693]

JOHN DOE, 1 THROUGH 4; JANE DOE, 1 THROUGH 2; AND OTHER SIMILARLY SITUATED INDIVIDUALS,
APPELLEES

v.

DONALD H. RUMSFELD, SECRETARY OF DEFENSE, ET AL.,
APPELLANTS

---

Appeal from the United States District Court
for the District of Columbia
(No. 03cv00707)

---

Before: RANDOLPH, TATEL, and GRIFFITH, *Circuit Judges*.

## JUDGMENT

This case was considered on the record from the United States District Court for the District of Columbia and on the briefs and arguments of the parties. It is

**ORDERED AND ADJUDGED** that the case be remanded to the district court because the appeal is moot. At issue here is—or rather, was—the validity of a permanent injunction forbidding the Department of Defense from administering anthrax vaccine adsorbed (AVA) to members of the military without their consent. By its own terms, that injunction remained in effect "[u]nless and until FDA classifies AVA as a safe and effective drug for its intended use." *Doe v. Rumsfeld*, No. 03-707 (D.D.C. Oct. 27, 2004) (order granting plaintiffs' motion for summary judgment) ("Summ. J. Order"). In its order of December 19, 2005, FDA did just that, namely, classified AVA as "safe and effective and not misbranded." Implementation of Efficacy Review; Anthrax Vaccine Adsorbed; Final Order, 70 Fed. Reg. 75,180, 75,182 (Dec. 19, 2005).

By its own terms, then, the injunction has dissolved, and this case no longer presents a live

controversy on which we may pass judgment. *See Nat'l Black Police Ass'n v. District of Columbia*, 108 F.3d 346, 349 (D.C. Cir. 1997) ("a live controversy must exist at all stages of review"). Although the parties still dispute whether AVA's original 1970 license takes it outside the definition of "drug unapproved for its applied use" within the meaning of 10 U.S.C. § 1107(g)(2), resolving that issue would have no practical effect on the now-dissolved injunction, and we have "no power to . . . decide questions that cannot affect the rights of litigants in the case before [us]." *Nat'l Black Police Ass'n*, 108 F.3d at 349 (internal quotation marks removed).

The government argues that the case is not moot because the district court's final order "encompasses a declaration that the vaccine's 1970 license does not extend to inhalation anthrax." Reply to Opp'n to Appellant's Mot. to Govern Further Proceedings 2. As we read the district court's order, however, it never granted such declaratory relief, nor any other relief except the injunction. *See* Summ. J. Order.

In the event we find the case moot, the government urges us to vacate the district court's opinion. We decline to do so, and instead remand with instructions to the district court to consider that request. *See U.S. Bancorp Mortgage Co. v. Bonner Mall P'ship*, 513 U.S. 18, 29 (1994) ("a court of appeals presented with a request for vacatur of a district-court judgment may remand the case with instructions that the district court consider the request").

Pursuant to D.C. Circuit Rule 36, this disposition will not be published. The clerk is directed to withhold issuance of the mandate herein until seven days after resolution of any timely petition for rehearing or rehearing en banc. *See* Fed. R. App. P. 41(b); D.C. Cir. R. 41.

*Per Curiam*
**FOR THE COURT:**
Mark J. Langer, Clerk

BY:

Michael C. McGrail
Deputy Clerk